Original

GEORGE W. SHUFELT
NAME
T-65128
PRISON NUMBER
KERN VALLEY STATE PRISON
P.O. BOX 5103
CURRENT ADDRESS OR PLACE OF CONFINEMENT

DELANO, CA 93216
CITY, STATE, ZIP CODE





FILED

JUN - 2 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

GEORGE W. SHUFELT                    ,
(FULL NAME OF PETITIONER)
                              **PETITIONER**

v.

A. HEDGPETH   , WARDEN          ,
(NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER [E.G., DIRECTOR OF THE
CALIFORNIA DEPARTMENT OF CORRECTIONS])

                              **RESPONDENT**
             and

EDMOND G. BROWN JR.            ,
The Attorney General of the State of
California, Additional Respondent.

Civil No **'08 CV 0991 JAH CAB**
(TO BE FILLED IN BY CLERK OF U.S. DISTRICT COURT)

**PETITION FOR WRIT OF HABEAS CORPUS**

UNDER 28 U.S.C. § 2254
BY A PERSON IN STATE CUSTODY

1.   Name and location of the court that entered the judgment of conviction under attack: _____
     Superior court State of California, County of San Diego County(Downtown)

2.   Date of judgment of conviction: June 27, 2002

3.   Trial court case number of the judgment of conviction being challenged: _____
     Case No. SCD163510

4.   Length of sentence: 19 years, 8 months

CIV 68 (Rev. Jan. 2006)

5. Sentence start date and projected release date: <u>August 12, 2001, start date;</u>
<u>February 28, 2018; projected release date.</u>

6. Offense(s) for which you were convicted or pleaded guilty (all counts): <u>Burglary P.C.§459,</u>
<u>460 (x4); Receiving Stolen Property P.C. §496(x5); Unlawful taking</u>
<u>of a auto, P.C. §10851; Resisting an Officer, P.C. §148(A)(1)</u>

7. What was your plea? (CHECK ONE)
   - (a) Not guilty        ☒
   - (b) Guilty            ☐
   - (c) Nolo contendere   ☐

8. If you pleaded not guilty, what kind of trial did you have? (CHECK ONE)
   - (a) Jury         ☒
   - (b) Judge only ☐

9. Did you testify at the trial?
   ☐ Yes  ☒ No

## DIRECT APPEAL

10. Did you appeal from the judgment of conviction in the **California Court of Appeal**?
    ☒ Yes  ☐ No

11. If you appealed in the **California Court of Appeal**, answer the following:
    - (a) Result: <u>Denied</u>
    - (b) Date of result (if known): <u>November 13, 2003</u>
    - (c) Case number and citation (if known): <u>No. D040805, 2003 WL 22674780</u>
    - (d) Names of Judges participating in case (if known) <u>McConnell, Haller, and</u>
      <u>O' Rourke</u>
    - (e) Grounds raised on direct appeal: <u>Utah conviction is not a qualifying</u>
    <u>serious felony; Denied right to jury trial on strike allegation.</u>

12. If you sought further direct review of the decision on appeal by the **California Supreme Court** (e.g., a Petition for Review), please answer the following:
    - (a) Result: <u>Review Denied</u>
    - (b) Date of result (if known): <u>February 18, 2004</u>
    - (c) Case number and citation (if known): <u>S121327</u>

    - (d) Grounds raised: <u>Utah conviction is not a qualifying serious</u>
    <u>felony; Denied right to jury trial on strike allegation.</u>

13. If you filed a petition for certiorari in the **United States Supreme Court**, please answer the following with respect to that petition:

    (a) Result: _N/A_____

    (b) Date of result (if known): _____

    (c) Case number and citation (if known): _____

    _____

    (d) Grounds raised: _____

    _____

    _____

    _____

    _____

## COLLATERAL REVIEW IN STATE COURT

14. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Superior Court**?
☒ Yes  ☐ No

15. If your answer to #14 was "Yes," give the following information:

    (a) **California Superior Court** Case Number (if known):_HC18018_____

    (b) Nature of proceeding: _Petition for Habeas Corpus_____

    _____

    (c) Grounds raised: _I.A.C. trial counsel; I.A.C. Appellate counsel;_
Prosecutor Misconduct, Jury instruction error, unauthorized_____
sentence, ect...(28 claims)_____

    _____

    (d) Did you receive an evidentiary hearing on your petition, application or motion?
    ☐ Yes  ☒ No

    (e) Result: _Denied_____

    (f) Date of result (if known): _January 24, 2007_____

16. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Court of Appeal**?
☒ Yes  ☐ No

17. If your answer to #16 was "Yes," give the following information:

    (a) **California Court of Appeal** Case Number (if known): D051016

    (b) Nature of proceeding: Petition for Habeas corpus

    (c) Names of Judges participating in case (if known) Haller, McDonald, and McIntyre.

    (d) Grounds raised: I.A.C. Trial counsel; I.A.C. Appellate counsel; unauthorized sentence; jury instruction error; Prosecutor Misconduct ect...

    (e) Did you receive an evidentiary hearing on your petition, application or motion?
    ☐ Yes ☒ No

    (f) Result: Denied

    (g) Date of result (if known): August 17, 2007

18. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Supreme Court**?
☒ Yes ☐ No

19. If your answer to #18 was "Yes," give the following information:

    (a) **California Supreme Court** Case Number (if known): S157353

    (b) Nature of proceeding: Petition for Habeas Corpus

    (c) Grounds raised: I.A.C. Trial counsel; I.A.C. Appellate counsel; Sentence unauthorized; Jury instruction error; Prosecutor Misconduct; ect...

    (d) Did you receive an evidentiary hearing on your petition, application or motion?
    ☐ Yes ☒ No

    (e) Result: Denied

    (f) Date of result (if known): August 30, 2008

20.  If you did *not* file a petition, application or motion (e.g., a Petition for Review or a Petition for Writ of Habeas Corpus) with the **California Supreme Court**, containing the grounds raised in this federal Petition, explain briefly why you did not:

  N/A
  _____

  _____

  _____

  _____


## COLLATERAL REVIEW IN FEDERAL COURT

21.  Is this your **first** federal petition for writ of habeas corpus challenging this conviction?
  ☒ Yes ☐ No     (IF "YES" SKIP TO #22)
  (a)  If no, in what federal court was the prior action filed? _____
    (i)  What was the prior case number? _____
    (ii) Was the prior action (CHECK ONE):
       ☐ Denied on the merits?
       ☐ Dismissed for procedural reasons?
    (iii) Date of decision: _____
  (b)  Were any of the issues in this current petition also raised in the prior federal petition?
    ☐ Yes ☐ No
  (c)  If the prior case was denied on the merits, has the Ninth Circuit Court of Appeals given you permission to file this second or successive petition?
    ☐ Yes ☐ No

CAUTION:
  • **Exhaustion of State Court Remedies:**  In order to proceed in federal court you must ordinarily first exhaust your state court remedies as to each ground on which you request action by the federal court.  This means that even if you have exhausted some grounds by raising them before the California Supreme Court, you must first present *all* other grounds to the California Supreme Court before raising them in your federal Petition.

  • **Single Petition:**  If you fail to set forth all grounds in this Petition challenging a specific judgment, you may be barred from presenting additional grounds challenging the same judgment at a later date.

  • **Factual Specificity:**  You must state facts, not conclusions, in support of your grounds.  For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do.  A rule of thumb to follow is — state who did exactly what to violate your federal constitutional rights at what time or place.

23. Do you have any petition or appeal **now pending** in any court, either state or federal, pertaining to the judgment under attack?
☒ Yes ☐ No

24. If your answer to #23 is "Yes," give the following information:
   (a) Name of Court: Court of Appeals, State of California
   (b) Case Number: D050975 (Spr Ct GIC894071)
   (c) Date action filed: June 17, 2005
   (d) Nature of proceeding: Civil Action for Declaratory Relief

   (e) Name(s) of judges (if known): McConnell, Haller, O'Rourke
   (f) Grounds raised: Appellant seeks declaration prosecution must prove additional elements of "personal infliction" of G.B.I, or use of deadly weapon before prior conviction for Vehicular Manslaughter can qualify as a "Strike" prior, sentence unauthorized.

   (g) Did you receive an evidentiary hearing on your petition, application or motion?
   ☐ Yes ☒ No

25. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
   (a) At preliminary hearing: N/a
   (b) At arraignment and plea: PRO PER
   (c) At trial:
   (d) At sentencing:
   (e) On appeal:
   (f) In any post-conviction proceeding:
   (g) On appeal from any adverse ruling in a post-conviction proceeding:

26. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
☐ Yes  ☒ No

27. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
☐ Yes  ☒ No

   (a) If so, give name and location of court that imposed sentence to be served in the future:

   _____

   (b) Give date and length of the future sentence: _____

   _____

   (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
   ☐ Yes  ☐ No

28. Consent to Magistrate Judge Jurisdiction

In order to insure the just, speedy and inexpensive determination of Section 2254 habeas cases filed in this district, the parties may waive their right to proceed before a district judge and consent to magistrate judge jurisdiction. Upon consent of all the parties under 28 U.S.C. § 636(c) to such jurisdiction, the magistrate judge will conduct all proceedings including the entry of final judgment. The parties are free to withhold consent without adverse substantive consequences.

The Court encourages parties to consent to a magistrate judge as it will likely result in an earlier resolution of this matter. If you request that a district judge be designated to decide dispositive matters, a magistrate judge will nevertheless hear and decide all non-dispositive matters and will hear and issue a recommendation to the district judge as to all dispositive matters.

You may consent to have a magistrate judge conduct any and all further proceedings in this case, including the entry of final judgment, by indicating your consent below.

Choose only one of the following:

☒ Plaintiff consents to magistrate judge jurisdiction as set forth above.

**OR**

Plaintiff requests that a district judge be designated to decide dispositive matters and trial in this case.

**29.** Date you are mailing (or handing to a correctional officer) this Petition to this court: _____

_May 28, 2008_

Wherefore, Petitioner prays that the Court grant Petitioner relief to which he may be entitled in this proceeding.

_George W. Shufer_
_____
SIGNATURE OF ATTORNEY (IF ANY)

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

_May 28, 2008_     _____    _George W. Shufer_
(DATE)                              SIGNATURE OF PETITIONER

CIV 68 (Rev. Jan. 2006)

cv

JS44
(Rev. 07/89)

## CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**FILED**

**JUN - 2 2008**

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**I (a) PLAINTIFFS**

George W. Shufelt

Hedgpeth, et al

**(b) COUNTY OF RESIDENCE OF FIRST LISTED** Kern
**PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

George W. Shufelt
PO Box 5103
Delano, CA 93216
T-65128

ATTORNEYS (IF KNOWN)

**'08 CV 0991 JAH CAB**

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

**28 U.S.C. 2254**

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ 160 Stockholders Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ Other Contract | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☒ 530 General | ☐ Security Act | | |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding   ☐ 2 Removal from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23   DEMAND $ _____   Check YES only if demanded in complaint:   **JURY DEMAND:** ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**   JUDGE _____   Docket Number _____

DATE   6/2/2008   SIGNATURE OF ATTORNEY OF RECORD   *R Miller*

# STATEMENT OF THE CASE

## CASE NO. SCD161961

On August 12, 2001, petitioner was arrested at 5334 Westknoll Lane, in the Pacific Beach, La Jolla area.

On 08/14/01, petitioner war arraigned in Municial Court.

On 08/28/01, a preliminary hearing was held. Petitioner was bound over to Superior Court on information alleging 3 count's (1)-(3) of P.C. 459x(3), Count (4) V.C. 40851(d), court (5) P.C.496, count (6) P.C.484, and count (7) P.C. 148(a)(1).

On 09/12/01, petitioner was arraigned on Information SC0161961.

Trial date was set for 11/01/01, in Department 31.

On 10/26/01 People moved to dismiss Information, which was Granted by the trial court.

## CASE NO. SCD163510

Prosecution filed a new complant on 10/30/01, SCD16351, charging P.C.459x(3), V.C. 10851(a), P.C. 496(a)x(4), P.C. 848, P.C. 148(a)(1).

On 11/20-26/01 a second preliminary hearing was held while petitioner was in Pro-Per.

Petitioner was bound-over on Information and subsequently arraigned on 12/18/01.

On December 5th, 2001, a new eleven count information was filed against petitioner, GEORGE W. SHUFELT (petitioner), charging him with offenses occurring on August 12, 2001, (CT 1-11). Count 1 charged the theft of William Wadsworth's vehicle in violation of Vehicle Code section 10851(a). Count 2 charged a related offense of receiving a a stolen motor vehicle in violation of section 496(d). Count 3 consisted of burglary of an inhabited dwelling, Goedhuys residence, P.C. 459, 460. Count 4 consisted of burglary of an inhabited dwelling, Rahilly residence, P.C.459,460. Count 5 consisted

of burglary of an inhabited dwelling, as to the Hammerling residence, P.C. 459,460.

Count 6 consisted of burglary of an inhabited dwelling, McCarthy residence, P.C. 459.

Count's 7-10, consisted of Reciving stolen property belonging to victims of

the four residential burglary count's, P.C. 496(a)x(4). Count 11 charged a misdemeanor

resisting  arrest in violation of section P.C.148(a)(1).

In addition the information alleged petitioners Automobile Homicide convicion

in Utah in 1995 constituted both a serious felony (five-year) prior (P.C.667(a)(1),

668, 1192.7(c)) and a strike prior (P.C. 667(b)-(i), 668, 1170.12).

## TRIAL/CONVICTION

After numerous and lengthy pretrial and in limine motions, jury trial commenced

on June 17, 2002. (RT 1429). On June 27, 2002, the jury returned verdicts finding

petitioner guilty on all counts. (CT.704-714, RT.2899-2900.)

At a bifurcated trial, the jury foudn appelant had suffered the Utah automobile

homicide conviction. (CT 669,717;RT. 2952) The sole issue presented to the jury was

whether Petitioner had suffered the prior conviction. (RT.2940-2941.) The legal

significance of that conviction is the subject of petitioners first four claims.

On August 22, 2002, Petitioner was sentenced to a total of 19 years and 8 months

(CT.6040606;RT.3185-3188). Some 12 years 4 months of petitioners sentence was because

of the Strike allegation. Petitioner has no prison prior's.

On one burglary charge (Count 3) Petitioner received a sentence of eight years

(the four-year midterm boubled because of the strike). Consecutive sentences of two

eight months (1/3 the midterm doubled because of the strike) were imposed on two

other burglary charged (Counts 4 and 5). A two-year, eight-month sentence was imposed

on the fourth burglary charge (Count 6) to run concurrently to the other sentences.

A one-year, four month consecutive sentence was imposed on the unlawful taking of a

vehicle charge (Count 1). A five-year sentence was imposed for the serious felony

prior.

pg.2

15

A time-served sentence was imposed on the misdemeanor charge. Sentences on all remaining counts were properly stayed under section 654.

A timely notice of appeal was filed on August 28, 2002. (CT. 597.)

DIRECT APPEAL

On March 20th, 2003, appointed Appellate counsel filed opening brief, alleging two contentions, both pretained to the strike allegation. DO40805

1. Appellant's Utah conviction was not a "serious" felony.

2. The court prejudicially erred in removing from the jury the question of the nature of Appellants prior conviction. (See; Exhibit "E" Opening Brief)

Neither contention alleged Federal Constitutional error. Nor did any contention raised by Appellate Counsel in petitioners direct appeal challenge the conviction. Appellate Counsels letter to petitioner dated March 20, 2003, (Exhibit "V") states appellate counsel determined that no other arguments deserved briefing.

On November 13th, 2003, Appellate Court denied Both issues raised on direct Appeal. (See; Exhibit "H" Appellate court opinion).

REVIEW SUPREME COURT

On December 18, 2003, a petition for review was filed raising both contentions which were denied on direct appeal.

On February 19, 2004, petition for review was denied.

1 | HABEAS CORPUS PROCEEDINGS, HC18018

2      On january 19, 2005, petitioner filed by prison mail, a massive petiton alleging

3  27 claims, attacking both petitioners lengthly trial and use of his Utah conviction

4  as a "serious" flony, under ineffective assistance of appellate counsel, and trial

5  counsel. Petition was some 600 pages long, without exhibits.

6      On January 26, 2005, the Superior Court, County of San Diego, stamp filed

7  petition and assigned case no. HC18018.

8      On March 17, 2005, the Honorable Howard H. Shore, issued his order summarily

9  benying petitioners first 5 claims, grounds 1 through 5, but then ordered the District

10  Attorney to informally respond to petition grounds 6 through 27. (See; Order March

11  17, 2005, attached; exhibit "S")

12      On June 30, 2005, the people filed informal response to petitioners remaining

13  21 claims.

14      On October 20, 2005 the superior Court, ordered appointment of counsel from

15  the San Diego County Public Defenders.

16      On January 13, 2006, the San Diego public Defenders declared a conflict and

17  the Public Defender was relieved.

18      On January 25, 2006, Private Conflicts Counsel, by W. Allan Williams took over

19  representation of petitioners case.

20      On August 21, 2006, Attorney Al Williams filed his supplemental pleading in

21  support of petition for habeas corpus.

22      On December 12, 2006, the District Attorney of San Diego Filed his second

23  informal response to the petition. Appointed Counsel did not file a reply.

24      On January 24, 2007, Superior Court Judge Howard H. Shore, filed his final order

25  denying remaining grounds 6 through 28, without ordering an evidentry hearing.

26      However, petitioner did not receive a copy of the courts order until May 7,

27  2007, after beinging informed that his petition was denied by counsel on March 30,

28  2007. Petitioner had to request his copy from the clerk of the superior court.

(See. Brd. One)

17

## STATEMENT OF FACTS

During the evening of August 11, 2001, William Wadsworth parked his 1985 red Saab on the street near the front of his home on Playa del Norte in La Jolla. (RT 1760, 1762.) The doors were locked but the keys were jammed in the ignition and would not come out. (RT 1762.) Wadsworth placed a rag over the keys and left the sun roof open. (RT 1762-1763.) When he came out the next morning, the car was gone. (RT 1761.) He had given no one permission to take it. (RT 1763-1764.) Wadsworth later identified some property that had been impounded by the police as coming from his Saab. (RT 1766-1767, 2344-2347.)

On August 12, 2001, at approximately 6:12 a.m., the San Diego Police Department ("SDPD") received a radio call to do an investigation of vehicle tampering at 330 Play Del Sur Street. (RT 1760-1761.) This address is about 150 yards from Wadsworth's address. (*Ibid.*) A few minutes earlier, the reporting party, Jack Bieser, saw Appellant, whom he had previously seen in the neighborhood, searching through Bieser's belongs in the trunk of his car. (RT 1777-1778, 1780,1801-1802.) Appellant had no shirt or shoes on and was wearing green shorts. (RT 1790.) Bieser grabbed Appellant and tried to restrain him but Appellant got away. (RT 1782.) About an hour later, he saw Appellant again and started chasing him. (RT 1783-1785.) At this time, Appellant was wearing khaki pants, a Pendleton shirt, and cap. (RT 1784,

4

E-046

49



1800.) Appellant ran toward Wadsworth's Saab and Bieser heard it speed away. (RT 1786, 1802.)

At about 10:15 a.m., on August 12, 2001, Diana Goedhuys, who lived in the same neighborhood at 5414 Bahia Lane, was in the upstairs of her home taking a shower. (RT 1774-1775, 1833, 1836.) She was expecting her accountant at 10:30 a.m. (RT 1836.) She heard her dog barking, got out of the shower, dressed quickly and walked out to her attached garage which had been converted to an office with entry directly into the house. (RT 1833-1834, 1836, 1853, 1866.) She saw a white male, later identified as Appellant, coming out of the office. (RT 1837, 1839-1840, 1849.) She asked Appellant if she could help him and he told her he was looking for a contractor for a lot that was nearby. (RT 1838.) She noticed he was carrying a checkbook and a camera like those which she kept in her office. (RT 1837, 1840.) Goedhuys asked Appellant if it was his camera and he had a nervous look on his face. (RT 1848.) She decided not to confront him. (RT 1848-1849.) Appellant walked away and moments later Goedhuys saw an older red Saab driving away from near the front of her house. (RT 1842, 1844, 1901-1902, 1921, 1924, 2681.) She checked around and saw that her desk drawers had been opened. (RT 1845, 1846.) A book of checks was missing from the drawer and a camera from the bookshelf. (RT 1845-1846.) She also saw other items of her property had been piled up outside next to her husband's van. (RT 1835,

5

1846.) The checkbook and camera were later recovered from the Corden residence and returned to her. (RT 1847-1848, 2236-2237.)

While police were in the area, at 5261 Vickie Drive, Carlton Corden flagged them down. (RT 2108, 2233.) While checking his property, he found two backpacks on the south side of the house, next to the garage. (RT 2111.) The police took them. (RT 2112.) Property found in these bags was later determined to include the checkbook and camera stolen from Goedhuys and backpacks and a checkbook that had apparently been taken from the Michael Rahilly residence with a listed address nearby of 2168 Belloc Court. (RT 2234, 2235-2237.)

The officers then drove to Michael Rahilly's nearby address at 2168 Belloc Court. (RT 1950-1951.) He was able to identify property in the backpacks picked up at Corden's as his and the backpacks were also his. (RT 1954-1957.) This property was returned to him. (RT 2233, 2238-2239.) Rahilly had just flown in from Arizona that morning, August 12th. (RT 1959, 1968.) Upon arriving home, he parked his Honda Accord in the driveway and took out the backpacks and put them into his Ford Explorer which was open and in his garage which was also open. (RT 1951-1953.) He then went into the house. (RT 1954.) The garage was attached to the house and a door from the garage opened into the kitchen. (RT 1953.) A shirt belonging to Rahilly was found later at the McCarthy home and it, along with other property taken

6

from Rahilly, was ultimately returned to him. (RT 1959-1960, 2344-2347.)

On August 12, 2001, SDPD Officer Rose was dispatched on an evidence call to the McCarthy residence at 5323 Calle Vista which was in the same area as the just mentioned incidents. (RT 2154.) Justin McCarthy and his wife had been gone from about 10:00 a.m. until 6:00 p.m. that day. (RT, 2156.) When they got home and opened the garage door, they found the side door of their attached garage had been pushed open and items were knocked over. (RT 2155-2157.) As she checked her car in the garage, Mrs. McCarthy discovered the interior had been rummaged through and she was missing a brand-new pair of white pants which had been left in the car. (RT 2159.) A bicycle had also been taken. (RT 2157-2158.) Mrs. McCarthy found a pair of pants and a shirt, later identified as belonging to Rahilly, next to her car. (RT 2243-2244, 2163-2164.) She also found some identification cards in the name of Charles Mirabile who also lived in the neighborhood. (RT 2241-2246, 2162, 2164.) These cards were apparently taken from Mirabile's car and they were returned to him. (RT 2205-2211.)

When Appellant was later seen by SDPD Officer Robert Herzig, he was wearing McCarthy's white pants and pushing the bicycle taken from the McCarthy garage. (RT 2184-2185, 2192, 2283, 2300, 2318.) Herzig contacted Appellant and asked him for some "ID." (RT 2287.) Appellant said he would go home to get it and then turned and took off, dropping the bike as he ran off.

7

(RT 2287, 2291.)

SDPD took another call at about 1:15 p.m. on August 12, 2001, to investigate a burglary at 2497 Baja Cerro Court, the Hammerling home which again was in the general area of the other incidents. (RT 1974-1976, 1983.) Peter Hammerling and his son Philipe Hammering had left the door of their attached garage open that morning. (RT 1976, 1977.) While Philipe was putting some bottled water in the refrigerator in the garage, he saw a man near the front of his mother's BMW. (RT 1979, 1997-2001.) He asked the man, fitting the description of Appellant, what he was doing. (RT 1979-1980.) The man apologized and said he must have had the wrong house. (*Ibid.*) The man walked quickly to a red, older model Saab and left in the vehicle. (RT 1980, 1982.) Philipe was able to get the last three numbers of the license plate and these matched those on Wadsworth's Saab. (RT 1981, 2204.) Philipe then checked his mother's BMW and noticed that a coin box containing around $2.00 in coins was taken. (RT 1984.) A Sony car phone had also taken along with a Nokia car phone taken out the Honda. (RT 1985, 1988.) These phones were later recovered by the police from at the nearby Steibel/Stankowski home and returned to the Hammerlings. (RT 2098, 2099, 2344-2347.) The Hammerlings also discovered an open bottle of Molson's beer on the garage floor. (RT 1990.) Appellant's fingerprint was found to be on this bottle. (RT 1991-1992, 2005-2006, 2012, 2014, 2075-2077, 2668-2670.)

On August 12, 2001, Mercedes Stankowski was standing in her kitchen at 5320 Westknoll Lane which was in the neighborhood. (RT 5320.) She observed a male wearing a hat and carrying something run by. (RT 2095,2102.) John Steibel, her husband, returned home a short time later and looked around his house. (RT 2095, 2102.) He found some cloth bags in his trash area and several cellular telephones in his front yard. (RT 2098, 2099.) The police were notified and picked up the items. (RT 2100-2101.) Steibel also noticed a red Saab parked in front of his house that he did not recognize. (RT 2096-2097, 2202.)

On August 12, 2001, at around 3:00 p.m., SDPD Officer Dale Flamand responded to assist in the search for a burglary/auto theft suspect. (RT 2182.) Flamand was able to see a male (later identified as Appellant) running up the hill on 5300 West Knoll with another officer chasing him. (RT 2186-2187, 2194.) Flamand joined in the chase and the male jumped the fence and ran to the rear sliding glass door of the home of Corine Miller at 5334 Westknoll Drive. (RT 2188-2189.) Flamand told him to stop and Appellant yelled back, "No." (RT 2189.) He ran into the house and out into the garage. (*Ibid.*) It was dark in the garage and Appellant charged the officer and pushed him backwards with both hands. (*Ibid.*) Both fell to the ground. (*Ibid.*) Flamand struck a washing machine and injured his lower back. (RT 2189, 2191-2192) Appellant began to strike the officer with his elbows and Flamand struck

9

Appellant three or four times with a closed fist in his right side. Officer

Flamand decided to use a carotid restraint on Appellant and Appellant yelled,

"Ok, Ok, don't kill me." (RT 2190.) Other officers arrived on the scene and

Appellant was handcuffed. (RT 2191.)

While Appellant was in the police car, he somehow got the handcuffs

to the front of his body and tried to run. (RT 2192.) He was then placed in

maximum restraint. (RT 2193.)

After he was transported to SDPD headquarters, Appellant escaped

from the patrol car and hid inside a storage area in the sally port. (RT 2321-

2322.) He was taken into custody by police after a police dog rousted him out.

(RT 2323.) He had to be taken to the hospital for treatment of his dog bites.

(RT 2342.)

PROOF OF SERVICE

Declaration of Service by Mail

I, _George W. Shufelt_, declare that I am over the age of eighteen (18) and that I (am/am not) a party to this action. On _May 28_, _2008_, I deposited a copy of the following document(s):

- Federal Petition for Habeas Corpus
- Exhibits A through TT
- In Forma Pauperis
- Proof of Mailing

in a sealed envelope with postage prepaid into the United States mail outlet via an authorized California Department of Corrections employee at _Kern Valley_ State Prison, in _Kern_ County, _Delano_ California, and addressed as follows:

United States District Court
Southern District of California
880 Front St., Room 4290
San Diego, CA 92101-8900

I declare under penalty of perjury by the laws of the State of California that the foregoing is true and correct (pursuant to 28 USCA §1746(2)).

Date: _5/28/08_          Signature _George W. Shufelt_

OURT PAPER
TATE OF CALIFORNIA
TO. 113 (REV. 8-72)

# TABLE OF CLAIMS

| Grounds/Pages | Discription | Total |
|---|---|---|
| 1 (1-17) | Federal Petition is timely within meaning of 28 U.S.C. §2244(d)(1)'s, One Year statute of limitations. | 17 |
| 2 (18-21) | Appellate Counsel Ineffective for failing to file merits brief challenging trial and convictions. | 4 |
| 3 (22-50) | Appellate Counsel Ineffective for failing to challenge CALJIC 2.50's list of permitted inferances, and trial courts ruling on E.C. §1101(b) uncharge crimes. | 9 |
| 4 (51-55) | Appellate Counsel Ineffective for failing to challenge CALJIC's 2.50 inference "if defendant committed uncharged crimes, defendant committed charged offenses. | 5 |
| 5 (56-60) | Appellate Counsel ineffective for failing to challenge fact trial court failed to instruct jury on prosecutions burden of proof on uncharged crimes, I.A.C trial counsel. | 5 |
| 6 (61-65) | Appellate Counsel ineffective for failing to challenge fact trial court failed to instruct jury, sua sponte, on elements of uncharged crimes. | 5 |
| 7 (66-80) | Appellate Counsel ineffective for failing to challenge fact CALJIC 2.03 listed permitted inference unfettered. | 15 |
| 8 (81-89) | Appellate Counsel ineffective for failing to challenge CALJIC 2.06 listed permitted inferences unfettered. | 9 |

| Grounds/Pages | Disciption | Total |
|---|---|---|
| 9 (90-98) | Appellate Counsel ineffective for failing to Challenge CALJIC 2.15's permitted inference unfettered | 9 |
| 10 (99-115) | Appellate Counsel ineffective for failing to Challenge Trial Courts unwarranted denial of trial transcripts in support of new trial motion. | 17 |
| 11 (116-122) | Trial Counsel ineffective for introducing fact defendant had warrent for his arrest, history of flight then argued against his client. | 7 |
| 12 (123-133) | Trial Counsel ineffective for failing to object to prosecutor arguing facts not in evidence, which denied defendant a fair trial. | 11 |
| 13 (134-142) | Trial Counsel ineffective for failing to object to prosecutor arguing criminal propensity as inference of defendants guilt contrary to due process | 9 |
| 14 (143-146) | Trial Counsel ineffective for failing to object to prosecuter arguing facts not in evidence as consciousness of guilt. | 4 |
| 15 (147-160) | Trial Counsel ineffective for failing to object to prosecutor violating court order not to use the phrase "identification" during line of questioning | 14 |

<u>Grounds/Pages</u>                    <u>Discription</u>                            <u>Total</u>

16 (161-171)  Sentence Unauthorized, Trial Court made no finding,         11
              Prosecution did not charge "personal infliction", or "personal
              use of a deadly weapon" which are essential elements to prior
              "strike" allegation. Trial & Appellate counsel rendered I.A.C.

17 (172-180)  Appellate Court erroneously interpreted Utah's law regarding   9
              vehicular Manslaughter, Simple negligent standard, citing
              wrong Utah case. I.A.C Appellate Counsel for not Federizing Claim.

18 (181-193)  Any adjudication of the elements of either "personal infliction"
              or "personal use of a dangrous or deadly weapon" would      13
              breach Petitioners Utah plea agreement.

19 (194-199)  Appellate Counsel rendered ineffective for failing to argue   6
              "serious" felony allegation required factual finding
              regarding conduct enumerated within (8) or (23) of 1192.7(c)
              to which right to jury trial attached.

20 (200-214)  California's Three Strike law unconstitutionally vague       15
              when applied to petitioners Utah conviction as a
              "qualifying" "serious" felony.

    215       Varification of Petition.                                     1

GROUND ONE

1   PETITIONER CLAIMS HIS FEDERAL PETITION WAS TIMELY FILED

2   WITHIN THE MEANING OF 28 U.S.C. § 2244(d)(1)'s ONE YEAR

3   STATUTE OF LIMITATIONS, AS TIME WAS TOLLED WHILE

4   PETITIONER MAINTAINED A PROPERLY FILED STATE

5   HABEAS CORPUS PETITION, AND PETITIONER WAS DILIGENT

6   IN HIS PURSUIT OF STATE COLLATERAL REVIEW


8   STATEMENT OF FACTS   SCD163510


10   On December 5th, 2001, a new eleven count information

11   was filed against petitioner, George W. Shufelt, charging

12   him with offenses occurring on August 12, 2001. (CT. 1-11)

13   Count 1+2 charged the theft and possession of a

14   vehicle in violation of Penal Code §496(d), and Vehicle

15   code § 10851 (a).

16   Counts 3+9, 4+7, 5+10, 6+8, mated pairs of

17   residential burglary with receiving stolen property

18   under penal codes 459, 460, and 496(a).

19   Count 11 charged a misdemeanor, resisting an

20   Officer in the performance of his duty.

21   On June 27, 2002, the jury returned verdicts finding

22   petitioner guilty on all counts. (CT. 704-714, RT. 2899-2900)

24   The information filed December 5th, 2001 also alleged

25   petitioners Utah prior conviction was to a qualifying

26   "serious" felony prior. (CT. 001-011)

27   At a bifurcated trial, jury found petitioner was the

28   person who suffered the Utah conviction. (RT. 2940-2941)

—1—

SENTENCING   SCD163510

1

2    On August 22, 2002, Petitioner was sentenced to a
3  total of 19 years, 8 months. 12 years 4 months was a
4  result of use of petitioner's Utah conviction as a "serious"
5  felony prior. (see: CT. 604-606; RT. 3185-3188)
6    A timely notice of appeal was filed on August 26,
7  2002.

8

9  DIRECT APPEAL   D 040805

10

11   On March 20, 2003, appointed Appellate counsel filed
12  his opening brief, alleging two contentions, both pretained
    to use of prior as a strike, (see: Opening Response, Reply, exhibit E-G)
13   On November 13, 2003, the court of Appeals denied
14  both issues raised on appeal. ( Opinion 11/13/03, exhibit "H", pgs 100-105)
15

16  REVIEW STATE SUPREME COURT  S121327

17

18   On December 18, 2003, a petition for review was filed
19  raising both contentions which were denied on direct
20  appeal.
21   On February 18, 2004, petition for review was
22  denied. (See: Letter, Appellate Counsel, Feb. 19, 2004, exhibit "L")

23

24  WRIT FOR CERTIORARI

25   Because Ground Two, raises a Federal Constitutional
26  question regarding defendants right to jury trial regarding
27  use of his prior as a qualifying "serious" felony which
28  greatly increased petitioners sentence beyond statutory

-2-

1    maximum aloud by law, under Apprendi v. New Jersey,
2    Petitioner had until May 20 2005 by which to file his
3    Writ for Certiorari in the United States Supreme Court
4    pursuant to Rules of the Supreme Court, Rule 13.1.

5        Petitioner did not actually file for Writ of Certiorari
6    in the United States Supreme Court.

7        Judgment became finial for purposes of commencing
8    One year Statute of limitations to file Federal Petition
9    on May 18, 2005, when time to file writ for cert. expired.

10

11   <u>HABEAS PETITION; SUPERIOR COURT</u>  HC 18018

12       On January 19, 2005 petitioner filed a massive petition
13   for writ of habeas corpus in the Superior Court, County
14   of San Diego, by placing his petition in the prison
15   legal mail system, with instructions to file said, 28 claim
16   petition, into the Superior Court. (Prisoner's Mailbox Rule)

17       Petition was stamp filed received by the Clerk of the
18   Superior Court on January 26, 2005.

19       On March 17, 2005 the Superior Court of California
20   of San Diego issued its order for Informal Responce,
21   and Order denying Petition for Writ of Habeas corpus in
22   part. (See; Exhibit "S", Order dated 3/17/05, pgs 156-163)

23       The Superior Court summarily denied petitioners first
24   5 claims regarding use of his prior as a "strike", relying
25   on the decision made by the Court of Appeals affirming
26   use of appellants prior as a "strike". (ibid)

27       Informal Response was ordered on claims 6 through 27.

—3—

On or about April 4, 2005, Petitioner also filed a motion For Reconsideration of the Court's denial of the Petition based upon the first ground raised, because, the claim Prosecutor failed to plead or prove "Personal infliction", or "Personal use of a dangerous weapon", before petitioner's Utah conviction was deemed a "strike", was never challenged on direct appeal, and claim pretained to I.A.C. of trial counsel, and appellate counsel, so was not barred. (See: Exhibit "I I", App. Recon. 4/4/05)

Also, the Superior Court gave no reason why it denied claim One, in violation of rules of the Court.

On May 2, 2005 the Superior Court issued its order denying petitions motion for consideration, and granted the District Attorney extension of time to file informal response. (See: Order, exhibit "U" pg's 180-181)

On June 30, 2005, the People filed their Informal Response to Petitioner's 22 remaining grounds challenging his jury trial and resulting convictions.

On or about October 17, 2005, Petitioner filed one copy of a 208-page, single-spaced reply.

On or about October 20, 2005, the Superior Court issued its order appointing Counsel to assist petitioner by reviewing the massive amount of documentation and to narrow the issues wherever possible and focus the argument so that the People May properly respond and to give the Court the full opportunity to rule on the merits of the issues presented via a habeas corpus petition.

-4-

1  The Superior court allowed the Public Defender 90
2  days to review the material and file a supplemental
3  petition. (See: Order, Sup. Ct. 10/20/05, exhibit "MM")
4     After requesting an extension of time to file his
5  supplemental informal response, Public Defender, Edward
6  Kinsey, declared a conflict of interest in petitioners case
7  and withdrew as counsel. This happened on January 17,
8  2006, and time to file was extended to May 18, 2006. (exhibit "NN")
9     On or about March 15, 2006, the Superior Court appointed
10 W. Allan Williams, from Conflict free Counsel to help
11 represent petitioner. (exhibit "OO", letter 3/15/05 W. Williams)
12    On August 21, 2006, attorney W. Allan Williams, filed
13 his "Pleading in Support of Petition for Writ of Habeas
14 Corpus. (Exhibit "PP", filed 8/21/06, Sup. Petition)
15    On December 12, 2006, the District Attorney filed
16 their, second informal response to the Petition for Habeas
17 Corpus, (Exhibit "QQ", Peoples informal responce 12/12/06)
18
19 SUPERIOR COURTS FINAL RULING  HC18018
20    On or about January 24, 2007 the Superior Court
21 issued its ruling Denying the remaining claims in
22 the Petition. (See: Opinion, 1/24/07, exhibit "T", pgs 164-179)
23    However, petitioner never received a copy of the Courts
24 order and had know Idea that a ruling had been made
25 until he received a letter from W. Allan Williams on
26 March 30, 2007 via the prisoners legal mail system.
27 (Exhibit "RR", Counsel's letter, Seealso, exhibit "JJ" legal mail log
28                                                              4/3/07

Petitioner did not receive the letter from Mr. Williams until April 3, 2007, which is recorded on the Prisoner's Legal Mail in coming record maintained by the Prison Officials. (See; Legal in-coming log exhibit "JJ" pg 251)

NOTE: Although Prisoners Mail log indicates that Petitioner received mail from the Superior Court on February 2, 2007, that was an order from the Superior Court regarding "Matters Under Submission" on petitioner Civil action for Declaratory Relief, Case No. GIC 848071.

Petitioners's incoming legal mail record proves the he did not obtain a copy of the Superior Court Order denying his petition for habeas Corpus until, after several written request to the Clerk of the Court, (May 7, 2007)

The order petitioner received on February 2, 2007, was Mailed to Petitioner on January 30, 2007, where the court denied petitioner's application for reconsideration Case No. GIC 848071, Honorable Charles Hayes, Dept. 66 (See; exhibit "SS" Order (30/07.)

Petitioner finally received the copy of the Courts January 26, 2007, order denying his Petition for Habeas Corpus on May 7, 2007. (See; Mail log, exhibit "JJ", pg 251)

Petitioner immediately prepared his habeas petition for the Court of Appeals, (which was Mailed out on 6/1/07)

<u>HABAS CORPUS, APPELLATE COURT</u>    D051016

On May 30, 2007, petitioner mailed his petition for writ of habeas Corpus to the Court of Appeals, Fourth District, Division One, via the prison legal mail system. (Petition was stamped filed on 6/7/07 by the Clerk)

-6-

On or about August 17, 2007, Court of Appeal, Fourth District, Division One, State of California issued its order denying all claims contained in petition without ordering an evidentiary hearing, citing <u>In re Harris</u> (issues already raised, or could have been raised on Direct Appeal) although petitioner alleged I.A.C. (see: Opinion dated 8/17/07, exhibit "FF", pg's 216-217)

On or about August 27, 2007, petitioner filed an application for reconsideration of Appellate Courts ruling because <u>In re Harris</u> procedural bar does not apply to petitioners I.A.C. claims. (all claims are brought under I.A.C.) (exhibit "GG")

On September 11, 2007 the Court of Appeal denied petitioners application for reconsideration under the supposition the court no longer has jurisdiction to reconsider the matter. (see: Motion for Consideration, and Denial 9/11/07 Exhibits "GG", & "HH", pg's 218-244)

<u>HABEAS CORPUS, SUPREME COURT</u>   S157353

On or about October 17, 2007, petitioner mailed his Petition into the California Supreme Court, via the Prison legal mail system. (see: Prison Log Out going legal Mail, exhibit "KK")

On October 19, 2007, the Supreme Court received and filed the petition for habeas corpus. (Case No. S157353)

On April 30, 2008, Supreme Court of California denied petition for habeas corpus. (see: Exhibit "TT", final order, 4/30/08)

POINTS AND AUTHORITIES

Under the antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) (Pub L. 104-132, 110 Stat 1214), all petitions seeking federal habeas corpus relief from a judgment of the state court must be filed within one year from the latest of the following dates under 28 U.S.C. § 2244 (d)(1):

- The conclusion of direct review or expiration of the time for seeking review (which presumably includes a petition for certiorari);

- The removal of any unconstitutional state impediment to filing a habeas petition;

- The recognition by the Supreme Court of a new constitutional right that has been made retroactively applicable to cases on collateral review; or

- The date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

The AEDPA time limit, like other statutes of limitations, is an affirmative defense; the respondent may waive it by not raising it.

Although Habeas Rule 4 permits the court to dismiss a habeas petition sua sponte if the limitations period

has expired, it may do so only before a responsive pleading is filed. (Nardi v. Stewart (9th Cir 2004) 354 F.3d 1134, 1141)

A paper filed by a prisoner is timely if deposited in the institution's internal mailing system on or before the last day of filing. (See: Habeas Rule 3(d))

CALCULATING FILING DEADLINE

In Bowen v. Roe (9th Cir 1999) 188 F.3d 1157, 1158, the Ninth Circuit held that direct review does not conclude under 28 USC §2244(d)(1) until the expiration of the period during which the defendant could apply for a writ of certiorari in the United States Supreme Court, i.e, 90 days after the date of finality of the state court decision that the writ of certiorari asks the Court to review. (See: R. Sup. Ct. Rule 13.1)

Because, under Cal Rules of Ct 29.4(b), an order of the California Supreme Court denying review is final as to that court when filed, in the typical case in which the judgment is affirmed on appeal and the California Supreme Court denies review, the AEDPA one-year grace period begins 90 days after the order denying review is filed.

The Ninth Circuit has also held that the grace period includes the date on which the petition is filed. (Patterson v. Stewart (9th Cir 2001) 251 F.3d 1243

<u>STATUTORY TOLLING</u>

The one-year time limit is tolled during the period that a "properly filed" state postconviction petition is pending. (28 U.S.C. §2244(d)(2))

Under California's unique post conviction practice, in which a "new" petition must be filed in the court of appeal after denial by the court of appeal, a petition for post conviction relief is pending" until some court has granted relief or the California Supreme Court has denied relief. (<u>Carey v. Saffold</u> (2002) 536 U.S. 214, 153 L. Ed. 2d 260, 268, 122 S. Ct. 2134)

However, the petition will no longer be considered pending (and tolling will be interrupted) if there is an "unreasonable" delay between denial of relief in a lower court and filing the petition in the next higher court. (Ibid, 153 L. Ed. 2d at 271)

Tolling ends on the date of finality of the decision or order finally resolving the petition for postconviction relief in state court.

Under Cal Rules of Ct 29.4(b) (effective Jan 1, 2003), a California Supreme Court decision denying a petition for a writ within the court's original jurisdiction is final on filing if the court has not issued an order to show cause (or an alternative writ). If there has been an OSC, the date of finality is 30 days after filing, Cal. Rules of Ct. 29.4(b).

For California petitioners exhausting state remedies, tolling extends for the full period from the initial filing of the petition in superior court to the supreme court's denial including periods between the petition's denial in the lower court and its refiling in the reviewing court. (Nino v. Galaza (9th Cir 1999) 183 F.3d 1003, 1006)

For purposes of tolling the one-year limitations period, a state postconviction petition is "properly filed" when it is delivered to the appropriate state court clerk or other official and complies with the applicable laws and rules governing filings. The fact that some or all of the claims in the petition may be proceedurally barred does not make the petition improperly filed. Artuz v. Bennett (2000) 531 U.S. 4, 148 L. Ed. 2d 213, 121 S. Ct. 361, See also Smith v. Duncan (9th Cir 2002) 297 F.3d 809

A habeas petitioner proceeding through California's original writ system was entitled to "interval tolling" i.e., tolling of the AEDPA statue of limitations for all of the time during which he was attempting to exhaust his state court habeas corpus remedies through the filing of six habeas petitions, none of which was denied by a State Court as untimely. Gaston v. Palmer (9th Cir 2005) 417 F.3d 1030)

## TIME CALCULATIONS

On November 13, 2003 the California, Court of Appeals Fourth District, Division One filed their Opinion denying petitioner's direct appeal.

On December 18, 2003 a petition for review was filed raising the same issues on direct appeal.

On February 18, 2004, petition for review was denied, case no. S121327.

Note: 2004 was a leap year. (29 days in Feb.)

Pursuant to Rules of the Supreme Court, Rule 13.1 petitioner had 90 days after the date of finality of the state court decision denying petition for review which expired at the end of May 18, 2004

The state convictions became final for purposes of commencing AEDPA's one year Statute of limitations on May 18, 2004, when time petitioner could have filed for petition for certiorari expired.

Petitioner filed his original petition for habeas corpus into the Superior Court, via the institutions legal mailing system by handing it to prison officials on January 19, 2005. (Petition was stamp filed 1/26/05, by clerk of Sp. Ct.)

The original Proof of Mailing was filed with the petition into the Superior Court, for the record. (legal prison log's also)

Assuming date of mailing petition to the Superior Court is date petition is deemed "filed" under the prisoners

1  mailbox rule, petitioner took 244 days out of the 365
2  days, one year grace period, before tolling principles
3  applied, leaving petitioner up to 121 days from time
4  his petition for habeas corpus was decided by the
5  California Supreme Court, which denied the petition on
6  April 30, 2008.
7      However, it is possible to argue, from the time petitioner
8  received the complete trial record, which was not until
9  Appellate Counsel mailed it to petitioner, after petition for
10 review was denied, until he filed his petition in the
11 Superior Court, could be tolled during time petitioner was
12 discovering the factual bases of his claims.
13     Because appellate counsel did not raise a single issue
14 challenging petitioners jury trial, and subsequent convictions,
15 petitioner was stuck with the "Herculean" task of reviewing
16 a trial record of some 4,000 pages, and researching legal
17 principles in support of meritorous habeas corpus, and
18 appellate claims, that could have been but were not raised
19 on direct appeal.
20     Hopefully, equitable tolling principles, and time limitation
21 calculations from the date on which the factual predicate
22 of the claim, or claims presented could have been discovered,
23 and due diligence wont be necessary.
24
25 <u>DECLARATORY RELIEF ACTION STILL PENDING</u>    GIC 848071
26
27     The Federal court should also keep in mind that
28 petitioner filed his action for declaratory relief

seeking a declaration of the laws governing use of petitioners
foreign conviction from Utah as a "qualifying "serious"
felony under California's "Three strikes law", which if
granted could lead to petitioner being resentenced, and is
currently pending in the California, Court of Appeals, Fourth
District, Division One, Case No. GIC 844011, and D050925,
(See: Also, Federal Petition Application, pg. 10, petition or
Appeal Now Pending, attacking the judgment.)

 Although the substance of the issue pending in the
Court of Appeals, has been exhausted by the petition for
writ of habeas corpus proceedings, their still is an action
pending challenging appellants sentence.

 There may be an issue as to whether this action is
considered a collateral attack, or "properly filed", but it
most certainly has been fully exhausted and is contained
within the claims incorporated in the Federal petition.

 However, oral arguments were conducted in the Court of
Appeal on May 20, 2008, and the issue regarding use of
petitioners Utah conviction as a "Strike", without any finding of,
or the prosecution charging, the necessary essential elements
of "personal infliction", or "personal use of a dangerous
weapon", before petitioners prior was erroneously used to
increase his sentence by some 12 years, 4 months, and
this issue is currently under submission, pending a ruling.

 The Court of Appeal may deem appellants action a
"successive petition", or a "coram vobis", and rule on
the merits, or issue a "declaration of law".

 — 14 —

1  Ultimately, the California Court of Appeals could deem
2  petitioners sentence unauthorized, and remand him back
3  to Superior Court for resentencing, or simply deny relief.
4  None of this may matter because, petitioner's petition
5  was timely filed within the statutory time limits even
6  without considerations of the pending action for declaratory
7  relief, or time petitioner discovered factual bases of
8  all his 27 claims presented to the Superior Court.
9  Petitioner has been dilligent to the core in researching
10  the legal and factual bases of his claims, and preparing
11  the original petition filed in the Superior Court, which
12  was some 565 pages of typed legal and factual claims,
13  not excluding the record, or exhibits.
14
15  <u>STATE PETITION TIMELY</u>
16
17  At no time during state habeas corpus proceedings
18  did the state ever allege petition was untimely.
19  Any delay in filing petition into the court of Appeals
20  after Superior Court denied the petition and issued its
21  order on January 24, 2007, was excused because
22  petitioner was not provided his copy of the courts order
23  until May 7, 2007, after demanding a copy from the
24  court.
25  Petitioner was first informed that the court
26  had issued its order denying his petition by
27  appointed counsel on April 4, 2007, via his letter
28

-15-

dated March 30, 2007, stating;

"The Superior Court has denied your petition for Writ of Habeas Corpus, without granting a hearing."

Counsel goes on to instruct petitioner to file his Petition for Writ of Habeas Corpus into the Court of Appeals. (See: Letter from Counsel, March 30, 2007, exhibit "KK")

"...Your next step is to file a Petition for a Writ of Habeas Corpus in the Fourth District Court of Appeal"

Why counsel waited almost two months befor informing petitioner that his writ was denied, I don't know.

I also dont understand why the Superior Courts order was not mailed to petitioner until May 7, 2007. (See: Mail Log, exhibit "JJ", incoming mail

Needless to say, I was rather surprised when I finally received my copy of the Superior Courts final order denying my petition, and saw it had been filed back in January 24, 2007.

Petitioner could not file his petition into the Court of Appeals until after he received his copy of the courts order denying his petition in the Superior Court, which petitioner did on May 30, 2007, which is less then a month after receiving the order.

Moreover, petitioner was placed in ad-seg on November 25, 2006, and had limited access to law library, and research material through out the proceedings, for over 15 months,

-16-

Equitable tolling could apply when state court failed to notify claiment in a timely manner that it dismissed his petition for post-conviction relief. (Jenkins v. Johnson, (9th Cir. 2003) 330 F.3d 1133, 1155-56) See also, Knight v. Schofield (11cir. 2002) 292 F.3d 709, 711 (equitable tolling applied because petitioner was not informed of the disposition of his case.)

Any delay between Superior and Appellate court in filing the petition is excused because petitioner was not informed of the disposition of his petition until April 4, 2007, and did not know the Court had issued this order until May 7, 2007 when petitioner finally received his copy of the court's order.

Petitioner has been extremely diligent in his pursuit of his constitutional violation claims attacking both his sentence, and conviction, which went unchallenge by appointed counsel on direct appeal.

GROUND TWO;

1  APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO FILE A MERITS BRIEF THAT CHALLENGED
   THE CONVICTION ON PETITIONERS DIRECT APPEAL. PETITIONER CONTENDS THERE ARE NUMEROUS
2  ERRORS DURING THE COURSE OF TRIAL THAT SHOULD HAVE BEEN RIASED IN THE OPENING BRIEF
   THUS, PETITIONER WAS DENIED EFFECTIVE COUNSEL ON DIRECT APPEAL IN VIOLATION OF THE
3  6TH AND 14TH AMENDMENT OF THE U.S. CONSTITUTION

4

5  SUPPORTING FACTS

        Appellate counsel, on direct appeal filed an opening brief that raised no
6
   issues that challenged the convictions. (See; Opening Brief, No. DO40805, exhibit "E")
7
        Only issues raised by appellate counsel were collateral ones that alleged
8
   petitioners Utah conviciton was not a qualifing serious felony, and petitioners
9
   right to jury trial on that issue was violated. (See; opening brief, exhibit "E")
10
        Petitioner alleges that there were many issues that could have been raised
11
   namely; an incorrect analysis under evidnece code section 1101(b) allowing evidence
12
   of uncharged crimes to be used to support permitted inferences listed under CALJIC
13
   2.50, such as to prove "identiy, common plan or design, knowledge of thing found
14
   in defendant's posession, ultimate inference, "if defendant committed uncharged
15
   crimes, defendant committed the charged offenses, ect... (See; CALJIC 2.50 as given
16
   CT. 0510-0511, exhibit " W" )
17
        The trial court also instructed the jury with a host of consciousness of guilt
18
   instructions that were not limited to any particular charged offenses, such as
19
   CALJIC 2.03, 2.06, 2.15, 2.52, all of which were objected to by defense counsel and
20
   congnizable on direct appeal.
21
        There are other issues to that have major implications, such as, the
22
   trial court denying defendant his right to trial transcripts to assist him in arguing
23
   his new trial motion.
24
        The trial court failed to provide any instructions that the prosecution must
25
   prove the uncharged offenses, first, before proffered evidence was used to support
26
   the list of inferences under CALJIC 2.50. CALJIC 2.50.1 & 2.50.2 were not given or
27
   modified to reflect the courts order that uncharged crimes must be proved beyond a
28
   reasonable doubt.

POINTS AND AUTHORITIES

RIGHT OF APPELLATE COUNSEL

The United States Supreme Court has held that refusing to appoint counsel for an indigent defendant's direct appeal of a criminal conviction was a denial of equal protection. <u>Douglas v. California</u> (1963) 372 U.S. 353, 9 L.Ed.2d 811, 83 S.Ct 814.

RIGHT TO EFFECTIVE APPELLATE COUNSEL

A criminal defendants constitutional right to counsel includes;

The right to effective assistance of counsel on appeal. This right is guaranteed by the due process clause of the United States Constitution. <u>Evitts v. Lucey</u> (1985) 469 U.S. 387, 83 L.Ed.2d 821, 105 S.Ct. 830.

STANDARD

The United States Supreme Court has interpreted the term "effective assistance" to require active advocacy on the part of appellate counsel. <u>Anders v. California</u> (1967) 386 U.S. 738, 18 L.Ed.2d 493, 87 S.Ct. 1396.

Effectiveness of counsel is determined by standards based on U.S. Const. Amend VI and Cal. Const. Art. I,15. <u>People v. Ledesma</u> (1987) 43 C.3d 171, 233 C.R. 404. The test is whether counsel provided the kind of legal assistance expected of a reasonably competent attorney, acting as a conscientious, diligent advocate. 23 C.3d at 424.

DUTY TO RAISE ARGUABLE ISSUES

In California, effective assistance of counsel on appeal requires that counsel prepare a brief to assist the court in understanding the facts and the legal issues in the case. The brief must set forth a statement of facts with citations to the

1  transcripts, discuss the legal issues with citations to appropriate authority, and

2  argue <u>all issues that are arguable.</u> If counsel concludes that there are no arguable

3  issues and the appeal is frivolous, he or she may limit the brief to a statement of

4  facts and the applicable law and may ask to withdraw from the case. Counsel must

5  not, however, argue the case against his or her client. <u>People v. Feggans</u> (1967) 67

6  C.2d 444,447, 62 C.R. 419.

7      The term "arguable issue on appeal" consists of two elements. First, the issue

8  must be one that, in counsel's professional opinion, is meritorious. That is not to

9  say that the contention must necessarily achieve success. Second, if successful, the

10  issue must be such that, if resolved favorably to the appellant, the result will

11  either be a reversal or a modification of the judgment. <u>People v. Johnson</u> (1981) 123

12  CA3d 106,109, 176 C.R. 390.

13      There is some disagreement in the courts about whether due process on appeals

14  requires counsel to raise arguable but unmeritorious issues. (not issue here)

15  See; e.g., <u>People v. Scobie</u> (1973) 36 C.A.3d 97,99, 111 C.R. 600 (noting that the

16  California Supreme court has determined that there is a category of arguable-but-

17  unmeritorious issues that must be argued as a requirement of due process on appeal);

18  <u>People v. Valenzuela</u> (1985) 175 CA3d 381, 222 C.R. 405 (arguable contentions are

19  potentially successful, not frivolous, contentions on appeal); and

20  <u>People v. Johnson</u> (1981) 123 CA3d 106,109, 176 CR 390 (dismissing idea that counsel

21  must raise arguable but unmeritorious issues.).

22      However, appellate counsel has no duty to raise every nonfrivolous issue requested

23  by his or her client. (<u>Jones v. Barnes</u>, (1983) 463 U.S. 745, 77 L.Ed.2d 987, 103

24  S.Ct. 3308)

25

26      The crux of petitioners claim is that appellate counsel didn't raise any claims

27  challenging conviction in opening brief. Although there are many.

28

ACTUAL PREJUDICE

SHOWING OF INEFFECTIVENESS; PREJUDICE

In **Smith v. Robbins** (2000) 528 U.S. 259, 120 S.Ct. 746, 145 L.Ed.2d 756, the Supreme Court provided further guidance on what must be shown to establish that appellate counsel was ineffective in neglecting to file a merits brief.

Applying **Strickland v. Washington**, (1984) 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct 2052, the court stated that appellant must first show that counsel was objectively unreasonable in failing to find arguable issues on appeal, and once this is shown successfully, the defendant has the burden on demonstrating prejudice. i.e., there must be a reasonable probability that, but for counsel's unreasonable failure to file her a merits brief, the appellant would have prevailed on appeal. (528 U.S. at p. 285-286)

Where appellate counsel failed to raise a particular claim, the petitioner must show that the ignored issues are clearly stronger than those presented, which is a difficult standard to demonstrate.

However,, where counsel failed to file a merits brief all together, it will be easier for a defendant-petitioner to satisfy the first part of the Strickland standard. (See; 528 U.S. at p. 288) Indeed all one would have to do is show that a reasonably competent attorney would have found one nonfrivolous issue warranting a merits brief.

Because appellate counsel raised only collateral issues, (prior conviction qualifying as a serious felony), any issue that can reasonably overturn the conviction is far superior to the collateral "strike" enhancement, which followed it.

Although this has been a very difficult task for a layman to fulfill, the bar was lowered by the fact appellate counsel raised no issues that challenged the conviction.

All one has to do is read petitioners next claim before petitioners burden has been met, under the Strickland test.

−2\−

GROUND THREE;

APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE FOR FAILING TO CHALLENGE CALJIC 2.50'S LIST OF PERMITTED INFERENCES AND TRIAL COURTS RULING ON 1101(b) EVIDENCE ON DIRECT APPEAL, WHICH ERRONEOUSLY REDUCED THE PROSECUTIONS BURDEN OF PROOF ON THE ELEMENTS AND IDENTITY OF PERSON WHO COMMITTED CHARGED OFFENSES, IN VIOLATION OF THE 6TH AND 14TH AMENDMENTS OF THE U.S. CONSTITUTION

SUPPORTING FACTS

During a 402 hearing trial court permitted prosecution to introduce three prior uncharged acts involving Jack Bieser, Janice Boner, and a Charles Mirabile, under evidence code §1101(b) as prior crimes committed by the defendant. (See; 402 hearing R.T. 1741-1750, exhibit "BB")

Trial court also instructed jury that they could infer, if the defendant committed the uncharged crimes, defendant committed all crimes charged; the identity of person who committed charged offenses; knowledge of nature of things found in defendant's possession; common design plan or scheme used in cahrged offenses, ect.. (See; CALJIC 2.50's list of inferences, CT. 0510-0511, exhibit "W")

The uncharged offenses involving Jack Bieser, Janice Boner, and Charles Mirabile involved theft or attempted theft of property from unlocked vehicles, compared to the charged offenses which involved four residential burglaries, and unlawful taking of an automobile. (See; Information, CT. 0001-0005, exhibit "M")

Prosecution had no witnesses see who took property from the automobiles involving Janice Boner, and Charles Maribile. (See; Prosecutions offer of proof, 402 hearing, RT. 1741-1750, exhibit "BB")

Appellate counsel did not challenge CALJIC 2.50's list of permitted inferences on the ultimate material issues of identity, or any ofthe other inferences listed on direct appeal. (See; opening Brief, exhibit "E", No. D040805)

In fact, appellate counsel did not raise any issues that challenged petitioners lengthy trial and resulting conviction on direct appeal.

Trial court conducted no analysis or consider the relationship between the charged and uncharged offenses, or how the uncharged offenses proved any of the elements in dispute on the charged offenses. (See; ruling exhibit "BB")(RT, 1741-1750)

- 21 -

## COUNTS 1 & 2

Identity of the person who took an automobile belonging to William Wadsworth was the only material fact in dispute regarding count 1 & 2.

During the course of trial the prosecution produced no witnesses who testified they saw the defendant take a car belonging to William Wadsworth.

During the course of trial prosecutor produced no eye witnesses who testified they saw the defendant drive a car belonging to William Wadsworth.

Defendant's fingerprints were not found in the red saab belonging to William Wadsworth, or on any property belonging to William Wadsworth.

Prosecutions case regarding counts 1 & 2, was based entirely on circumstantial evidence.

However, jury could infer the identity of the persons who took William Wadsworth's red saab, as the defendant based soley from any one of the three uncharged crimes involving Jack Bieser, Janice Boner, or Charles Maribile.

## COUNTS 3 & 9

The identity of person's who took property belonging to Diane Goedhuy's from her residence (garage), then disposed of that property at verious dump sites was the only material fact in dispute regarding counts 3 & 9.

Diane Goedhuy testified that she saw someone standing in her driveway, three four or five feet from her office door, (RT. 1837,ln.18-19). Identitified this person in court as the defendant (R.T.1839, ln. 22-28), carrying a camera and check book that looked sort of familiar to her. (RT.1840,ln.10-12)

This person walked toward the corner and disappeared behind very thick bushes (RT. 1841,ln.8-9). She heard a car start (RT.1841, ln.26), ran through her house and saw a red saab drive bye (RT.1842,ln.8-9)

Later that day she was given a camera and check book by an officer (RT.1847, ln.4-8) The camara and check book was never taken into evidence or produced at trial.

## DISCRIPTION OF SUSPECT

Diane Goedhuy described the suspect to the 911 operator as a "white male, mid 30's, and thin." (RT.1925,ln.11-13)

Diane Goedhuy testified that the suspect was 5'6" to 5'8".

Q. Do you recall how tall you told the police officer that the suspect was?

A. He was kind of small to medium build, medium height, maybe 5'6" to 5'8", probably in that range. (RT. 1885, ln. 11-15)

The defendant is 6' tall. During trial the defendant's height was measured. "just a tad or maybe about on forth of an inch under six feet." (RT. 1894,ln.2-4)

After seeing the defendant stand up in court and get measured Mrs. Goedhuy testified;

Q. As you sit here today, do you recall how tall you told the police that the person was?

A. ...I think I may have said 5' 6" or 5' 8". It just didn't seem like six feet tall to me. (RT. 1894, ln.6-10)

## PRE TRIAL PHOTO LINEUP

B.J. Schultz, the investigator for the San Deigo police department arrainged a photo lineup array, in which the defendant was the only person shown not wearing a shirt. (See; Photo line up given to Diane Goedhuy, Dated August 14, 2001, exhibit "DD")

B.J. Schultz testified when asked how long it took the witness Diane Goedhuy to make her comment "more incline to say him, looked more like him."? She said, "I wouldn't say anymore than three minutes,". (See; RT. 1714-1718)

The defense to the pre trial photo lineup was two part;

(1) That the statement made by Diane Goedhuy "more incline tosay him. Looked more like him." was a relative non-identification, especially after three minutes of careful study.

1    (2) That her implication of the defendant's photo was tainted by the

2  suggestive fact that the defendant was the only one not wearing a shirt, when

3  in fact the defendant was arrested shirtless.

4    However, according to the trial courts instructions, jury could infer the

5  identity of the person's who took Mrs. Goedhuy's property from her garage, then

6  disposed of it at verious locations, as the defendant from anyone of three uncharged

7  offenses involving Jack Bieser, Janice Boner, or Charles Maribile, pursuant to

8  CALJIC 2.50's list of permitted inferences, rather than consider discrepancies

9  in Diane Goedhuy's discription of the suspect and that of the defendant.

10    Diane Goedhuy's in court implication of the defendant as the person she

11  saw standing in her driveway, was the only material eye witness identification

12  testimony, aside from uncharged crime witness Jack Bieser, to implicate the

13  defendant in court.

14    Diane Goedhuy also testified that it is required for her to wear glasses

15  when she drives her vehicle.

16    Identity of the suspect who Diane Goedhuy saw standing in her driveway holding

17  a camara and checkbook, run to where a red saab was seen driving bye, was far from

18  certain, and the ultimate fact in dispute for the jury to decide.

19

20  COUNTS 4 & 8

21    Identity of the person's who took property belonging to Michael Rahilly, from

22  his residence (garage), then disposed of his property at verious dump sites was

23  the ultimate material fact in dispute regarding courts 4 & 8.

24    During the course of trial the prosecution produced no eye witnesses see

25  the suspects go into the Rahilly residence and take his property.

26    The defendant was not found in possession of property belonging to Mr. Rahilly.

27    The prosecution produced no eye witnesses see the defendant dispose of property

28  belonging to Michael Rahilly.

1    However, jury could infer the identiy of the person's who took Mr. Rahilly's

2  property and later disposed of it at verious locations, as the defendant, exclusively

3  from anyone of three uncharged crimes involving Jack Bieser, Janice Boner, or Charles

4  Maribile, pursuant to the trial court's instructions under CALJIC 2.50's list of

5  permitted inferences.

6    Identity of the suspects who took Mr. Rahilly's property from his residence was

7  far from certain, and was ultimately for the jury to decide.

8

9  COUNTS 5 & 8

10    The Identity of the person who took property belonging to Peter Hammerling, and

11 disposed of that property at the Stieble residence, was the ultimate material fact

12 in dispute regarding counts 5 & 6.

13    The identity of the person Phillip Hammerling saw standing in the corner of

14 the Hammerling open garage was a material fact in dispute.

15    Phillip Hammerling did not identify the defendant as the suspect he saw standing

16 inside his open garage during his trial testimony. (See; RT. 1971-1991)

17    Phillip Hammerling testified that he walked into his garage and saw someone

18 in the corner. (RT. 1971-1978, ln. 3-28,1-3)

19    Confronted this person said "he was looking for a neighbor" and said "sorry

20 I have the wrong house." (RT.1979-1980)

21    This person exited the garage, down the driveway, and he saw him get into a car

22 and leave. (RT. 1980)1981, ln. 18-28,1) He got a partial license plate number 4MRV&U3

23 (RT.1981,ln.25-27) The car he thought was a volvo, or a saab. (RT. 1982,ln.8)

24    Later he looked throught the automobiles and noticed some cell phones were

25 missing, after his father went out to look. (RT. 1985, ln. 4-5,19-21) The cars were

26 unlocked in the garage (RT. 1985,ln.10-14)

27    Phillip later discovered a beer bottle on the floor, in the garage. (RT. 1990,

28 ln.8-12 but did not see the suspect touch the bottle. (RT. 1991, ln.2-4)

1    Officer Rivers, later lifted finger prints off the bottle. Then threw the

2  Bottle away. (RT. 2005, ln. 19-23, RT. 2015, ln.22)

3    The latent print card was not assigned a long number or impounded at the

4  evidence impound locker.

5    The defendant was unable to examine the bottle do to the fact the officer

6  discarded it, and never impounded it.

7    Jane Jiennings, identitfied one print on the latent print card as the defendants

8  even though she never took the defendant's exemplars.

9    Phillip Hammerling did not identify the defendant in court as the person he

10 saw standing in his garage.

11   The identity of the suspect Phillip Hammerling saw standing in his garage was

12 very much a material fact in dispute and far from curtain.

13   However, jury could infer the identity of the suspect Phillip Hammerling saw

14 that day, and the persons who took property from his residence, then later disposed

15 of this property as the defendant, merely from evidence of the uncharged offenses

16 involving anyone ofthe three incidents proffered by the prosecution pursuant to the

17 permitted inferences listed under CALJIC 2.50.

18

19 COUNTS 6 & 7

20   The identity of persons who took property belonging to Michael McCarthey, from

21 his residence (garage), was the ultimate material fact in dispute regarding counts

22 6 & 7.

23   Donna Burger, the neighbor of the McCarthey's, saw a suspect leave the yard

24 of the McCarthey residence, pushing a bike up the hill, did not identify the suspect

25 as the defendant.

26   However, jury could infer the identity of the suspect as the defendant from

27 the erroneous instructions based exclusively from anyone of the three uncharged

28 offenses.

-26-

1    Because appellate counsel did not challenge CALJIC 2.50's list of permitted

2 inferences on the ultimate facts in dispute regarding charged offenses, based

3 exclusively on evidence of uncharged crimes, petitioner must raise the error by

4 this petition for habeas corpus, under the claim of ineffective appellate counsel.

5    Trial courts ruling on the unchargedcrime evidence, and charging the jury with

6 the host of permitted inferences listed under CALJIC 2.50, was perserved for review

7 on direct appeal pursuant to penal code § 1259, because the giving of CALJIC 2.50

8 affected petitioners substantial rights to a fair trial, by erroneously reducing the

9 prosecutions burden of proof on the ultimate issue of identity.

10    As it is, petitioner is forced to raise all trial errors on rulings of law,

11 and the host of consciousness of guilt instructions, which should have been raised

12 by appellate counsel on petitioners direct appeal, by this petition for habeas corpus.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## 402 HEARING ON UNCHARGED OFFENSES

### (SEE; R.T. 1741-1750)

(Exhibit "BB")

In sum

PROCEEDINGS

The prosecution moved to admit the use of prior acts of misconduct allegedly committed by the defendant under **Evid. Code §1101(b)**. There were three acts of alleged misconduct. The first was an incident involving a Jack Bieser, who said he saw defendant looking in the truck of his wifes car early in the moring of Aug. 12th 2001.Than an hour and a half latter chased someone who looked like the defendant around a corner, lost site of him, than saw a red saab drive away, but, did not see who was in it.(RT. 1741-1742)

The second incident involved a Charles Mirabile who's I.D. was found at various locations were other stolen property was found, allegedly his property was taken from his vehicle parked out-side his residence, down the street from one of the charged residential burglaries. Prosecution in their case-in-chief produced no evidence that a crime was committed infront of Mr. Mirabile's house, or that Mr. Mirabile was a victim of any crime. Mr. Mirabile never testified. (RT.1742-1743)

The third incident.involved a victim named Janice Boner. She lived near the Goedhuys residence, and was a victim of a theif of property taken from her unlooked car, parked out-side her house in her drive-way. Prosecution tried to connect this offense to the defendant by stating that her keys were found in the defendants possession shortly after his arrest. This fact was clearly in dispute. (RT. 1744-1745)

Prosecution had no witnesses to the Mirabile or Boner incidents, nor was the defendant ever charged with any of these prior acts, although their part of the same allegations. (allegedly part of same spree, on or about same day as charged crimes)

It's the fact that these acts are completely void of any characteristics, and were insufficiently connected to the defendant that is the crux of this claim, and ~~that~~ fact this ground was not raised by appellate counsel on petitioners direct appeal.

( THE 402 HEARING )

THE PROSECUTION

1

2  PROCEEDINGS (R.T. 1741-1750, exhibit "BB")

3       The prosecution moved to admit the use of prior misconduct allegedly committed

4  by the defendant under Evid. Code, §1101(b). There are three acts of alleged misconduct.

5  The first is a incident involving, Jack Bieser, which actually are two separate incidents

6  The second incident involved Mr. Mirabile, and the third incident involes a Janice

7  Boner. All three alleged acts of misconduct were tampering with a vehicle, in violation

8  of Vehicle Code §10852. The Mr. Mirabile and Mrs. Boner incidents are without witnesses.

9       The defendant was never charged with these acts.

10  Prosecutions Offer of Proof; 402 Hearing

11  ACT 1 THE JACK BIESER INCIDENT

12                              FIRST INCIDENT

13       The prosecution stated that "Mr. Bieser will testify that in the early moring

14  of August 12th Mr. Bieser came in contact with Mr. Shufelt. He saw Mr. Shufelt rumma-

15  ging in his wife's car. Mr. Shufelt was dressed in a pair of green shorts, no shirt

16  no shoes. They scoffled. Mr. Shufelt got away". (See: R.T. 1741,ln.16-22)

17                              SECOND INCIDENT

18       "Mr. Bieser then called the police and went out and looked through the neighbor-

19  hood to see if he could find Mr. Shufelt. He finds him in the same general area about

20  30 minutes later, 45 minutes later. This time Mr. Shufelt is wearing different cloth-

21  ing. He yelled at Mr. Shufelt. Mr. Shufelt flees, and Mr. Shufelt goes around the

22  corner to a very narrow alley. He's out of the sight all of ten seconds. Mr. Bieser

23  hears a door slam, and a car take off. He comes around the corner, and he sees what

24  looks like a red saab fleeing the area. That's the first instance."

25       "The relevance of that is it ties Mr. Shufelt circumstantially to the vehicle.

26  It also demonstrates that Mr. Shufelt changed clothes. He's in the clothing-chang-

27  ing business." (See; R.T.1741-1742)

28                              -29-

(2)

ACT 2 THE MR. MIRABILE INCIDENT (RT. 1742-1743)

"Secondly, Mr. Charles Mirabile, he's a neighbor of one of the charged resident-
ial burglary victims. Mr. Mirabile's unlocked car is outside of his residence. There
was property that was taken form it. It was not locked. That property is found at a
variety of locations, along with other property taken in the res burg that occured on
the 12th."

"For example, some of his identification cards, one of his I.D. cards was found
in the stolen red saab."

"One of his identification cards was found at the residential burglary scene of
the MacCarthy residence."

"I believe some additional property was found along with property belonging to
other burglary victims on that day."

The relevance of his testimony is I have to eliminate him as a suspect in the
jury's eye's, sence his property is found in the stolen vehicle. It would be one con-
clusion that the jury could draw is maybe this guy is Mirabile." (RT.1742-1743)

CAVEAT: MR. MIRABILE NEVER TESTIFIED AT TRIAL, ANY REFERENCE TO HIM BEING A VICTIM
CAME FROM PROSECUTOR'S CLOSING ARGUMENTS,

"Secondly, his property is found at one of the burglary scenes. Again, same situ-
ation. The third bases is since property is found in conjunction with Mr. Mirabile
and other victim's, I need to be able to have this other property make sense for the
jury. pane."

THE COURT: HOW DO YOU TIE MR. SHUFELT TO MIRABILE?

MR. HELLSTROM: OH, BECAUSE MR. SHUFELT -- FIRST OFF, THE ALLEGATION IS THAT THE
BURGLARY THAT OCCURS RIGHT NEXT DOOR TO WHERE HE DUMPS THE PROPERTY IS CONNECTED TO
OTHER PROPERTY FROM BURGLARIES THAT OCCURRED THAT DAY THAT WE'VE CHARGED MR. SHUFELT
WITH. MR. SHUFELT IS CHARGED WITH BURGLARIES WHEREIN -- WITH BURGLARIES WHERE MR.
MIRABILE'S PROPERTY IS FOUND.    ¬30¬

1        FOR EXAMPLE, THE MACCARTHY RESIDENCE, MIRABILE'S ID CARD IS FOUND THERE.

2  PART OF THE ID CARD IS FOUND THERE. .

3     SO, I NEED TO BE ABLE TO LINK HIM TO THAT.

4     THE COURT: BUT YOU DON'T HAVE ANYBODY WHO SEES MR. SHUFELT GO INTO THE MIRABILE'S

5  VEHICLE OR ANYTHING LIKE THAT?

6     MR. HELLSTROM: I DO NOT, NO.   (See; R.T.1742-1744)

7  CAVEAT: Petitioner contends that the act of alleged misconduct involving Mr. Mirabile

8  cannot be used as **Evid. Code §1101(b)** evidence, because the determination of who com-

9  mitted the act cannot be inferred until the identity of the culprit is determined

10  from the crimes charged, beyond a reasonable doubt. Thus creating a <u>vicious circle.</u>

11  (See; **People v. Long**, 7 Cal.App.3d 586 (1970); **People v. Erving**, (1998) 63 C.A.4th 652).

12  |Condemning circular reasoning|          (3)

13  <u>ACT 3 THE MRS. BONER INCEDENT</u>

14  "Finally is Mrs. Boner. Her car was burglarized either the evening before or the

15  very early morning hours of the 12th. In the defendant's pocket, when he is arrested,

16  is stolen property belonging to Mrs. Boner. Mrs. Boner also has property that is

17  found at the Steibel area, the arrest site, and in the stolen red saab." (RT.1745-46)

18  CAVEAT: Assumes the defendant was found in possession of keys belonging to Mrs. Boner.

19  Even if true, which this issue will be greatly protested, this would not be sufficient

20  without additional corroborating evidence pertaining to the crimes charged. Again

21  the vicious circle.  Jury was never instructed they had to find defendant in possession

22  (See; RT.1745-1746)              (B)          Janis Boner's Keys.

23             OBJECTIONS BY DEFENSE COUNSEL

24  <u>ACT 1 THE JACK BIESER INCIDENT</u>

25     Defence counsel Mr. Guthrie objected as follows: "First, as to Mr. Bieser,

26  the incident that the district attorney is talking about occurred perhaps at least

27  two miles away from the other occurrences that he speaks about. It's removed in

28  times, and it's removed in distance. There's no identification that this is, in fact,

the red saab that was recovered or stolen. In fact, there's going to be a dearth of
evidence that Mr. Shufelt actually stole the saab vehicle. The district attorney's
relying on that to put all of this bad conduct evidence together.

(2)

ACT 2 THE MIRABILE INCIDENT

"There's no evidence that Mr. Shufelt went into Mirabile's house. There's no
evidence that -- no eye witesses, no eye witnesses with regard to the Rahilly residence.
The placement of the car, the property, could have obviously been done by someone eles
other than Mr. Shufelt."

(3)

ACT 3 THE BONER INCIDENT

"And once Mrs. Boner's situation is -- once again, she's removed somewhat in
time from the incidents in this case. There's going to be some speculation, we
believe, as to whether she can actually identify the property that is allegedly
recovered on Mr. Shufelt".

(4)

CLOSING ARGUMENT

By counsel, "We would argue that to let this evidence in is highly prejudicial
to Mr. Shufelts case, and expecially when it outweighs any probative value when
there are no eye witnesses that put Mr. Shufelt into the Mirabile residence, or the
Rahilly residence. It could be someone else doing this. So, for those reasons, we
object on grounds of 352, and also we object on grounds that the Bieser testimony,
and the Boner testimony, is removed in time."

"The Boner burglary, albeit occurred in the same locations as the district
attorney brought indicating a series of burglaries in a circular fashion. Down the
street from the one that occurred on Bahia drive." (See: R.T.1745-1746)

NOTE: Mr. Helstrom never mentioned were the Boner incident occured.

(C)

THE JUDGES RULING

CIRCUMSTANTIAL EVIDENCE        (See; RT.1747-1750)

The court ruled that the evidence offered relating to all three incidents

was relevant and admissible as circumstantial evidence. (R.T.1747,ln.5-8)

NOTE: Peitioner is not addressing the ruling on circumstantial evidence in this

argument.

(1)

ACT'S 1,2,3, USE AS PLAN, METHOD OR SCHEME; USE AS IDENTITY, UNDER E.C.§1101(B)

The court ruled that it is also 1101(b) evidence."And that an an application

CALJIC 2.50 is applicable in the sense that it is evidence of a characteristic

plan, method, plan or scheme in the criminal acts similar to the method, plan or

scheme to the crimes in this case, which further show the identity of the person who

committed the crime, if any, of which the defendant is accused. And a clear connec-

tion between the other offenses and the one in which the defendant is accused, so

that it may be inferred that if the defendant committed the offenses, the defendant

also committed the crimes charged in this case. "

This is a heavy ruling considering, one, there has been no offer of proof who committed

the act's 2,& 3, secondly this ruling was made without any analysis as to what elements

or facts, or the materiality of the facts, to be proven by the prior uncharged act's

or what it disproves, or it's probative value of the other crime evidence. (See; People

v. Hawkins, (1995) 10 Cal.4th 920, 42 C.R.2d 636; People v Bigelow, infra, 37 Cal.3d 731)

(2)

ACT'S 1,2,3, USE AS KNOWLEDGE OF NATURE OF THINGS IN POSSESSION; INTENT

Court, "Also, separate and distinct, under 2.50, the separate category of the identity

of the person who committed the crime, if any, of which the defendant is accused.

motive for the commission of the crime charged. That the defendant had knowledge

of the nature of the things found in his possession, specifically relating to the

property of his -- of Mrs. Boner that was in his possession. And for those reasons,

-33-

1   " I would admit it." (See: R.T.1747-1748).

2                                  (3)

3   **§1101(B) EVIDENCE, PROVED BEYOND A REASONABLE DOUBT.**

4        The court ruled that it "It's my habit and custom for 2.50 not to use the pre-

5   ponderance of evidence instruction, but to just have it all proved beyond a reason-

6   able doubt. I think it is fraught with problems to try to separate it out, especially

7   in a circumstance like this, to try to say that some of it could be proved by a pre-

8   ponderance of the evidence, and then to use beyond a reasonable doubt."

9        The prosecution did not object, and stated " I believe that it would be appro-

10  priate, especially since I'm seeking admission under circumstantial evidence as it

11  relates to the crime." (See; R.T. 1748-1749).

12       In spite of the trial courts  allocation of the prosecutions burden of proof,

13  the jury was never instructed as such. There was no instruction to the jury that

14  indicated that the prosecution beared the burden of proving uncharged crimes beyond

15  a reasonable doubt. CALJIC 2.50.1 was not given, nor modified to the requisite

16  burden of proof agreed upon by the prosecution. (See; petitioner's claim trial

17  court failed to instruct jury pursuant to Evid. Code 502)

18       Moreover, jury was never instructed that they must find the preliminary facts

19  true, such as what type of crime the uncharged acts were under a specific penal

20  code, was the defendant in possession of property from uncharged offenses? did the

21  defendant commit  the uncharged offenses? ect... (See; Trial court, and defense

22  counsel's failure to request preliminary fact finding instructions claims)

23       Petitioner contends appellate counsel was ineffective for failing to challenge

24  these erroneous trial court permitted inferences in petitioners opening brief.

25       The question of ineffective assistance of appellate counsel failed to raise

26  assignments of error that were crucial assignments of error depro̶ves petitioner of

27  the effective assistance of appellate counsel. (In re Smith, (1970) 3 Cal.3d 202,203 also

28  Smith v. Robbins, (2000) 528,U.S. 259, 120 S.Ct. 746, 145 L.Ed.2d 756)

                                  ~34~

POINTS AND AUTHORITIES

The jury was charged under CALJIC 2.50 as followes;

"<u>EVIDENCE HAS BEEN INTRODUCED FOR THE PURPOSE OF SHOWING THAT THE DEFENDANT</u>
<u>COMMITTED [CRIMES] OTHER THAN THAT FOR WHICH [HE] IS ON TRIAL.</u>

[EXCEPT AS YOU WILL OTHERWISE BE INSTRUCTED,] [<u>THIS] EVIDENCE, IF BELIEVED,</u>
[MAY NOT BE CONSIDERED BY YOU TO PROVE THAT DEFENDANT IS A PERSON OF BAD CHARACTER
OR THAT [HE] HAS A DISPOSITION TO COMMIT CRIMES. [IT] <u>MAY BE CONSIDERED BY YOU</u>
[ONLY] <u>FOR</u> THE LIMITED <u>PURPOSE OF DETERMINING IF IT TENDS TO SHOW</u>:

[A CHARACTERISTIC METHOD, PLAN OR SCHEME USED IN THE COMMISSION OF THE OFFENSE
IN THIS CASE WHICH WOULD FURTHER TEND TO SHOW]

[OR] [<u>THE IDENTITY OF THE PERSON WHO COMMITTED THE CRIME</u>, IF ANY, OF WHICH THE
DEFENDANT IS ACCUSED] [OR] [<u>A CLEAR CONNECTION BETWEEN THE OTHER OFFENSE AND THE</u>
<u>ONE OF WHICH THE DEFENDANT IS ACCUSED SO THAT IT MAY BE INFERRED THAT IF DEFENDANT</u>
<u>COMMITTED THE OTHER OFFENSE[S] DEFENDANT ALSO COMMITTED THE CRIME[S] CHARGED IN</u>
<u>THIS CASE];]</u>

[<u>THE IDENTITY OF THE PERSON WHO COMMITTED THE CRIME</u>, IF ANY, OF WHICH THE
DEFENDANT IS ACCUSED;]

[<u>THE DEFENDANT HAD KNOWLEDGE OF THE NATURE OF THINGS FOUND IN</u> [HIS] [HER]
<u>POSSESSION;]</u>

[<u>THE DEFENDANT HAD KNOWLEDGE OR POSSESSED THE MEANS THAT MIGHT HAVE BEEN USEFUL</u>
<u>OR NECESSARY FOR THE COMMISSION OF THE CRIME CHARGED;]</u>

FOR THE LIMITED PURPOSE FOR WHICH YOU MAY CONSIDER SUCH EVIDENCE, YOU MUST
WEIGH IT IN THE SAME MANNER AS YOU DO ALL OTHER EVIDENCE IN THE CASE.

[YOU ARE NOT PERMITTED TO CONSIDER SUCH EVIDENCE FOR ANY OTHER PURPOSE.]

(See: Exhibit "W", CT. 0510-0511, RT. 2744-2755)

INFERENCE MUST BE A PRODUCT OF REASON AND LOGIC

In support of petitioner's claim, it was error to instruct the jury with the permitted inference's listed in CALJIC 2.50 as charged, because there is no clear connection that would prove all elements of charged offenses from uncharged offenses, the petitioner cites the following case law....

In criminal cases, ultimate test of any evidentiary device's constitutional validity in a given case is whether device undermines fact finders responcibility at trial, based on evidence adduced by the state, to find the ultimate facts beyond a reasonable doubt. (See; <u>County court of Ulster County v. Allen</u>, 442 U.S. 140,156, 99 S.Ct. 2213 (1979)

There must be a "rational connection" between the basic facts that the prosecution proved and the ultimate fact presumed. The inference must be rejected unless the evidence necessary to invoke the inference is sufficient for a rational jury to find the inferred fact beyond a reasonable doubt. (See; <u>Barns v. United States</u>, 412 U.S. at pp.842-843, 93 S.Ct. at 2361-2362.)

Since the prosecution bears the burden of establishing guilt, it may not rest its case entirely on a presumption unless the fact proved is sufficient to support the inference of guilt beyond a reasonable doubt. (<u>County Court of Ulster County v. Allen</u>, supra 99 S.Ct.22213 at pp.2229,2230, 442 U.S. 140)

Instructions that allow a jury to convict without finding every element of the offense violates In re Winship's requirement that "every fact necessary to "constitute the crime" must be proven beyond a reasonable doubt. (<u>Keating v. Hood</u>, 191 F.3d 1053, at p. 1061 citing <u>In re Winship,</u> 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

Due process "requires criminal convictions to rest upon a jury determination that

-36-

40

1  the defendant is guilty of every element of the crime with which he is charged, beyond

2  a reasonable doubt." (United States v. Gaudin, 515 U.S. 506, 510, 115 S.Ct. 2310,

3  12 L.Ed.2d 444 (1995).

4  Permissive presumption's affects the application of the "beyond a reasonable

5  doubt standard only if, under the facts of the case, there is no rational way the

6  trier could make the connection permitted by the inference. For only in that situtu-

7  ation is there any risk that an explanation of the premissible inference to a jury,

8  or its use by a jury, has caused the presumptively rational factfinder to make an

9  erroneous factual determination. (County Court of Ulster Cty v. Allen, supra 99

10  S.Ct. at p.2225)

11  Thus, the inferences permitted by CALJIC 2.50 "if defendant committed prior

12  uncharged crimes, defendant committed all crimes charged" could never meet the due

13  process standards set out in Ulster county. The connection between prior offense

14  evidence and guilt of the current offense is merely speculative without evidence

15  supporting the current charge. (See; People v. James, supra, 81 C.A.4th 1343, at

16  pg.1359-60) Thus, corroborating evidence must be established which was never required

17  by CALJIC 2.50.

18  A similar issue arose addressed in fomer CALJIC 2.50.01 and 2.50.02 which were

19  held unconstitutional because; "..none of the connections permitted by the instruction

20  is moored to any of the facts of the charged offense. The circumstances on which the

21  inferences are based relate only to the defendant, not to the facts of the charged

22  offense. without considering those facts, and former CALJIC 2.50 did not require the

23  jury to do so before inferring guilt, there is "no rational way the trier could make

24  the connection permitted by the inference." (People v. James, supra,  81 C.A4th at

25  pg. 1356-57) Thus, the inferences permitted by former CALJIC 2.50.02 fail to meet

26  the due process standards set out in Ulster County. The connection between prior

27  offense evidence and guilt of the current offense is merely speculative without evidence

28  supporting the current charge. (at pg.1356)

-37-

III

PRIOR MISCONDUCT CAN NOT BE USED TO SHOW IDENTITY

<u>VOID OF CHARACTERISTIC'S</u>

Petitioner contends the ruling, that allowed the prior uncharged act's to be used as proffered evidence, under <u>Evid. Code, §1101(b)</u>, to prove the identity of the person who committed the crimes charged was erroneous, and greatly reduced the prosecution's burden of proof, in violation of the United States Constitution 5th, 6th, and 14th Amendments, and State of California's Constitution Art. 1 Sec. §7, and §15, Due Process provisions. Especially, in a case like this were identity was the gravamen issue.

Petitioner contends, that the preliminary facts relating to the three prior act's of alleged misconduct, were not sufficiently unique, as to be like a signature, and useable to prove the identity, of the person who committed the crimes charged, under <u>Evid. Code, §1101(b)</u>. The proffered evidence of the prior act's was inadmissible under <u>Evid. Code, §1101(a)</u>, at the very least, at the most were unproven.

(A)

To show identity

RULE OF ADMISSIBILITY:

Evidence of the <u>defendant's</u> other crimes is ordinarily admissible to identify the defendant as the perpetrator if that evidence disclose's a <u>distinctive modus operandi</u> common both to the other crimes and to the crimes charged. <u>People v. Haston</u>, 69 Cal.2d 233, 70 C.R. 419, 444 P.2d 91 (1968); <u>People v. Sanchez</u>, 33 C.A.3d 413, 109 C.R. 56 (1973); <u>People v. Reza</u>, 152 C.A.3d 647, 199 C.R. 664 (1984).

Generally, modus operandi is a means of proving the identity of the perpetrator of the crime charged, by demonstrating that the defendant had committed in the past other crimes sharing with the present offense features <u>sufficiently unique</u> to make it likely that the same person committed the several crimes. <u>People v. Sam</u>, 71 Cal.2d 194, 77 C.R. 804, 454 P.2d 700 (1969).

-34-

1    The highly unusual and distinctive nature of both the charged and uncharged

2  offenses virtually eliminates the possibility that anyone other than the defendant

3  committed the charged offense. People v. Balcom, 7 Cal.4th 414, 27 C.R.2d 666, 867

4  P.2d 777, (1994).

5    To be relevant on the issue of identity, the uncharged crimes must be highly

6  similar to the charged offenses. People v. Kipp, 18 Cal.4th 349, 75 C.R.2d 716,

7  P.2d 1169 (1998), cert denied 525 U.S. 1152, 119 S.Ct. 1055, 143 L.Ed.2d 61 (1999).

8    The uncharged misconduct and the charged offense must share common features

9  that are sufficiently distinctive so as to support the inference that the same

10  person committed both acts. People v. Ewoldt, 7 Cal.4th 380, 27 C.R.2d 646, 867

11  P.2d 757,(1994); People v. Medina, 11 Cal,4th 694, 12 Cal.4th 651b, 47 C.R.2d 165,

12  906 P.2d 2 (1995); as modified (1996); People v. Rivera, 41 Cal.3d 388, 211 C.R. 562,

13  710 P.2d 362 (1985).

14    The pattern and characteristics of the crimes must be so unusual and distinctive

15  as to be like a signature. People v. Ewoldt, supra; People v. Kipp, supra.

16

17                                    (1)

18                      ACT 1 JACK BIESER INCIDENT'S

19    Petitioner contends, that there is nothing about the act, of rummeging through

20  the truck of a car, (if believed), that could be so distinctive, of a pattern and

21  characteristic, that anyone other than the defendant committed the charged offense's.

22                      JACK BEISER'S TESTIMONY

23    The prosecution call Jack Bieser in there case and chief as the second withess

24  of the nineteen witnesses the prosecution called. Thus, implanted in the minds of

25  the jury, early in the trial, the defendant was of bad char:     and possessed

26  criminal disposion on the day in question.

first incident

27

28    Jack Bieser testified that at 6:00 a.m. he walked out of his apartment, saw the

rummagingthroughthe trunk. Then he went ahead and attacked him. (R.T.1780,ln.16-22)

He felt violated so he attacked him (ln.27-28).

Jack Bieser did not know who it was. (R.T.1781,ln.1,2,). He knocked him down and then saw he had some merchandize with him. Then recognized him as the defendant. (R.T.1781,ln.15-19).

He said the defendant was wearing green short's no shirt or shoe's. Mr Bieser discribed the defendant as a neanderthal. Very skinny, shorts, sweaty, short hair kind of sticking out, eyes wide open, he didn't look well. (R.T.1778,ln.25-28).

Mr. Bieser, in his own words describes  what happened. "I just dont know what to do with him. He's slippery, sweaty. I just get on -- I was hitting him, and I couldn't hit him that hard. I just couldn't do it. I was trying to think do you arrest him, do you detain him, and then he finally slipped away and ran off. I chased after him." (R.T.1782, ln. 13-21).

Then he lost him. (ln.21-22)

second incident

About an hour and a half later Mr. Bieser see's a person that walks like the defendant. Q. "you see him, then its now what, about seven O'clock roughly?

A. "" Yeah, 7:30, Eight O'clock" (R.T. 1784,ln.12-14)

wearing different clothes. "he's wearing khaki pants, like a pendleton, beige, red in it, and a baseball cap." (R.T.1784, ln.17-18) and tenis shoes."

Q. "Any problem recongnizing him that second time?"  A. "No, I could tell by the way he walked." (R.T.1784, ln.2122).

Mr Bieser yell's and runs at him "come here you son of a bitch" (R.T.1n.24-28) This person starts running then disapears (R.T.1785,ln.14-15). Never see's him again. (ln.25-27)

After coming around a corner Mr. Bieser see's a red saab take off! (R.T.1786,ln.6-8) Hears tire screech, but does not hear any car door's (R.T.1786,ln.10-13), does not hear and engine start, his belief is that the car is already runing (ln.15-17).

-40-

## TROUBLING PARTS OF TESTIMONY

The troubling part's of Jack Bieser's testimony are:

(1) The distence he was from the person during the second incounter. (R.T.17 95,ln.23-25) Q. "And how far away from you was he at that time?" A. "I'd say about 130, 140 yeards."

(2) The fact, he did not recognize him. (R.T.1807-08,ln.28,1-4). Q."Did you have any trouble recognizing him that second time? was he close enough so you could see him?"

A. "<u>I couldn't recognize him</u>, because he had his hat pulled over his head. <u>I recognized him by the way he walked."</u>

(3) The fact he never saw the defendant drive a saab. (R.T.1802,ln.17-19)

(4) The fact he never saw the defendant get in a saab. (R.T.1803,ln.1-3)

(5) The fact he was told that the car belonged to a guy named "Lance's" (R.T. 1788,ln.4-5).

(6) Later he is told that it belong's to  "Will,Smith" ? (R.T.1789,ln.19-22)

(aa)

### ARGUMENTS

Petitioner contends there was no substantial evidence to support an inference, that in fact, the person Jack Bieser saw the second time, was the defendant.

There is no substantial evidence of solid value to support an inference, that the person who Jack Bieser saw the second time ever got into, or drove a red saab.

There is no substantial evidence or evidence of solid value, to support an inference, that in fact the red saab he saw, was a car belonging to a William Wadsworth.

Petitioner ask's what is the probative value, that could prove any of the elements contained in the felonies charged?, let alone, "identity".

-41-

II

PROSECUTION FAILED TO PRODUCE ANY EVIDENCE CHARLES MIRABLE
WAS A VICTIM OF A CAR TAMPERING IN FRONT OF HIS HOUSE

INSUFFICIENT 1101(B) EVIDENCE

During the 402 hearing on admissibility of uncharged misconduct, admitted as prior crimes committed by the defendant, with permitted inferences listed under CALJIC 2.50 as given, (See; RT.1741-1750) in the prosecution offer of proof, involving a Charls Mirable, the prosecution stated;

"...MR. CHARLES MIRABLE, HE'S A NEIGHBOR OF ONE OF THE CHARGED RESIDENTIAL BURGLARY VICTIMS. MR. MIRABLE'S UNLOCKED CAR IS OUTSIDE OF HIS RESIDENCE, THERE WAS PROPERTY THAT WAS TAKEN FROM IT. IT WAS NOT LOCKED... " (RT.1742,LN.13-17)

Yet, during the prosecutions case-in-chief, the people produced NO EVIDENCE, that Mr. Mirables car was tampered with out-side the front of his house, and that his ID's were taken from this vehicle. In fact the prosecution failed to produce any evidence that Charls Mirable was a victim of a crime or where this alleged crime took place.

Charls Mirable never testified, leaving the record void that a crime took place, or where.

PROSECUTION MUST PROVE PRELIMINARY FACTS

The preliminary determination of admissibility as to whether evidence of uncharged misconduct can be admitted as prior crimes commited by the defendant is governed by **Evid. Code, §403**, when the defendant claims he did not committ the prior crimes. Thus, any evidence under **Evid. Code §1101(b)**, must be conditionally admitted. The burden of proving any necessary preliminary facts is on the proponent, and must be found

1  true by a jury before proffered evidence, may be permitted as inference

2  of guilt, such as are listed under CALJIC 2.50, become applicable to

3  charged offenses. (See; **People v. Simon,** 184 C.A.3d 125,131, 228 C.R.

4  855 (1986) Stating that when the admissibility of certain evidence

5  turns on the determination of some "preliminary fact", Section 403

6  is controlling) at p. 131,132).

7      Although the prosecution informed the trial court he needed Mr.

8  Mirable's testimony, because "..I HAVE TO  ELIMINATE HIM AS A SUSPECT

9  IN THE JURY'S EYE'S.." in addition "MR. MIRABLES' UNLOCKED CAR IS OUT-

10 SIDE OF HIS RESIDENCE, THERE WAS PROPERTY THAT WAS TAKEN FROM IT.."

11 These facts were only preliminary findings which **must be proved** under

12 the requisite burden of proof, by the prosecution and found true by the

13 jury. Before any inference of guilt may apply. In addition the jury

14 must also determine whether or not defendant committed this uncharged

15 misconduct. (See; **People v. Simon**, supra, 184 C.A.3d at p.129,130)

16     Petitioner contends, the principal of law that the proponet has

17 the burden of proving preliminary facts, that a uncharged crime took

18 place, and that the defendant committed this act, before uncharged

19 misconduct can be deemed prior uncharged crimes committed by the

20 defendant, Than the jury can use permitted inferences listed by CALJIC

21 2.50 become applicable, is mandated by the 6th amendment right to a

22 jury trial (See: U.S. const. 6th amend.)

23     In addition, any evidence pretaining to the preliminary facts

24 must be brought before the jury in the court of law, subjected to cross-

25 examination by the defendant. (See 6th amend, right to confrontation

26 clause, U.S. Const.) and subject to the rules of evidence.

27     Which was completely and utterly bypassed by the prosecution,

28 rendering the resulting conviction a farce, a mockery of justice

ACT III.
JANICE BONER

1    The prosecution in the case and chief, called Janice Boner. The incident was

2    labled under Evid. Code 1101·(b) as prior misconduct committed by the defendant. And

3    used as, (a) A characteristic method, plan or scheme used in the commission of the·

4    offense, (b) The identity of the person who committed the crime's charged, (c)

5    That the defendnat had knowledge ofthe natureof things found in his possession;

6    that the defendant had the intent, necessary for the commission of ·the crime's

7    charged.    (See; CALJIC 2.50 as given, CT.0510-0511, Exhibit "W")

8        The evidence was also used as circumstantial.

9                            (A)

10                   TESTIMONY OF JANICE BONER
                      (See; R.T. 2223-2231)

11        Janice Boner testified that she lives at 1951 Park view terrace in La Jolla.

12    (Pg.2223). Monday morning (Aug.13th,2001) She noticed that· the glove compartment

13    was open, different things ajar. But thought one ofthe kids or her husband had been

14    looking for something, and didn't realize that something had been stolen from her

15    car or that it had been broken into.

16        After meeting with· Detective B.J. Schultz, on Aug. 14th, Property was returned

17    to her. Keys, some cloths and a pocket Knife. She was not sure if the Knife was

18    hers. She also was given her I.D. card (expired license), (R.T.2226-2228)

19        Her car windows were left open (R.T.2229).

20        No photo's of the items were taken, before they were returned, (R.T.2231) and

21    none of these items were     : produced at trial to cross-examine.

22                            (B)
                   TESTIMONY OF ESWARD NUGENT·
23                    (R.T.2298-2312)

24        The prosecution also intoduced the testimony of officer Edward nugent, who

25    testified he searched the defendant. (R.T.2299-2300) That he found a number of

26    key's as well as keys to vehicles, a partial credit card, a magnifying glass, small

27    telescope, a kind of spyglass, and a red swiss army knife. (R.T.2301-2302 ).

28

## JURY NOT INSTRUCTED THEY MUST FIND PRELIMINARY FACTS

The prosecution failed to provide substantial evidence that the defendant tampered with Janice Boner's vehicle.

And any inference's that the defendant did committ the prior misconduct, was purely speculative.

Further more, you cannot conclude even speculation, as to who might have committed the Janice Boner incident, untell after the prosecution proved, who committed the crimes charged. Thus, creating a vicious circle. (See: **People v. Long**, 7 Cal.App. 3d 586 (1970); **People v. Erving** (1998) 63 C.A.4th 652.) |Condemning circular reasoning|

In addition, the incident involving Janice Boner, is absent, of any sufficiently unique characteristics, to be used under Evid. Code, 1101(b) to prove the identity of the person who committed all the crimes charged. (See: **People v. Ewoldt**, 7 Cal. 4th 380, 27 C.R.2d 646, 867 P.2d 757,(1994); **People v. Medins**, 11 Cal.4th 694, 47 C.R.2d 165, 906 P.2d 2 (1995), and modified (1996); **Peole v. Rivera**, 41 Cal.3d 388, 211 C.R. 562, 710 P.2d 362 (1985).)

## JURY NEVER INSTRUCTED ON PRELIMINARY FACTS

Petitioner also contends the jury was never instructed that they had to find the preliminary facts true first, before proffered evidence became applicable under Evid. Code 403, otherwise the jury must reject the proffered evidence for any purpose.

Jury was never required to find whether or not the defendant was in possession of property belonging to Janice Boner, or that a crime was committed. (See; Trial courts failure in instruct jury must find preliminary facts otherwise reject proffered evidence for any purpose claims)

MOST IMPORTANT, the Janice bonner incident is void of any characteristics.

ALL THREE PRIOR ACTS WHERE INADMISSIBLE TO SHOW
COMMON DESIGN OR PLAN.

Petitioner contends, all three alleged acts of misconduct, constitutes, at

best, tampering with a vehicle under Vehical Code §10852, which has nothing in com-

mon with burglaries, let alone, residential burglary, possession of stolen property,

or theft of a vehicle, to be deemed a plan, or scheme.

Although existence of a design or plan may be proved collaterally by evidence

that the defendant has performed acts having such a concurrance of common features

that the various acts are naturally to be explained as caused by a general plan

of which they are the individual manifestations, the prior uncharged misconduct

is absent of common features that could be considered individual manifestations.

(See; People v. Ewoldt, 7 Cal.4th 380, 27 C.R.2d 646, 867 P.2d 757,(1994).

There must exist a high degree of similarity between the charged and uncharged

offenses, evidence of the uncharged similar misconduct is not admisssible to estab-

lish a common design or plan only where the charged and uncharged acts are part of

a single, continuing conception or plot. (Ibid)

Instead, evidence of a defendant's alleged uncharged misconduct is admissible

only where the uncharged misconduct and the charged offense are sufficiently similar

to support the inference that thay are manifestations of a common design or plan.

This rule, however, does not mean that evidence of a defendant's similar uncharged

acts that demonstrate the existence of a common design or plan will be admissible

in all or even most criminal prosecutions.(Ibid)

In many cases the prejudicial effect of such evidence will outweigh its probative

value, because the evidence would be merely cumulative, such as in this case, regar-

ding an issue that was not reasonably subject to dispute. (Ibid)

This is so because evidence of a common design or plan is admissible only to

establish that the defendant engaged in the conduct alleged to constitute the charged

offense, not to prove other matters, such as the defendant's intent or identity as

to the charged offense. (People v. Ewoldt, 7 Cal.4th 380, 27 C.R.2d 646, 867 P.2d 75,

(1994).

-46-

To establish a common design or plan, evidence of uncharged misconduct <u>must</u> demonstrate not merely a similarity in the <u>results</u>, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the <u>idividual's manifestations.</u> (See; **People v. Ewoldt**, supra; **People v. Balcum**, 7 Cal.4th 414, 27 C.R.2d 666, 867 P.2d 777,(1994).)

To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a <u>series</u> <u>of</u> <u>similar</u> <u>spontaneious</u> <u>acts</u>. ( **People v. Ewoldt**, 7 Cal.4th 380, 27 C.R.2d 646, 867 P.2d 757(1994); **People v.Kipp**, 18 Cal.4th 349, 75 C.R.2d 716, 956 P.2d 1169 (1998),cet, denied, 525 U.S. 1152, 119 S.Ct. 1055, 143 L.ed.2d 61 (1999); **People v. Kraft**; 23 Cal.4th 978, 99 C.R.2d 1, 5 P.3d 68 (2000), cetrl denied, 121 S.Ct. 1234, 149 L.Ed.2d 142 (U.S.2001).)

ALL THREE PRIOR ACTS WHERE INADMISSIBLE TO SHOW THAT
DEFENDANT HAD THE REQUISITE INTENT, OR MOTIVE TO COMMIT
CRIMES CHARGED, OR KNOWLEDGE OF THE THINGS IN HIS POSSESSION.

Petitioner contends, the use of alleged prior misconduct, to show that the defendant, horbored the requisite intent, or motive, or knowledge of the things in his possession, was erroneous. Intent was not a issue. The use of alleged uncharged misconduct to prove the defendant had motive and knowledge was merely cumulative.

The gravamen issue was the identity of the culprit, not intent, knowledge or motive.

Evidence of other crimes or wrongful acts may be introduced to show criminal intent or guilty knowledge only if the element of intent or knowledge is both material, and uncertain or disputed. (See: People v. O'Brien, 96 Cal.171, 31 P.45 (1892); People v. Giani, 145 C.A.2d 539, 302 P.2d 813 (1956); People v. Miranda, 44 Cal.3d 57, 241 C.R. 594, 744 P.2d 1127 (1987)).

Evidence of another crime to show intent or guilt knowledge is inadmissible if the defendant's intent to commit the crime's charged is conclusively inferable from the evidence introduced with direct reference to the act for which he is on trial, such that if the jury were to find that the defendant committed the act alleged, there could be no reasonable dispute that he harbored the requisite criminal intent. Such as in this case. (See: People v. Byrnes, 27 Cal.App. 79, 148 P.944 (1915); People v. Balcom, 7 Cal.4th 414, 27 C.R..2d 666, 867 P.2d 777 (1994)).

Although evidence of other crimes is admissible, where proof of the defendant's intent is ambiguous, as where the defedant admits the acts and denies the necessary intent because of mistake, or accident. This rule of admissibility does not apply to the case at hand. First intent was not ambiguous, second, the defendant did not admit to the charged or uncharged crimes. (See; People v. Felix, (1993) 18 C.R.2d 13, 14 C.A.4th 997; People v. Ewoldt, (1994) 27 C.A.2d 646, 7 C.A.4th,380, 867 P.2d 757 People v. Wilson, (1991) 278 C.R. 319, 227 C.A.3d 1210)

IN SUM

JACK BEISER INCIDENT

Clearly the Jack Bieser incident which involved the act of rummaging through the truck of his wifes car, parked outside his appartment, miles away from charged offenses in which no property was taken, than almost two hours later, he sees someone who walks like the defendant disappear were a red saab that had already been running, and where the witnesses heard no doors open or shut, and where the witness later learned that the saab belonged to a guy named "Will Smith"? (See; RT.1777-1816) could possibly "constitue prima facie" evidence of each elemental fact of all crimes charged. (Counts 1-11) Just what type of crime is this?

There is no way the trier of fact could make the connection permitted by the inference. (See; Ulster County Court v. Allen, supra, 442 U.S. at p. 157)

If the reviewing court agrees, that the Jack Bieser incident was sufficient to prove each and every element of the charged offenses, beyond a reasonable doubt, as is required by the due process clause of the United States Constitution, (See; In re Winship, 90 S.Ct. 1068,1071; Sullivan v. Louisiana, 113 S.Ct. 2078,2079) well The reviewing court would still have to reverse the conviction, because, there was no instruction allowcating that the prosecution beared the burden of proving uncharged offenses, under the requisite burden of proof, which in this case was beyond a reasonable doubt.

CHARLES MIRABILE

The prosecution in their case-in-chief produced no evidence that a crime took place involving a Charles Mirabile, or where. Charles Mirabile never testified, leaving the record void of any evidence that a crime took place. Or that the defendant committed any crime involving a charles Mirabile. thus ALL permitted inferences listed by CALJIC 2.50 were unconstitutional under any standerd. There was no crime!

-49-

101

JANICE BONER INCIDENT

Although the Janice Boner incident poses a different scenario, it produces the same absured result.

Even if we new for a fact that the defendant was in possession of keys belonging to Janice Boner, Although the jury was never required to find this fact ture first, In addition impounding officer Eedward Nugent had no idea were this property came from? This evidence doesn't even prove defendant committed the crime involving a Janice Boner, let alone, each and every element of all eleven crimes charged beyond a reasonable doubt. Nor was the jury told what type of crime the Janice Boner incident was? Or elements the prosecution must prove in order to find defendant guilty of this crime?

All three alleged uncharged crimes fail miserably to meet the due process standards set out in Ulster County. Thus, each one becomes a legaly inadequate legal theory which requires reversal, Because there is no-way to know which theory of the many presented to the jury were used.
Resulting conviction must be reversed.

GROUND FOUR

PETITIONER CLAIMS, PERMITTED INFERENCE LISTED UNDER CALJIC 2.50 "IF DEFENDANT COMMITTED UNCHARGED CRIMES, DEFENDANT COMMITTED ALL CRIMES CHARGED" IS CONSTITUTIONALLY INFIRM. REMOVING THE PROSECUTIONS BURDEN TO PROVE EACH ELEMENT OF CHARGED OFFENSES, BEYOND A REASONABLE DOUBT. THUS, VIOLATES DEFENDANTS RIGHT TO DUE PROCESS UNDER U.S. CONSTITUTION 14TH AMENDMENT, AND 6TH AMENDMENT RIGHT TO JURY TRIAL. APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RIASE ISSUE ON DIRECT APPEAL.

## FACTS

* Prosecution introduced in their case-in-chief evidence of uncharged offenses involving three alleged victims of car tampering. Janice Boner ; Jack Bieser; nad Charles Mirabile; as prior crimes committed by defendant under evidence Code §1101(b). (See; R.T.1741-1750)

* Trial court instructed jury could infer "if defendant committed prior uncharged offenses, defendant committed (ALL) crimes charged. (See; Charge to jury, RT.2765,ln.10-13; CALJIC 2.50 as given Exhibit W)

* Incident involving Jack Bieser was an allegation, defendant was seen looking in truck of his wifes car at 6:00am on August 12th, same day as other charged offenses. (See: RT.1777-1832, testimony of Jack Bieser) Jury was never told what type of crime this conduct alleges to be, or that jury had to find this conduct was a crime.

* Prosecution produced no evidence that Charles Mirabile was a victim of a crime, or that a crime took place at his reseidence, out-side his house, or that his car was tampered with.

* Janice Boner incident was predicated upon a determination as to whether or not Key's belonging to her were found in defendants possession, a fact that was heavily contested, Yet, Jury was not required to make preliminary factual determination, as to whether or not defendant was found in possession, before inference from proffered evidence became

applicable, or that this act constituted a crime under a requisite peanal code.

   * CALJIC 2.50 simply calls these uncharged acts crimes, " EVIDENCE HAS BEEN INTRODUCED FOR THE PURPOSE OF SHOWING THAT THE DEFENDANT COMMITTED CRIMES OTHER THAN THAT FOR WHICH HE IS ON TRIAL.." Thus, a directed verdict, conduct was a crime, which was removed from jury determination.

   * CALJIC 2.50.1 and 2.50.2 were not given.

   * Appellate counsel raised no issues that challenge the conviction in petitioners opening brief.

   * Petitioners only remedy is by writ of Habeas Corpus.

POINTS AND AUTHORITIES

The language contained in CALJIC 2.50 states, "Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial. [Except as you will otherwise be instructed,][this] evidence, if believed,...may be considered by you ....to show: [a clear connection between the other offense and the one of which the defendant is accused so that it may be inferred that if defendant committed the other offenses defendant also committed the crimes charged in this case]."

This language eliminates the need to prove any elements of the charged offense's, because "if the defendant committed the other offenses the defendant committed the crimes charged.

Where an instruction or omission wholly removes all the elements of the charge from the jury's failure to make a factual determination of an element of the offense, the error is reversible per se, not-with-standing defendant's failure to "dispute the existence of the predicate facts and that the evidence overwhelmingly established all the elements of [the charge].." People v. Cummings (1993) 4 C4th 1233,1316, 18 C.R. 2d 796; See also, Osborne v. Ohio (1990) 495 U.S. 103,123-25, 109 L.Ed. 2d 98.

Because the jury did not make requisite findings of each and every element of the crimes charged, there is no way to know what lagally in-sufficient theory the jury relied upon.

An improper instruction such as 2.50 as given, which permit's an improperlegal theory, requires reversal, because this instruction removes

1  the burden of having to prove all the elements of the crime charged.

2      The traditional rule is that reversal is required where it is un-

3  known whether the jury relied upon an improper legal theory. (**People v.**

4  **Guiton** (1993) 4 C.4th 1116, 17 C.R.2d 365; **People v. Green** (1980) 27

5  C.3d 1,69-70, 164 C.R.1).

6      Under this rule the prosecution must establish that "no juror

7  relied upon the erroneous instruction..." (**People v. Smith** (1984) 35 C.3d

8  798,809, 201 C.R. 311; see also **Stromberg v. California** (1931) 283 U.S.

9  359, 369-70, 75 L.Ed.2d 704; Cabana v. Bullock (1986) 474 U.S. 376,383,

10 fn 2, 88 L.Ed.2d 704) Although **Green** has been subjected to some scrutiny,

11 it remains viable. (See **People v. MOrris** (1988) 46 C.3d 1, 24, 249 C.R

12 119; soo also **People v. Brown** (1991) 226 C.A.3d 1361,1372, 277 C.R.309;

13 **People v. Landry** (1989) 212 C.A.3d 1428, 261 C.R. 254,(error due to

14 conflicting instructions on felony murder rule held prejudicial under

15 harmless beyond a reasonable doubt standard where it was uncertain

16 whether the jury relied on the right or wrong instuction.).

17     See also, **People v. Swain** (1996) 12 C.4th 593,607, 49 C.R.2d 390

18 reversing when record did not establish whether or not the jury relied

19 on the incorrect theory.

20     Similarly, in **U.S. v. Aguilar** (1996) 80 F.3d 329,333, the jury was

21 alternatively instructed upon a correct and incorrect theory of liability.

22 The 9th circuit held the error to be prejudicial because it could not

23 "tell whether the jury found the facts necessary to support a conviction"

24 (U.S. v. Aguilar 80 F3d at 333).

25     What the factfinder must determine to return a verdict of guilty

26 is prescribed by the Due Process Clause. The prosecution bears the burden

27 of proving of proving all elements ofthe offenses charged, See,e.g.,

28 **Patterson v. New York**, 432 U.S. 197,210, 97 S.Ct. 2319,2327, 53 L.Ed.2d

281 (1977); **Leland v. Oregon**, 343 U.S. 790,795, 72 S.Ct. 1002,1005, 96 L.Ed. 1302 (1952), and must persuade the factfinder, beyond a reasonable doubt, of the facts necessary to establish each of those elements, see **In re Winship**, 397 U.S. 358,364, 90 S.Ct. 1068,1072, 25 L.Ed.2d 368 (1970); **Cool v. United States**, 409 U.S. 100, 104, 93 S.Ct. 354, 357, 34 L.Ed.2d 335 (1972) This beyond a reasonable doubt, requirement, which was adhered to by virtually all common-law jurisdictions, applies in state as sell as federal proceedings.

It is safe to say CALJIC 2.50 removes this burden, from the prosecution of having to prove any of the elements on charged offenses, by inference from uncharged offenses. Which required only that prosecution produce testimony of let's say Jack Bieser, before defendant could be found guilty of all crimes charged.

To make permitted inferences listed on CALJIC more absurd, prosecution didn't even have to prove uncharged acts were a crime of some sort or that defendant was involved in it's commission beyond a reasonable doubt, before permitted inferences could be applied to charged offenses?

Thus, wholely removeing the prosecutions burden of proof beyond a reasonable doubt, of each and every element of the charged offenses.

Moreover, CALJIC 2.50 as given allows the jury to convict the defendant based entirely from uncharged crime evidence.

Under general rule, prosecution may not resort in its case in cheif to any kind of evidence of defendants evil character to establish probability of his guilt. [Michelson v. United States (1948) 69 S.Ct. 213, 335 U.S. 469, 475,476)

GROUND FIVE

PETITIONER CLAIMS, TRIAL COURT FAILED TO INSTRUCT JURY AS TO PROSECUTIONS BURDEN OF PROOF, OF DEFENDANTS GUILT ON UNCHARGED OFFENSES, BEFORE PERMITTED INFERENCES SUCH AS INFERENCE IF DEFENDANT COMMITTED OTHER OFFENSES, DEFENDANT COMMITTED ALL CRIMES CHARGED. THUS, STRUCTURAL DEFECT, WHICH CREATED INADEQUATE LEGAL THEORY, REQUIRING REVERSAL. IN VIOLATION OF 6TH, AND 14TH U.S. CONSTITUTION AMENDMENTS. (CALJIC 2.50.1 not givem)

APPELLATE COUNSEL RENDERED I.A.C. FOR NOT RAISING ISSUE ON DIRECT APPEAL (14TH AMEND)

FACTS

1. * Prosecution introduced in their case-in-chief, three prior uncharged acts of misconduct allegedly committed by defendant, under Evid. code, 1101(b). (See; RT. 1741-1750, 402 hearing) (Exhibit "BB")

2. * CALJIC 2.50 permitted jury could infer; Identity; plan or scheme; Knowledge; or inference "if defendant committed uncharged offenses, defendant committed all crimes charged". (See; CALJIC 2.50, as given; Exhibit "W") (C.T. 0510-0511)

3. * Trial court ruled prior uncharged crimes must be proven beyond a reasonable doubt. Which the prosecution agreed. (See; RT. 1748)

4. * CALJIC 2.50.1 and 2.50.2 were not given or modified. (See; Exhibit X & Y)

5. * Never was the jury instructed prior uncharged crimes must be proved beyond a reasonable doubt, or any burden of proof out-side the langauge of CALJIC 2.50 "if believed". (CALJIC 2.01 insufficient burden instruction for 1101(b) prior evidence)

6. * Appellate counsel did not raise any issues challenging the conviction in appelant's opening brief No. D040805. (Exhibit "E")

7. * Petitioners only remedy is by writ of Habeas Corpus.

8. Jury was never told that defendant had never been charged, or convicted of these alleged prior offenses, or what type of offenses they were.

- 56 -

I

JURY WAS NOT PROPERLY INSTRUCTED ON BURDEN OF PROOF

BEFORE PERMITTED USE OF PRIOR MISCONDUCT


SUMMATION OF CLAIM

The prosecution introduced in their case-in-chief, three prior uncharged acts of misconduct allegedly committed by the defendant.

The Honorable Judge Melinda J. Lasater ruled that all three uncharged acts could be used as inference to show, identity, knowledge, plan method or scheme, of the person who committed all crimes charged.

In addition CALJIC 2.50 (See; Exhibit B) was given in conjuction with a host of consciousness of guilt instructions such as CALJIC; 2.03, 2.06, 2.1, and 2.52.

When the jury was instructed, or charged CALJIC 2.50 was not corroborated with the standard CALJIC 2.50.1 or 2.50.2 which provide the burden of proof, of uncharged acts before inferences my be permitted.  (See: RT. 2744-2745)

CALJIC 2.50 does not provide the jury with any burden of proof criterion, outside the laguage contained within CALJIC 2.50 "If Believed". (See; CALJIC 2.50 Exhibit "W" CT. 0510-0511)

Petitioner contends that this error was fatal, and inherent to a structual defect, the kind of defect that mandate's reversal per se, because there has been no jury verdict within the meaning of the sixth Amendment. See; <u>Arizona v. Fulminante</u> (1991) 499 U.S. 279, 309, 11 S.Ct. 1246, 113 L.Ed.2d 302; <u>Sullivan v. Louisiana</u> (1993) 508 U.S. 275, 277-280, 113 S.Ct. 2078.

Trial court failed to give any version of CALJIC 2.50.1 which allocates the burden of proof, and specifies what that burden is, before proffered evidence of prior crimes can be permitted as inferences listed on CALJIC 2.50. In addition CALJIC 2.50.1 (See; Exhibit "X") also reminds jury to disregard proffered evidence for any purpose if prosecution fail's to meet it's burden of proving defendants involvement. In this case there was no instruction given.

## HOW THE ERROR OCCURRED

Although the trial court ruled all prior uncharged crimes must be proved beyond a reasonable doubt, it was the trial court's failure to instruct the jury as to any burden of proof, out-side the language "if believed", which created a structural defect.

The trial court ruled, "Prior crimes must be proved beyond a reasonable doubt". (See: R.T. 1748-1749).

THE COURT: "...I WILL FOREWARN THE PEOPLE THAT IT'S MY HABIT AND CUSTOM FOR 2.50 NOT TO USE THE PREPONDERANCE OF THE EVIDENCE INSTRUCTION, BUT TO JUST HAVE IT ALL PROVED BEYOND A REASONABLE DOUBT..." (See: R.T. 1748,ln.2-5)

The People did not object:

MR HELLSTROM: "...NO OBJECTION FROM THE PEOPLE..." (R.T.1748,ln.10)

The problem is that, when the trial court stated, "...it is my custom...not to use the preponderance of the evidence instruction.." which is CALJIC 2.50.1, the trial court failed to give any instruction as to the burden of proof before inference could be permitted.

CALJIC 2.50 being a standard instruction is designed to be given in conjunction with CALJIC 2.50.1 and 2.50.2 (See: Exhibit X & Y).

Petitioner contends, just because 2.50.1 is a preponderence of the evidence burden, does not preclude the trial court from modifying 2.50.1 to the beyond a reasonable doubt standard. Thus, the failure to give any instruction as to the burden of proof, or as ruled by the trial court, "beyond a reasonable doubt", before any of the inferences contained in CALJIC 2.50 could be used, created a structural defect. The kind of defect that mandates reversal per se. (See: In re Winship (1970) 397 U.S. 358, 90 S.Ct. 1068,1078, 25 L.Ed.2d 368,375; People v. Fitch (1997) 55 C.A.4th 172,182).

Petitioner contends, because the trial court ruled the prior uncharged crimes must be proved beyond a reasonable doubt, the trial court failed to give CALJIC 2.50.1 and 2.50.2. (See; R.T.1748,ln.2-5), relying insted on CALJIC 2.01, and CALJIC 2.90. Nothing contained in the laguage of CALJIC 2.01, or 2.90 require the jury to make the preliminary finding that in fact, as in this case, beyond a reasonable doubt, defendant committed the prior uncharged crimes. Thus a structural defect.

CALJIC 2.50.1 cures this defect by instructing the jury as follow's;

"Within the meaning of the preceding instrucitons, the prosecution has the burden of proving......that a defendant committed a crime other than that for which he is on trial...."

Then CALJIC 2.50.1 goes on to state;

"You must not consider this evidnece for any purpose unless you find by a 지구 [insert burden of proof] that a defendant committed the other crimes."

It was the failure of the trial court to give a modified version of CALJIC 2.50.1 which requires the prosecution to first prove the defendant committed the prior crimes, beyond a reasonable doubt, that causes the structural defect.

The reference to the part were the jury is charged "EXCEPT AS YOU WILL OTHERWISE BE INSTRUCTED," is a direct reference to CALJIC 2.50.1 which starts out by stating, "WITHIN THE MEANING OF THE PRECEDING INSTRUCTION, THE PROSECUTION HAS THE BURDEN OF PROOF." Yet was not given, nor can anyother instruction cure this lack of preliminary finding, under the requisite burden of proof.

Not only is 2.50.1 an important burden of proof instruction, it also reminds the jury that it is the prosecutions burden, and unless the prosecution meat this burden, the jury cannot use the profferred evidence as permitted by CALJIC 2.50. Which in this case, was allowed as inference of the ultimate issue.

1    The trial court could have very easly modified the burden of proof instruction

2  2.50.1 from the preponderence of the evidence, to beyond a reasonable doubt, standard.

3  Yet, was ignored by the prosecution, defense counsel, and the trial court.

4

5    Trial courts have the duty to screen out unsupported and invalid theories of

6  conviction, either by appropriate instructions or by not presenting them to the jury

7  in the first place. ( **People v. Guiton**, (1993), 4 Cal.4th 1116, 17 C.R.2d 365, 847

8  P.2d 45 (1993).

9    Petitioner contends never, at any time during the trial, did the trial court

10  instruct the jury verbally that it must prove the prior uncharged crimes beyond a

11  reasonable doubt, or that the jury may not consider prior uncharged crimes unless

12  proved. (such as the language used in 2.50.1).

13

14    Due process clause and Sixth Amendment right to jury trial require criminal

15  convictions to rest upon jury determination that defendant is guilty, of every element

16  of crime with which he is charged beyond a reasonable doubt. (**Sullivan v. Louisiana**,

17  508 U.S. 275, 277-278, 113 S.Ct. 2078, 2080,2081, 124 L.Ed.2d (1993).)

18    A jurys verdict cannot stand if the instructions given did not require the

19  jury to find each element of the crime under the proper standard of proof. (**Cabana v.**

20  **Bullock**, 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986)(abrogated on other grounds

21  by **Pope v. Illinois**, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987).

22    Thus, the instructions should inform the jury of the degree of proof required

23  for conviction. (**People v. Hess**, 107 C.A.2d 407, 237 P.2d 568 (1951).)

24

25    In sum, Petitioner contends the trial courts failure to instruct the jury that

26  (1) the prosecution must prove the defendant committed the prior uncharged crimes,

27  and the elements of what those crimes are, beyond a reasonable doubt, (2) that you

28  may not consider this evidence unless proved, similar to CALJIC 2.50.1, requires reversal.

-60-

GROUND SIX ; TRIAL COUNSEL RENDERED IAC, FOR FAILING TO REQUEST INSTRUCTIONS

PETITIONER CLAIMS, TRIAL COURT FAILED TO INSTRUCT JURY ON ELEMENTS OF UNCHARGED CRIMES,

NOR DID TRIAL COURT INSTRUCT JURY WHAT TYPE OF CRIME THE UNCHARGED ACT ALLEGED. HENCE,

STRUCTURAL DEFECT, REMOVING EACH AND EVERY ELEMENT FROM JURY CONSIDERATION, OF UN-

CHARGED UNADJUDICATED OFFENSES. BEFORE PERMITTED INFERENCE OF GUILT OF CRIMES CHARGED.

A VIOLATIOIN OF RIGHT TO JURY TRIAL AND DUE PROCESS OF LAW, 6TH, AND 14TH AMEND. U.S.

CONST. ISSUE SHOULD HAVE BEEN RAISED ON DIRECT APPEAL BY APPELLATE COUNSEL.


## FACTS

* Trial court ruled prior uncharged alleged crimes, must be proved beyond a

reasonable doubt. (See; RT. 1748,ln.2-5)(Exhibit "BB")

* Prosecution agreed with the trial courts ruling. (See: RT. 1748,ln.10-13)

* There was no instruction given to the jury as to what elements must be proved

by the prosecution, or what type of crime the prior uncharged misconduct alleges to

be under a specific penal code.

* At no time was the defendant charged with these prior offenses, or had there

been any former adjudication.

* Nor, was the jury instructed that they must find prior act constitutes a crime

under a certain penal code, as a preliminary fact, before inferences listed under

CALJIC 2.50 become applicable as proffered 1101(b) evidence. (CALJIC 2.50.1 not given)

* Trial court permitted inferences from proffered evidence such as; Identity;

method, plan or scheme; inference if defendant committed uncharged offenses, defendant

committed  all crimes charged; and knowledge of  things found in his possession; ect.

see CALJIC as given,(Exhibit "W", CALJIC 2.50,CT. 0510-0511)

* Appellant counsel raised no issues challenging conviction in petitioners opening

brief.

* Petitioners only remedy is by writ of Habeas Corpus.

—61—

POINTS AND AUTHORITIES

The Honorable Judge Melinda J. Lasater ruled that the prior un-charged misconduct, had to be proved beyond a reasonable doubt. (See R.T.1748,ln.2-5).(Exhibit "BB")

The prosecution not only, failed to object, but agreed with this burden. (See;R.T.1748,ln.10-13) Although, the ruling was of little consolation to the defendant, because the jury was never instructed as such. (See claim Trial court failed to give CALJIC 2.50.1)

CALJIC 2.50 as given, states "Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial." "This evidence, if believed,...may be con-sidered by you to prove that...if defendant committed the other offenses, defendant also committed the crimes charged in this case." (See; Exhiit "W").

PETITIONER POSES THE FOLLOWING QUESTION

How, do you prove beyond a reasonable doubt, that the defendant committed a crime, whether charged or uncharged, without instructing the jury, what the element's are of that crime, or what the crime's allegedly are? under any burden?

Petitioner contends the failure to instruct the jury on the elements of the alleged prior uncharged crimes, was reversable error. (See: People v. Cummings (1993) 4 C.4th 1233,1315-16, 18 C.R.2d 796) ....
..."Where an instruction or omission wholly removes all the elements of the charge from the jury's consideration, thus resulting in the jury's failure to make a factual determination of an element of the offense,

the error is reversible per se notwithstanding defendant's failure to

"dispute the existence of the predicate facts and that the evidence

overwhelmingly established all the elements of the charge..." (See

also: <u>Osborne v. Ohio</u> (1990) 495 U.S. 103, 123-25, 109 LEd2d 98).

Petitioner claims, the same protection should apply to prior

uncharged acts alleged as <u>crimes</u>. Because without instructing the jury

what thoughs elements are, violates the defendants Due Process right's

under both state (Cal. Const.Art.1 Sec.7,14,& 15th) and Federal const-

itutional Due Process provission's (U.S.Const.5 & 14th Amend.).

The shear fact that "Acts" was crossed out and replaced with the

word "crimes" on CALJIC 2.50 was a conclussion by the trial judge,

without Due Process of law.(<u>People v. Enos</u> (1973) 34 C.A.3d 25,42,109 C.R.276,888)

Petitioner contends that this should not have releaved the prose-

cution from having to prove each and every element of what those crimes

intail, before use as prior crimes committed by the defendant.

What the factfinder must determine to return a verdict of guilty

is prescribed by the Due Process Clause. The prosecution bears the

burden of proving all elements of the offense charged. (See; e.g.,

<u>Patterson v. New York,</u> 432 U.S. 197,210, 97 S.Ct. 2319,2327; 53 L.Ed.

2d 281 (1977); <u>Leland v. Oregon</u>, 343 U.S. 790, 795, 72 S.Ct. 1002,1005,

96 L.Ed. 1302 (1952), and must persuade the factfinder "beyond a rea-

sonable doubt" of the facts necessary to establish each of those elements,

See,e.g., <u>In re Winship</u>, 397 U.S. 358,364, 90 S.Ct. 1068,1072, 25 L.Ed.

2d 368 (1970); <u>Cool v. United States,</u> 409 U.S. 100, 104, 93 S.Ct. 354,

357, 34 L.Ed.2d 335 (1972).

It is the petitioner's contention that this same protection should

apply to alleged prior crimes. Especially when...

(1) there has been no prior ajudication regarding the prior mis-

1 | conduct alleged. And...

2 |    (2) This prior alleged misconduct was labled as a uncharged **crime**.

3 | Then used as infernce of guilt of <u>All Crimes Charged</u>.

4 |    It would not satisfy the Sixth Amendment to have a jury determine

5 | that the defendant is probably guilty, and then leave it up to the

6 | judge to determine (as Winship requires) whether he is guilty beyond

7 | a reasonable doubt. (<u>Sullivan v. Louisiana</u> 133 S.Ct. 2078,2081)

8 |    Yet, that is (in a indirect way) exactly what the trial judge did,

9 | by calling prior misconduct allegedly committed by the defendant, a

10 | crime. Than permit its use to prove that if the defendant committed the

11 | prior crimes, than he committed all crimes charged. (See; CALJIC 2.50

12 | as given, Exhibit W). The wrong enity made the conclusion prior acts were crimes.

13 |    Petitioner contends the trial court bypassed the Due Process clause,

14 | by failing to instruct the jury what the elements are that make the prior

15 | misconduct a crime, (let alone what the burden of proof was)before

16 | permitting its use as a inference of guilt of all crimes charged.

17 |    Without instructing the jury on each and every element of what

18 | crime the prior misconduct alleges to be, there is no-way the factfinder

19 | could possibly pass that infact the defendant committed them, Without

20 | violating the defendants Due Process right's of law.

21 |    Petitioner poses the following questions to the reviewing court;

22 |    (1) just what kind of crime was the Jack Bieser incident?

23 |    (2) What kind of crime was the Charles Mirable incident? Keep in

24 | mind he never testified.

25 |    (3) What kind of crime was the Janice Boner incident? Vehicle

26 | burglary (car was unlocked)? tampering with a vehicle? petty theft?

27 | possession of stolen property?

28 |  

PREJUDICE

1   Because the jury was never instructed of the elements of uncharged offenses

2   there is no way jury could have passed on each and every element of those offenses.

3   Nor, could jury have realized their responsibility to do so.

4   Failure to instruct on elements of uncharged offenses, wholely removes a critical

5   jury determination of preliminary facts i.e. prosecutions proof of uncharged offenses.

6   Thus, making CALJIC 2.50 permitted inferences unconstitutional legally inadequate

7   theroies premitted in direct violation of due process of law under the 14th amendment

8   of the U.S. Constitution. Resulting conviction must be reversed.

9   The principle that requires the jury to decide all of a crimes elements applies

10  to only the **essential elements** factual components has no support in case law.

11  (See; <u>U.S. v. Gaudin</u>, (1995) 115 S.Ct. 2310,2312)

12  In other words, there is no case law that the respondent can possibly cite that

13  would dispute petitioners contention, i.e., that he is entitled to a jury properly

14  instructed as to all elements of a uncharged offense, where he claims he had no part

15  in it's commission, and there has been no former adjudication. Just like petitioners

16  right to have a jury properly instructed on all elements of the charged offenses.

17  The same **presumption of innocents** of charged offenses applies to uncharged

18  offenses **especially** where there part of the same spree, or res gestae. Therefore

19  the same principals of law that apply to charged offenses, in this case should also

20  be applied to uncharged offenses, i.e., prosecutions burden is to prove each and

21  every element of uncharged offenses first before permitted inferences can be applied.

22  The failure by the trial court to instruct the jury that uncharged acts must

23  be proved by the prosecution, and that burden included proving each and every element

24  of what constitutes a crime, violated petitioners sixth Amendment right to trial by

25  jury, especailly in serious cases, which includes, as its most important element,

26  right to have jury, rather than judge, reach a requisite finding of "guilty". Judge

27  may not direct verdict for the state no matter how over whelming the evidence.

28  (<u>Sullivan v. Louisiana</u> (1993) 113 S.Ct. 2078, 2080)

Ground Seven

1  APPELLATE COUNSEL RENDERED I.A.C. FOR FAILING TO
2  CHALLENGE CALJIC 2.03 USE OF FALSE STATEMENTS AS
3  DEFENDANTS GUILT OF ALL CRIMES CHARGED, WHERE
4  IDENTITY OF CULPRIT WHO MADE ALLEGEDLY FALSE STATE-
5  MENT WAS ULTIMATE MATERIAL FACT IN DISPUTE, AND
6  DEFENSE WAS THAT DEFENDANT WAS NOT THE GUY WHO
7  SPOKE TO VICTIMS AT THEIR RESIDENCE, THUS PETITIONERS
8  RIGHT TO A FAIR TRIAL, AND ASSISTANCE OF COUNSEL ON
9  DIRECT APPEAL WERE VIOLATED UNDER THE 6th AND 14th
10  AMENDMENTS OF THE U.S. CONSTITUTION

12  SUPPORTING FACTS

14  1.    During the course of trial, prosecution's witnesses
15  Phillip Hammerling and Diane Goedhuy testified that the
16  suspect seen at their separate residences, made
17  statements in response to their various questions that
18  a jury could infer were false, or misleading.
19  2.    The identity of the culprit who burglarized the four
20  victims garages, and unlawfully drove a vehicle belonging
21  to William Wadsworth, counts 1 through 10, was
22  the ultimate fact in dispute for the jury to decide.
23  3.    The defense did not dispute that the person who
24  spoke to Diane Goedhuy and Phillip Hammerling at
25  their residence was the culprit.
26  4.    Jury was not instructed that CALJIC 2.03's
27  listed inference of guilt could not be applied unless

- Cole -

1  jury first found beyond a reasonable doubt the
2  identity of the person who made false statements
3  was the defendant.
4  5.  The fact that the suspect made willfully false
5  statements that were deliberately misleading was
6  not probative in proving identity.
7  6.  Identity was the only issue in dispute.
8
9  COUNTS 1 & 2
10  7.  During course of trial prosecution produced no
11  evidence that the defendant, or anyone else, made
12  willfully false or deliberately misleading statements
13  concerning the crimes charged in counts 1 and 2.
14
15  COUNTS 3 & 4
16  8.  Diane Goedhuy testified that on the morning of August
17  12, 2001, she walked out the front door of her house to
18  look around because her dog was barking. (RT. 1836-1837)
19  when she turned towards her driveway she saw someone
20  walking out her office. The door was unlocked. She said
21  she saw the person "four of five feet" from the house holding
22  a camera and a check book. (RT. 1837).
23  9.  Diane Goedhuy couldn't remember her exact words,
24  but she thought she said "who are you, or what are you
25  doing walking out of my house?" The response by the suspect
26  was that he was "looking for the construction manager
27  of this site here, and that he was supposed to be having

-67-

1  a meeting with the manager of this construction going on "
2  (across the street). (RT. 1839) She said she douted that anyone
3  would be there on a Sunday. (RT. 1839)
4  10.  Mrs. Goedhuy told the suspect that her neighbor was
5  a contractor, she said mybe the person he was looking for
6  would be over there. The suspect responded by saying
7  "I'm going to get my car and back in the alley". (RT. 1839-1840)
8  11.  Mrs. Goedhuy implicated the defendant as the person she
9  saw standing in her driveway. (ln. 22-28, RT. 1840)
10  12.  Mrs. Goedhuy a few minutes later saw a Red Saab
11  drive by the back yard of her house. (RT. 1843)
12  13.  Later on that same day an officer came to her home and
13  returned her camara and check book. (RT. 1847)
14  14.  Mrs Goedhuy testified that she could not remember
15  what the reporting officer Breckenridge, looked like. (RT. 1852-1853

16

17  <u>Identification uncertain/indispute</u>

18

19  15.  During the pretrial photographic lineup it took Mrs.
20  Goedhuy a few minutes of careful study to finally make
21  her relative judgment "More inclined to say him, Looks
22  more like him." (RT. 1871-1873) (See: also photolineup, exhibit
23  "DD" attached to petition)
24  16.  Diane Goedhuy testified she had difficulty picking
25  out a photo because the person she saw that day was
26  wearing a hat, and none of the people in the photo lineup
27  were wearing hats. (RT. 1873-1875)

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 98 10924

7. Diane Goedhuy discribed the suspect she spoke to as wearing a blue hat, white Polo shirt, short sleeves, open collar, and blue jean type pants which were light blue in colbr. (1877-1879)

8. Mrs Goedhuy also testified that the height of the suspect was between 5'6" to 5'8". (RT. 1885, ln, 14-15)

9. The defendant is 6' feet tall, without a hat. (see RT. 1893-1894)

10. Mrs. Goedhuy was told by police that they had caught the suspect who stoled her property before conducting the photo line up. (RT. 1882-1883) and obveously she was under that impression before her in-court identification, while the defendant was wearing jail clothing. (RT 1888-1889)

11. Mrs. Goedhuy also testified she needs to wear glasses to see. (RT. 1890).

12. When asked:

Q. As you sit here today, do you recall how tall you told the police that the person was?

13. A. "I think you reminded me. I may have said 5'6" to 5'8". It just didn't seem like six feet tall to me."

14. (RT. 1894, ln 1-10).

15. In regards to count's 3 and 9, the defense was that the defendant was not the suspect seen standing in Mrs. Goedhuy's drive way holding a camara and check book, making false statements.

16. Defendant did not dispute statements made by suspect were willfully false.       -69-

COUNTS 4 & 8

17. There were no statements made by the defendant, or any suspects that had any relationship to the Michael Rahilly burglary.

COUNTS 5 & 10

18. Phillip Hammerling testified that after he had finished breakfast with his girlfriend and his parents he walked out to his garage to take some bottles of water to the refrigerator, when he saw someone standing in his garage. (RT. 1976-1978).

19. Mr. Hammerling stated that the person was standing in the very back of the garage to his left. He asked the person "what are you doing here?" The suspect responded "I'm sorry, I have the wrong house. I was looking for a neighbor."

20. Mr. Hammerling testified that the suspect started saying "I'm sorry, I have the wrong house. I was looking for a neighbor." He keep apologizing. He kept saying, "I'm sorry, I'm sorry, I made a mistake." As the suspect was saying this he slowly walked out of the garage. (RT. 1979-1980)

21. Mr. Hammerling testified the suspect got into a Red Volvo or saab and drove away. (RT. 1983)

22. Phillip Hammerling noticed some property, cell phones, and a change box were missing from his parents car. (RT. 1984-1986).

~70~

## The Beer Bottle

23.  Phillip Hammerling later on noticed there was an open bottle of beer left on the floor of the garage. (RT. 1990)

24.  He gave the bottle to the officer, then watched the officer dist the bottle for finger prints. (RT. 1991.).

25.  Phillip Hammerling did not identify the defendant as the suspect in-court.

## Officer Gary Rivers

26.  Officer Gary Rivers testified he was the officer who responded to the Hammerling garage burglary. Officer Rivers testified he dusted the beer bottle given to him by the Hammerling's, and took two talent prints and put them on cards marked exhibits 15-A and 15-B, and elimination prints marked exhibits 15-C, & 15-D, from the Hammerlings. (RT. 2008

27.  However, Officer Rivers, inspite of his experience, threw the beer bottle away. (RT. 2015-2016) Needless to say, the alleged beer bottle was not preserved for examination by the defense.

28.  Officer Rivers never checked or dusted the cars parked in the garage of the Hammerling residence for prints. Even though the property allegedly stolen was taken from the automobiles. (RT. 2058-2059)

29.  The latent print cards were not impounded or assigned tag numbers. Nor did Officer Rivers photograph the bottle at the Hammerling residence. (RT. 2024)

## Jane Jinings

30.  Jane Jinings testified she identified one fingerprint

- 71 -

1  on exhibit 15-A as belonging to the defendants exemplars.

2  31. However, Jane Jinings never took exemplars from the

3  defendant leaving the record void of any foundation for her

4  to testify that a print matched the defendants.

5  32. Jane Jinings also testified the remaining fingerprints

6  found on the latent lifts, did not belong to the defendant

7  and could have been placed by anyone. (RT. 2082-2083;

8  2092-2093).

9  33. Evidence that the police had found a fingerprint matching

10  the defendants was not discovered until after petitioners case

11  had been dismissed, Case number SCD 161961, some 2½

12  months later.

13

14  34. The defense to the Phillip Hammerling incidents counts

15  4 and 8, was that the defendant was not the person

16  Phillip Hammerling saw and spoke to, inside his open garage,

17  who made statements a jury could find were misleading

18  or false.

19  35. It was also the defense's possition that the one

20  single fingerprint allegedly lifted off a beer bottle from

21  the Hammerling residence, then thrown away, was spurious, or

22  ostensibly suspect, and an item easily fabracated.

23  (see; Lisa Di Meo's defense expert testimony on fabracated

24  latent prints, RT. 2622-2669)

25

26

27

COUNTS 6 and 7

36. Regarding the MacCarthy garage burglary, the prosecution produced no evidence jury could infer where false or Mrs leading made by the suspect or the defendant that were material.

Donna Berger:

37. Donna Berger, the neighbor who lived next door to the MacCarthy's residence, testified she saw a suspect leave the yard of the MacCarthey residence on a Bicycle and head up the road on the bicycle. (RT. 2173-2174)

38. Donna Burger testified she watched the suspect on the bicycle go about half way up the Hill, then turn around and came back down the hill very quickly. (See: RT. 2176-2177)

39. Mrs Burger testified she watch as the suspect went Into the gate of the MacCarthy residence, throw the bike down, then disappear. (See RT. 2177-2178)

40. Donna Burger said the suspect never got close to the Officer at the top of the Hill, and only made it about a third or half way up to the Officer. (RT. 2176-2177, ln. 18-28,1-2,

41. Donna Burger did not identify the suspect she saw on the bicycle as the defendant.

Officer Robert Herzig

42. Officer Herzig testified that he was holding the perimeter at the top of Calle Vista, when he saw the suspect coming up the hill on his bicycle. (RT. 2284-2285)

43. Officer Herzig said as the suspect on the Bicycle approach him, he stopped him and asked him for his I.D.


COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 98 10924

44. When officer Herzig asked the suspect for his I.D.
Officer Herzig testified the suspect said he left his
I.D at home. (See R.T. 2286, ln. 15-22)

45. Officer Herzig then testified the suspect turned around
and started following the suspect down the Hill thinking
the suspect was going home to get his I.D. (2286-2287)

46. Officer Herzig implicated the defendant as the suspect
he saw on the Bicycle, and spoke to, in court. (R.T. 2285-
2286)

47. However, Officer Herzig was not given a pretrial
lineup, and his first corporeal incounter with the defendant
was made in court at the trial, nearly a year later, after
the incident on August 12, 2001, (Highly suggestive).

48. Nonetheless, there was nothing to which Officer Herzig
testified to, regarding the statement made by the
suspect that "he left his I.D. at home", which a jury use
to make the priliminary finding that the statement
was willfully false, or misleading.

49. Nor was there any evidence introduced by the
prosecution that the responce to Officer Herzig's question,
regarding the whereabouts of the suspects Identifica-
tion, was material to any of the charged crimes.

50. In other words there was nothing about the suspects
response to officer Herzig's question that would even
remotely suggest guilt of committing the charged
offenses.

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)
OSP 98 10924

POINTS AND AUTHORITIES

51. "It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which if believed by the jury will support the suggested inference. (People V. Carmen (1951) 36 Cal. 2d 768; People V. Hannon (1977) 19 Cal. 3d 588)

52. It is also an elementary principle of Law that a consciousness of guilt may not be proven by establishing that a person made willfully false statements, unless those statements are clearly connected to the defendant. (See; People v. Olguin (1994) 37. C.R. 2d 596, 31 C.A. 4th 1365)

53. To be sure, if identity is the only issue in a case, evidence of a willfully false statements or deliberately misleading statements is irrelevant, and such instructions should not be given. (see; People V. Parrish (1986) 185 C.A. 3d 942, 948, 230 C.R. 118 [evidence of flight irrelevant to issue of identity]; People V. Olguin, supra, 37 C.R. 2d 596, [attempts to suppress evidence irrelevant unless connected to the defendant].

54. In Mr. Shufelt's case, the only material issue was the identity of person who committed the charged crimes.

55. The defense did not dispute that someone had committed the charged offenses of Burglary and taking of a vehicle.

56. It was simply a defense that defendant wasn't the guy. Yet, the trial Courts instructions to the jury allowed evidence that the culprit made false or

-75-


COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)
OSP 98 10924

1  misleading statements to be used by the jury as "proof"
2  that the defendant committed the charged crimes.
3  57. Just the fact someone may have made false
4  statements while committing the charged offenses, does
5  not prove the defendant committed those offenses, and
6  is    not probative in any way of assisting the jury
7  in its deliberations on the "identity" issue.
8  58. Thus, the trial courts instructions to the jury that
9  statements made by the culprit, could be considered by
10  the jury as evidence that the defendant committed
11  those offenses, presupposed the identity of the culprit
12  was the defendant, and violated the petitioners right to
13  due process of law under the 14th Amendment of the
14  U.S. Constitution. (Directing verdict on identity)
15  59. The fact someone made a false or deliberately
16  misleading statement while committing the charged
17  offenses, could not support an inference that the
18  culprit was in fact the defendant, or that the defendant
19  committed those crimes.
20  60. Thus, CALJIC 2.03 as given, in light of the facts
21  in dispute, ie identity, could not support the conclusion
22  permitted by the inference and thus causes a rational
23  fact finder to make an irrational conclusion, in
24  such a way as to violate the Federal Constitution
25  under the 6th & 14th Amendments. (See; Ulster County
26  V Allen (1979) 442 U.S. 140, 157-163, 99 S.Ct. 2213)
27


COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)
OSP 98 10924

61. A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury. (Ulster County Court, supra, 442 U.S. at 157-163).

62. As petitioner has shown, there were no statements that a jury could find were willfully false or deliberately misleading that pretained to Counts 1&2; 4&8; or 6&7 involving victims William Wadsworth (1&2), Evilyn MacCarthy (6&7) or Micheal Rahilly (4&8).

63. So, if a member of the jury applied CALJIC 2.03 to those counts in determining defendants guilt in their deliberations, CALJIC 2.03 would have violated defendants rights to Due process, because there is no way for a jury to make the connection permitted by the inference.

64. More importantly, if a jury had determined the identity of the accused as the person Phillip Hammerling saw and spoke too, while standing in his garage, or the person Diane Goedhuy spoke to standing in her driveway while holding her camara and check book, there would be nothing left for the jury to decide, and the instruction would have been superflous, because that person obviously committed those offense, and the defense was that the defendant was not the person they spoke to.

65. But that is exacty how CALJIC 2.03 operated.


COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 98 10924

1  CALJIC 2.03 AS GIVEN

2  (e.  The trial court instructed jury sua sponte with

3  CALJIC 2.03 as follows;

4

5  67.  "If you find that before this trial the defendant

6  made a willfully false or deliberately misleading statement

7  concerning the crimes for which he is now being tried,

8  you may consider that statement as a circumstance

9  tending to prove a consciousness of guilt. However,

10  that conduct is not sufficient by itself to prove guilt,

11  and its weight and significance, if any, are for you to

12  decide."  (See: CALJIC 2.03, exhibit "cc"; RT. 0499.)

13

14  68.  Notwithstanding fact, "identity" of the culprit who made

15  statements to Diane Goedhuey, Phillip Hammerling, and

16  Officer Herzig, was the ultimate issue in dispute that

17  jury had to decide, the trial court did not instruct jury

18  that they must first...

19  69.      (1) determine whether or not defendant, and

20              not some other person made the statements

21              beyond a reasonable doubt...

22  70.      (2) that those statements were, in fact, willfully

23              false or misleading...

24          (3) that the false statement must relate to

25              the charged crime...

26  before CALJIC 2.03 became applicable.

27

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

QSP 98 10924

## COUNSEL OBJECTS TO CALJIC 2.03

71. Trial counsel, on behalf of defendant objected to the trial courts giving sue sponte, CALJIC 2.03 because identity of the suspect who made allegedly false statements to witnesses, was ultimate fact in dispute.

72. Trail counsel objected to CALJIC 2.03 being given because "We would argue that thats putting the cart before the horse." (RT. 2699)

73. Trial counsel argued "identity" of suspect who made false statements was the ultimate issue in dispute.

74. Trial counsel argued:

"The argument is that since identity is an issue, then if you give that instruction, then there is an inference by giving that instruction that it was, in fact, Mr. Shufelt that was -- we argue that that instruction might be applicable if identity was not an issue. And that in this particular case, it would be prejudicial to Mr. Shufelt's case." (RT. 2699)

75. Defense counsel again objected to CALJIC 2.03;

76. "I'll just track an argument I made yesterday. I would just reinforce that this is a good instruction if identity is already known, but if identity isn't known then 2.03 assumes that the person who's making this statement has already been identified. So, we'd argue that it's 352, and shouldn't be given." (RT. 2748)

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)
OSP 98 10924

77. The trial courts instruction "puts the cart before the horse", and presupposes that the identity of the culprit who made the statements was the defendant.

78. CALJIC 2.03 also allows the jury to draw the inference with out having to decide the issue of identity, beyond a reasonable doubt, first, because there are no instructions requiring the jury must do so.

79. The prohibition against directed verdicts "includes preforce situations in which the judge's instructions fall short of directing a verdict but which nevertheless have the effect of so doing by eliminating other relevant factual considerations if the jury finds one fact to be true." (People v. Figueroa, supra 41 C3d at 724; see also U.S. v. Voss (8th cir. 1986) 787 F.2d 393, 398 ["when the jury is not given an opportunity to decide a relevant factual question," the defendant is deprived of his right to a jury trial]

80. CALJIC 2.03 as given also sent a strong message to the jury that the trial court believed there was sufficient evidence that the defendant was the suspect who spoke to the victims of the charged offenses, thus the reason the court commended the inference.

81. Moreover, the permitted inferences listed under CalJIC 2.03 could apply to any of the ten felonies charged.

82. Appellate Counsel should have challenged CALJIC 2.03 on direct appeal and was ineffective for not doing so. (See; In re Smith (1970) 3 Cal.3d 192, 202, 9A Cir. I [I.A.C. Appellate Counsel]



COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 98 10924

Ground Eight

1  APPELLATE COUNSEL RENDERD I.A.C. FOR FAILING TO
2  CHALLENGE CALJIC 2.06, EFFORTS TO SUPPRESS EVIDENCE
3  AS CONSCIOUSNESS OF DEFENDANTS GUILT, WHERE IDENTITY
4  OF CULPRIT WHO DISPOSED OF STOLEN PROPERTY WAS
5  UNCERTAIN, AND DEFENSE WAS THE DEFENDANT WAS NOT GUY
6  WHO DISPOSED OF THE PROPERTY, THUS PETITIONERS RIGHT TO A
7  FAIR TRIAL AND ASSISTANCE OF COUNSEL WERE VIOLATED
8  UNDER THE 6th AND 14th AMENDMENTS OF THE U.S.
9  CONSTITUTION.

10

11  <u>SUPPORTING FACTS</u>

12  1.   During course of trial, prosecution introduced
13  evidence that property belonging to victims of the
14  charged offenses was discovered a three seperate
15  locations. The John Stieble residence (RT. 2093-2107),
16  Carlton Corden residence (RT. 2108-2177), and Evelyn
17  MacCarthey residence (RT. 2173-2173).
18  2.   Prosecution produced on eye witnesses who testified
19  they saw the defendant dispose of the stolen property
20  at any of the three dump site locations.
21  3.   Identity of the culprit who stoled the property
22  from the residence of the victim of the charged
23  offenses, then disposed of that same property found
24  at the various locations, was the key material
25  fact in dispute for the jury to decide.
26  4.   Because prosecution produced no eye witnesses
27  who testified they saw the defendant disposed

-81-

1 the stolen property at the John Stieble residence,
2 the Carlton Cordon residence, or the Evelyn
3 MacCarthy residence, there was strong "reasonable
4 dout" that defendant disposed of the stolen property, and
5 in an effort to suppress evidence.
6 5. Whether or not defendant was the person who
7 actually abandoned stolen property at the three
8 locations, could not be inferred without first, proving
9 defendant actually stoled the property, or committed
10 the charged burglaries.
11 6. Yet, the jury was instructed they could infer
12 defendants guilt of committing the charged offenses
13 from mere evidence that the stolen property had been
14 disposed. (see: CALJIC 2.06 as given, CT. 500, exhibit "œ")

16 7. Property belonging to victims of the charged offenses
17 was found disposed at the following three locations;

19 Stieble Residense

21 8. Prosecution produced evidence that a Red Saab belong
22 to William Wadsworth was found abandon in front of
23 John Stieble and Mercedes Stankowski home, located
24 at 5320 West Knoll lane, in Pacific Beace, La Jolla area,
25 (See: RT. 2096).
26 9. Defendant was charge with unlawful taking of, and
27 receiving the stolen vehicle belonging to Mr. Wadsworth in
counts 1 + 2; (see information. CT 008-00012).

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 98 10924

10. Inside Mr. Wadsworth's stolen vehicle was property belonging to victims of both charged and uncharged crimes.

11. Also found at John Stieble's residence was the two cell phones belonging to Peter Hamerling (counts 5 & 10) which were abandoned or disposed of in Mr. Stieble's front lawn. (See: R.T. 2097)

12. Mr. Stieble also testified he discovered to bags containing stolen propert inside trash cans along the side of his garage. (R.T. 2099)

13. The bags found inside Mr. Stieble's trashcans contained stolen property belonging to Michial Rahilly (counts 4 & 8), and victim of uncharged crime involving Janice Boner.

14. Although Mr. Stieble's girlfriend testified she saw someone run past her kitchen window, (see: R.T. 2538-2545) she did not identify that person as the suspect or defendant.

15. During course of trial, prosecution produced no eye-witnesses who saw the suspect abondon William Wadsworth's vehicle, and dispose of the cell phones or stolen property found in the trashcans at the Stieble residence.



## CORDEN RESIDENCE

16.    Carlton Corden testified the on the day of August 12, 2001, he heard the noise of a helicopter and went outside to take a look around his house. (RT. 2109-2110)

17.    In his side yard he found two backpacks on the top of his trashcans. He had know idea how long they had been there. (RT. 2110).

18.    Mr. Corden handed the two back packs to officer Roser who was parked out in front of his house at 5261 Vickie Drive.

19.    Some of the property found inside the two back packs included, Mrs Diane Goedhuy's camara and check book. (See: Investigator Schultz's testimony, RT. 2344-2371) Also found at Mr Corden's residence were two ID's belonging to Charles Marible, who was an alleged victim of uncharged crime. (although he never testified)

20.    Prosecution produced no eyewitnesses see the suspect or the defendant dispose of the stolen property found inside the backpacks recovered from Mr. Corden's residence.

## MacCarthy's Residence.

21.    Evelyn MacCarthy testified she discovered some property inside her garage at 5323 Calle Vista, at around 6:00 pm on August 12, 2006.



COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)
OSP 98 10924

22   Among the items Mrs MacCarthey discovered behind a water softener, was a pair of trousers, a belt, and a shirt. (RT. 2162)

23.  Inside the pants was another I.D. belonging to Charles Mirable. (RT. 2164-2165)

24.  Mr Rahilly was given the shirt that was found inside the MacCarthy garage by Investigator BJ Schultz. (RT. 2344)

25.  Prosecution produced no eyewitness see anyone dispose of the property found at the MacCarthey residence.

TRIAL COURTS INSTUCTS JURY WITH CALJIC 2.06

26.  In spite of the fact prosecution produced no evidence that the defendant disposed of the stolen property belonging to victims of the charged offenses counts 1 through 10, at the three dump sites, trial Court gave CALJIC 2.06 as follows;

27.  "If you find that a defendant attempted to suppress evidence against himself in any manner, such as by concealing evidence, or by disposing of evidence, this attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, this conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide." (See: CALJIC 2.06, CT. 0500)

-85-

28. The trial court did not limit the evidence of disposed property as inference of consciousness of the defendants guilt to any particular charged offense.

29. Nor, did the court provide any instruction that before jury could infer suppressed evidence as consciousness of defendants guilt, jury must first find the "identity" of the person who disposed of the stolen property, was in fact, the defendant, "beyond a reasonable doubt."

30. Appellate counsel did not challenge CALJIC 2.06, or any of the jury instructions on direct appeal, although issue was prejudical to defendants right to a fair trial.

## POINTS AND AUTHORITIES

31. Consciousness of guilt may not be proven by establishing attempts to suppress evidence unless those attempts can be connected to defendant. (People v. Olguin (1994) 37 C.R.2d 596, 31 C.A.4th 1355)

32. Failure to adequately or correctly instruct the jury upon consciousness of guilt lessens the prosecutions burden and allows the jury to draw impermissible inferences of guilt in violation of the defendants state (art. I, § 15) and Federal (6th and 14th Amendments) constitutional rights to trial by jury and due process of law.

33. Moreover, trial courts sue sponte giving of CALJIC 2.06 eliminated any defense that the defendant was not the perpetrator who committed the charged offenses and then disposed of the stolen property.

34. It is well established that the defendant may rely upon the theory that a third party committed the charged offenses. (People v. Edelbacher (1989) 47 C3d 983, 1017, 254 C.R. 586; People v. Hall (1986) 41 C.3d 826, 833, 226 C.R. 112).

35. CALJIC 2.06 also erroneously assumed that defendant was in possession of reciently stolen property belonging to victim's of the charged offenses, which had the effect of triggering CALJIC 2.15 as well.

36. In other words, the combined affect of CALJIC 2.06 with CALJIC 2.15 both erroneously assumed defendant possessed the stolen property, then disposed of it at the various locations.

37. Furthermore, the defense did not dispute that whoever abandoned William Wadsworths Red Saab in front of John Stiebles residence, dropped Peter Hammerlings cell phones on his front lawn, placed to bags full of stolen property in his trashcans, left two back pack at Mr. Corden's residence, committed the charged offenses.

38. Where, as here, the defendant does not dispute that the conduct in question was committed by the culprit, it is error to use that conduct to convict the defendant,

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)
OSP 98 10924

1 where the only issue is identity, and the only
2 defense was that the conduct in question, was not
3 the defendant's conduct.
4 39. CALJIC 2.06 dealing as it does with an inference of
5 guilt arising from conduct, it has no place when the
6 defense concedes that the person who distroyed evidence
7 who ever it may have been — committed the offense. (See;
8 People v. London (1988) 206 C.A.3d 896, 902-906, 254 C.R. 59
9 fn 3)
10 40.    "IDENITY", CALJIC 2.06 NOT PROBATIVE
11    Also, CALJIC 2.06 as given has no probative value
12 proving the identity of the culprit was in fact the
13 defendant, because jury could not infer that it was
14 the defendant who disposed of the stolen property unless
15 jury first believed defendant stoled the property.
16 41.    Once jury believed the defendant committed the
17 charged offense's, identity was no longer material
18 and there would be nothing left for the jury to decide.
19 42.    Since CALJIC 2.06 was not probative of proving the
20 identity of the culprit, as the defendant, there would
21 be no way for the jury to make the connection
22 permitted by the inference, i.e., consciousness of
23 the defendants guilt, and not someone elses.
24 43. "Prosecution's use of inferences comports with due
25 process requirements unless, under facts of case, there
26 is no rational way for jury to make logical connection
27 which inference permits. (See; People v. Anderson (1989)
210 Cal.App.3d 414, 258 C.R. 482) at pg 427 citing

~44~

<u>Ulster County v. Allen</u> (1979) 442 U.S. 140, 157, 99 S.Ct 2213, 2224)

44. Appellate Counsel failed to raise any issues of error which occurred during petitioners trial, had an adverse affect on the jury verdict, and denied petitioners right to a fundamentally fair trial, on direct appeal.

45. Petitioner is prejudiced by appellate counsel's omission of failing to challenge CALJIC 2.06, or any instructions on direct appeal, because a petition for habeas corpus does not lie as a second appeal, and petitioner must bring all errors under ineffective assistance of counsel, instead of directly to an appellate court.

46. "The appellate court may also review any instruction given, modified, or refused, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (Penal Code §1259)

47. The Due process clause of the fourteenth amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. (<u>Evitts v. Lucey</u> (1985) 469 U.S. 387, 105 S.Ct 830, 833-841

48. Where as here, appellate counsel didn't raise any issue challenging defendants convictions, petitioner needs to show only one issue that could have potentially lead to a reversal. (<u>Smith v. Robbins</u> (2000) 120 S.Ct. 746, 765 528 U.S. 288)

— 69 —

Ground Nine

APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE
OF COUNSEL FOR FAILING TO CHALLENGE ON DIRECT
APPEAL CALJIC 2.15 USE OF POSSESSION OF RECENTLY
STOLEN PROPERTY AS EVIDENCE OF DEFENDANTS GUILT,
EVEN IF PROPERTY DID NOT BELONG TO VICTIMS OF CHARGED
OFFENSES, OR JURY FIRST FINDING "CONSCIOUS POSSESSION"
BEYOND A REASONABLE DOUBT, IN VIOLATION OF DEFENDANTS
RIGHTS UNDER THE 6th AND 14th AMENDMENTS OF THE U.S,
CONSTITUTION.


SUPPORTING FACTS

1.    Identity of person who committed charged offenses,
and whether or not defendant ever had possession of stolen
property belonging to charged offenses was the ultimate
fact that jury was suppose to decide.

2.    It was the defense to the charged offenses that
defendant never had possession of property belonging to
any of the victims of those offenses, or that defendant
committed them. (identity, only material issue)

3.    Appellate counsel didn't raise a single issue challenging
petitioners trial or resulting convictions on charged offenses.

4.    During coarse of trial prosecution introduced evidence
proffered under evidence code § 1101(b) of three uncharged
crimes allegedly committed by the defendant on the same
day as the charged offenses.

5.   Property from the uncharged offenses was found mixed
with property from charged offenses.

    Defendant was not found in possession of property from charged crimes.

-90-

CALJIC 2.15

6.   The trial court, sue sponte, instructed jury with a modified version of CALJIC 2.15 "POSSESSION OF STOLEN PROPERTY". (See; CT. 0504, ehibit "cc")

7.   The trial courts version stated that;

8.   "If you find that a defendant was in conscious possession of recently stolen property, the fact of that possession is not by itself sufficient to permit an inference that the defendant is guilty of the crime of burglary. Before guilt may be inferred, there must be corroborating evidence tending to prove defendant's guilt. <u>However, this corroborating evidence need only be slight, and need not by itself be sufficient to warrant an inference of guilt."</u>

9.   The trial court did not specify any particular burglary count, or limit the permitted inference from conscious possession of stolen property to any particular charged offense.

10.   "Whether or not defendant was in conscious possession of recently stolen property belonging to the charged offenses was a material fact in dispute. Yet, jury was not instructed that they must find first, beyond a reasonable doubt that, in fact, defendant was in conscious possession of recently stolen property, before permitted inference could be inferred.

11.   Trial court did not instruct jury that defendants possession of stolen property must belong to the owners of the charged burglaries.

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 98 10924

12. During the course of trial, prosecution introduced evidence that defendant had possession of stolen property belonging to victims of uncharged crimes involving Jack Bieser, Janice Bones, and a Charles Marible.

13. Jury could infer defendant committed all four charged burglaries, based on just slight corroborating evidence, from evidence introduced showing defendant possessed "stolen property" belonging to victims of uncharged crimes.

14. In addition, jury could use defendants "conscious possession" of any stolen property to convict the defendant of all counts, even if the stolen property did not belong to the particular owner of a particular charged count.

15. So, if the jury believed defendant was in conscious possession of stolen property belong' to Jack Bieser, who was an alleged victim of uncharged crime, admitted under evidence code 1101(b), (See: RT. 1777-1817, Bieser's testimony), Jury could theoretically convict the defendant of all burglary counts involving Diana Goedhuy, Peter Wammerling, Michael Rahilly, and the McCarthy, (counts, 3+9, 4+8, 5+10 and 6+7) on just slight evidence!

16. Moreover, defendant could be found guilty of committing all four charged burglaries, from mere possession of property belonging to uncharged crimes, on just slight corroborating evidence, as well as unlawfully taking a vehicle.

17. CALJIC 2.15 States;



17. "As corroboration, you may consider the attributes of possession--time, place, manner, that the defendant had the opportunity to commit the crime charged, the defendants conduct, his false or contradictory statements, if any, or other statements he may have made with reference to the property, any other evidence which tends to connect the defendant with the crime charged." (see: CALJIC 2.15, CT. 0504)

POINTS AND AUTHORITIES

18. Petitioner contends appellate counsel rendered ineffective assistence of counsel for failing to challenge the unlimited use of CALJIC 2.15's permitted inference of guilt on direct appeal.

19. Petitioner contends that CALJIC 2.15 erroneously reduced prosecutions burden of proving defendant committed the charged burglaries, on just slight evidence otherwise insufficient to establish guilt, based on evidence that defendant was in conscious possession of any stolen property, whether or not that same property belonged to the owners of the particular charge crimes.

20. In other words, CALJIC 2.15, as given, permitted jury could convict the defendant of all counts, based from evidence defendant was in conscious possession of stolen property belonging to victims of uncharged crimes, or requireing jury to first find defendant was in fact in possession of recently stolen property beyond a reasonable doubt.

21. CALJIC 2.15 was not limited to any particular charged burglary.

22. Nor did CALJIC 2.15 requires prosecution must prove beyond a reasonable doubt defendant was actually in "conscious possession" of recently stolen property belonging to charged crimes, befor permitted inference applied.


COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)
OSP 98 10924

-94-

23. Prosecution introduced evidence during trial that defendant committed three uncharge crimes involving Jack Biesor, Janice Bonner, and Charles Maribile (who never testified). (See: 402 hearing regarding 1101(b) evid. R.T. 1626-1629, 1741-1750 exhibits "AA" & "BB", Trial testimony of Jack Biesor, R.T. 1777-1817, Janice Bonner R.T. 2222-2231)

24. Prosecution introduced evidence from which jury could infer defendant had conscious possession of stolen property belonging to uncharged crimes.

25. However, defendant was not in possession of the stolen property belonging to charged offenses, unless of coarse, jury was already convinced defendant was guilty of committing them.

26. CALJIC 2.15 was not probative of determining defendants guilt of committing charged offenses, because, whether or not defendant had "conscious possession" of recently stolen property belonging to victims of the charged offense's could not be infered until after jury was convinced, beyond a reasonable doubt, that defendant was the person who committed them.

27. It was defendants defense he never had possession of stolen property belonging to victims of the charged burglaries.

28. Where evidence of possession or whether property is stolen is conflicting or unclear CALJIC 2.15, should not be given. <u>People v. Morris</u> (1988) 46 C. 3d 1, 40, 249 C.R. 719, 756 P. 2d 843.


COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-85)

OSP 88 10924

29. Requiring only "slight" corroborative evidence in support of a permissive inference, such as that created by possession of stolen property, does not change the prosecution's burden of proving every element of the offense, or otherwise violate the accuser's right to due process unless the conclusion suggested is not one that reason or common sense could justify in light of the proven facts before the jury. (Francis v. Franklin (1985) 471 U.S. 307, 314-315; Ulster County v. Allen (1979) 442 U.S. 140, 99 S.Ct. 2213; People v. Gamble (1994) 22 Cal. App. 4th 446, 454-455, 27 C.R. 2d 451)

30. In light of the proven facts before the jury, and the prosecution's admittince in evidence,      a jury could infer defendant had conscious possession of stolen property belonging to victims of uncharged crimes, and then use that conclusion to find defendant guilty of committing the charged Burglaries, on just slight corroborating evidence.

31. Moreover, jury could use possession of any stolen property to infer guilt, of not just one particular count but, all of them.

32. Even if jury found defendant was in conscious possession of property belonging to Evelyn MacCarthey, such as her white pants, or a half credit card, (see; R.T. 2153-2173, Evelyn MacCarthy's testimony) jury was not limited to applying CAL JIC 2.15 to just her counts Ce47, But to all counts.

-26-

33. The trial court errored by giving CALJIC 2.15 unfettered in a case such as this where there are multiple counts factualy distinguishable from each other, mixed with uncharged crime evidence.

34. There are five separate crimes married to five separate counts of recieving stolen property, mixed with three uncharged crimes, all of which occuring on the same day, in or around the same general ~~vicirty~~ location

35. In light of the separate charged and uncharged crime evidence, all having to deal with stolen property, the trial court should have provided additional instructions such as "jury cannot infer defendants guilt of charged burglaries unless first...

36. (1) Defendant was found in possession of recieintly stolen property, beyond a reasonable doubt...

37. (2) That property found in defendants conscious possession belonged to victims of that particular charged offense...

38. (3) That jury could only apply CALJIC 2.15 to particulary counts which owned property was found in his conscious possession.

39. Otherwise jury should not be permitted to use CALJIC 2.15 for any purpose.

40. Because no such foundational instructions were given by the trial court, jury was free to convict the defendant on just slight evidence, from mere possession of any stolen property, even if not belonging to victims of the charged offenses,

- a7 -

41. CALJIC 2.15 as given violated petitioners due process rights under the 14th Amendment for two reason,

42. First, CALJIC 2.15 as given, did not require jury must find beyond a reasonable doubt that defendant was actually in conscious possession of recently stolen property, before permitted inference of guilt applied. and

43. Second, CALJIC 2.15 as given, did not require that stolen property found in actuall possession belonged to a particular victim, and apply only to that particular charge count of burglary related to that particular victim.

## CONCLUSION

44. The fact that CALJIC 2.15, as give, applied to all counts of burglary, whether or not property belonged to victims of the charged offences, and without first, requirering jury to find beyond a reasonable doubt that defendant was actualy in "conscious possession" should have been raised by appointed appellate counsel on direct appeal.

45. Jury instructions which have a substantial injurous affect on the jury are congizable on direct appeal even without an objection under penal code § 1259.

46. Appellate counsel didn't raise any issues challenging petitioners jury trial or convictions. Yet, had counsel challenged CALJIC 2.15, it is likely reasonable that the appellate court would have reversed.

-aa-



GROUND TEN

PETITIONER CLAIMS APPELLATE COUNSEL WAS INEFFECTIVE FOR NOT RAISING THIS ISSUE ON DIRECT APPEAL. TRIAL COURT'S UNWARRANTED DENIAL OF PETITIONERS MOTION FOR TRIAL TRANSCRIPTS, WITHOUT HOLDING HEARING, DENIED PETITIONERS RIGHT TO FILE MEANINGFUL NEW TRIAL MOTION, IN VIOLATION OF DUE PROCESS & EQUAL PROTECTION OF LAW, AND EFFECTIVE ASSISTANCE OF COUNSEL, AND ACCESS TO THE COURTS, UNDER THE 1ST, 6TH, & 14TH AMENDMENTS U.S. CONST. & CAL. COSNT. ART. I SEC. 15, 28(d).

FACTS IN SUPPORT

1.) Appellate Counsel filed no claims that challenged the conviction on petitioners direct appeal. (See; Exhibits "E" opening brief)

2.) Record of conviction is 3,410 pages long.

3.) Petitioner was represented by court appointed counsel during course of trial.

4.) Petitioner moved for two Marsden hearings during course of trial, which were denied by the trial court. (See; RT. 2118-2152, on 06/20/02; & RT. 2550-2583, on 06/25/02, under Seal)

5.) On 06/27/02, jury returned guilty verdicts on all counts (Counts 1-11). (See; Verdict forms, CT. 0702-0714).

6.) During Bifuracted trial, jury found defendant had suffered a prior felony conviction from the state of Utah. (See; CT. 0715-0717) on 06/28/02.

7.) Trial court set Probation hearing and Sentencing hearing for August 12th, 2002, in department 32. (CT. 0717)

8.) On 07/12/02, petitioner requested for self-representation to file motion for new trial, and sentencing. (See; RT. 2991, ln. 5-27, CT. 0719)

9.) Trial court granted petitiorer pro-per status for filing motion for new trial. (See; RT. 2997, ln. 2-5) and sentencing.

10.) Trial court acknowledges petitioner will have restraints on access to Law Library facility. (RT. 2994, ln. 12-20)

~99~

11.) Trial court authorized 10 hours for investigation services to help petitioner conduct investigation as to witness not called by the defense, and collect affidavit's, ect...(RT.2998,ln.13-27)

12.) Addressing prosecutions concerns that witnesses may be subpoenaed, trial court stated that an evidentiary hearing would not issue, unless there's a sufficient basis in the written motion, i.e., factual showing. (RT.2998,Ln.13-27)

13.) Trial court appoints trial cousenl Mr. Guthrie as advisory counsel, otherwise, no advisory counsel would be appointed. (RT.2997,ln.9-16)

14.) Sentencing date remained set for 08/12/02. (RT.2999,ln. 23)

15.) Trial court allowed ten days for peoples responce to application for new trial, application date set fon 08/02/02.

16.) Petitioner puts court on notice that there is a potential for the defense to ask for a continuance in regards to the cutoff date, and sentencing date (See; RT.3000,ln. 16-19) citing investigative concerns, and need for affidavit's.

17.) Trial court responded with comment "don't plan on it." (RT. 3000,ln.20)

PETITIONER MOTIONS FOR TRIAL TRANSCRIPTS/WAIVER OF FEE

18.) Petitioner motions for trial transcipts in support of New Trial Motion. (CT. 0575-0583, written motion for trial transcripts/fee waiver) dated 07/21/01, filed 07/25/02. Note; Petitioner gave motion to runner on 07/22/02.

19.) In petitioners written motion petitioner requested hearing on motion, to provide additional support for full transcripts, and make a more specific showing of need if necessary. (CT.0579-0580)

20.) Trial court sua sponte denied petitioner motion for complete trial transcripts, but granted in part, side bar potions of trial, and ordered those delivered to petitioner. (See; Minute Order Dated 07/30/02, Ct. 0720)

21.) No hearing was held, and defendant was precluded from introducing any additional showing of need for a complete set of transcripts, in support of New Trial motion.

−100−

25.) Prosecution filed no opposition to petitioners request for trial transcripts, in support of new trial motion.

26.) In support of petitioners motion for trial transcripts, petitioners motion stated the following facts and grounds; (See; CT.0575-0583) written motion)

27.) Motion for new trial must be supported by evidence that is admissible under Evid. Code, 300. (Ibid, at pg.2)

28.) That the court "please take notice that on a date yet to be determined by the court the defendant will move that the court provide the defendant with the trial transcript and waive the fee." (Ibid. at pg.1)

29.) Petitioner "requests the trial transcript in order to support petitioner motion for new trial. The petitioner asked the court to please grant this request since the petitioner is indigent." (ibid. at pg.1)

30.) Petitioner stated "This motion will be based on the attached memorandum of points and authorities, the attached declaration and evidence taken at the hearing on this motion, and argument at that hearing." (CT.0575, at pg.1)

31.) Petitioner argued "Indigent defendants are entitled to a free transcript if they can show that the transcript is necessary for effective representation on the motion for new trial." citing People v. Bizieff (1991) 226 C.A.3d 1689, 1702; Also; People v. Lopez (1969) 1 C.A.3d 78,83, 81 C.R. 386.

32.) Petitioner states to the court that he will be arguing both statutory grounds specified in P.C.1181, (and that trancripts will be necessary in support of those grounds) and the nonstatutory ground of ineffective assistance of counsel, citing; People v. Fosselman (1983) 33 C.3d 572, 582, 189 C.R. 855, 861 (issue was ineffective assistance of counsel). (ibid, at pg.2)

33.) In addition petitioner cited People v. Davis (1973) 31 C.A.3d 106, 110. 106 C.R. 897, 899, (which held that the trial court has broad discretion to grant a new trial when ever an accused is denied a fair and impartial trial.)

34.) Petitioner indicated that motion for new trial will be based in part on

-101-

the grounds that defense counsel was so ineffective the accused was denied a fair

and impartial trial, which resulted in a miscarriage of justice. citing <u>People</u>

<u>v. Smith</u> (1993) 6 C.4th 684, 25 C.R.2d 122. (CT.0577, at pg.3)

35.) Petitioner contended he was intitled to the trial transcripts and waiver

of fee because;

a.) The defendant is completely indigent

b.) The trial transcript is relevant and necessary evidence in support of

new trial motion. See Evid. Code 351.

c.) A defendant for whom new counsel was appointed is required to establish

by affidavit, Oral testimony or <u>Reference to Trial Record</u> on his motion for a

new trial that his trial counsel was ineffective in same manner that counsels in-

effectiveness prejudiced him. citing; <u>People v. Dennis</u> (1986) 233 C.R. 236, 177

Cal.App.3d 863.    (CT.0578 at pg. 4)

36.) Petitioner Constitutionalized his right to the trial transcripts under

both State and Federal Constitutional provisions;

"The defendants right to have the trial record transcribed and made available

as evidence in support of his new trial motion is compulsory by both State and

Federal Constitutions; See; Cal.Const. art.I sec. 28(d) Right to truth in evidence,

'Relevant evidence shall not be excluded in any criminal proceeding, including

pretrial and post conviction motions and hearings; See; U.S. Const. V, VI, XII Amend.

(Ct. 0578, at pg.4) <u>Britt V. North Carolina</u> (1971) 92 S. Ct 431, 404 U.S. 226, 227

37.) Petitioner argued fact that he was not the attorney of record and that

he has no knowledge of what was placed on record during side-bar conferences. That

without the record defendant cannot adequately argue ineffective counsel. (Ct. 0578,

at pg. 4)

38.) Petitioner argued to further support ineffective counsel claim, "To

show the court that valuable impeachable, and exculpatory evidence was not utilized

by defense counsel during trial, the defendant needs the record of witness state-

ments to present to the magistrate just how ineffective counsel was that had this

~ 102 ~

evidence been used, the outcome of the verdict could and should have been different. (CT. 0579, at pg. 5)

39.) Petitioner further argued that he could not possibly remember the trial record. Petitioner stated; "Although the defendant was present through all stages of the proceedings, the defendant spent a fair amount of time searching for impeachable material, writing questions down and perswading counsel to make objections to aid in the defence. Thus, the defendant did not hear all the testimony and could not possibly recall effectively the record." (CT. 0579, at pg. 5).

40.) That it would greatly handicap the effectiveness of the defendants New Trial motion to not have the trial transcripts available to aid in preparing the motion and hearing. (ibid, at pg. 5)

41.) Petitioner again argued in his written motion that "Because on motions for new trial defendant must show a particularized need for transcripts and presumption of need for transcript does not apply to request for trial transcripts to prepare new trial motion, (See People v. Bizieff, supra) if the court feels that a more specific showing would be required, do to the sensitive nature of evidence that relates to witnesses testimony, the defendant would request that the court conduct a in camera hearing, otherwise the need for the transcripts will be clearly displayed at the hearing and motion for new trial." (CT.0580, at pg, 6)

42.) Petitioner continues; "Where the defendant is requesting a motion for new trial on statutory grounds P.C. 1181(6)(6) (verdict contrary to law or evidence), The trial transcripts will be necessary in order to show what evidence was presented and what the grounds of admissibility was when introduced. And if in fact was properly objected to where applicable. Such as the chain of Custody of evidence." (CT. 0580, pg. 6)

43.) Petitioner argues in-particular; "In regards to the defendants challenge of the statutory grounds 1181(5), a accurate record will be absolutely necessary to challenge the court rulings on questions of law, such as....

—103—

– admission of 1101(b) evidence

– exclusion of expert opinion testimony

– exclusion of police policy and proceedures

– denial of request for origiinal police reports

– completion of officers e-mails

– denial of continuance (motion)

– in-court Identification

–ext....        (CT. 0580, pg. 6)

44.) Petitioner also stated the defendant would like to check the record to verify whether or not the defendant pretrial motions and objections such as the 995, retaliatory prosecution, severance motion, dismissal motions.... ext. were properly incorporated into the trial record and preserved for appeal. (CT. 0581, pg.7)

45.) That because defendant is indigent he is protected by statute that courts should order funds when funds are reasonably necessary for the preparation or presentation of the defense. (such as funds for transcripts)

In making the ruling the court shall be guided by the need to provide a complete and full defense for the defendant. (See P.C. 987.9)  (CT.0581, pg.7)

46.) Petitioner then incorporated petitioers declaration in support of motion for transcripts.  (CT.0581, pg.7)

47.) Petitioners declaration stated under penalty of perjury, that

a.) Petitioner is  acting in pro-per

b.) that he was represente at the trial stage by attorney Mr. Guthrie.

c.) that defense counsel inadequately prepared and deprived the defendant adjudication of a crucial or potentially  meritorious defense.

d.) That the defendant and the attorney had become embroiled in such an irreconcilable conflict that ineffective representation is/was likely to result an in fact did.

~ 104 ~

e.) that had counsel utilized the available evidence, e.g., preliminary transcripts, property tags, subpoenas, photos, evidence from property room, ect... it is reasonably probable that a more favorable determination would have resulted in the absence of counsels failings.

f.) That during trial and closing arguments counsel incriminated the defendant, as well as misstated evidence, That the result of counsels ineffectiveness prejudiced the defendant.

g.) That the defendant needs the trial record in order to establish that his trial consel was ineffective and result should be a new trial.

h.) That the defendant is indigent and cannot afford the trial transcript fee.

i.) That the defendant needs the trial record in order to effectively argue, that the courts ruling and jurys findings were contrary to law and evidence.

j.) That the transcripts and record documents sought by this motion are necessary to help prepare the defense motion for New trial, such as preparing for the examination and impeachment of witnesses in support of motion. (Ct. 0582-0583, pg 8 & 9)

48.) Appellate counsel deemed all issues that challenged the conviction not worth briefing. (Exhibit "V" letter from appellate counsel at pg. 5)

49.) Petitioners only remedy is by this petition for habeas corpus.

50.) Because this claim is supported intirely by the record of conviction petitioner must sight the failure to raise this claim under ineffective appellate counsel.

51.) Petitioner went on to argue new trial motion under ineffective assistance of counsel for his failure to call key defense witness, and argue trial error's by counsel that prejudiced the defendant, without any support or reference to the trial record. (See; Petitioners oral new trial motion, RT. 3035-3085)

52.) Trial court precluded petitioner from making a record during his new trial motion, to which petitioner objected under the 6th & 14th Amend. U.S. Cosnt

POINTS AND AUTHORITES

## RIGHT TO NEW TRIAL MOTION/UNIMPAIRED

It is conceded that a state is not required, by Federal Constitutional mandate, to invest a person who has been convicted of a crime by a jury of his peers with the right to seek a "New lease on life", from the judge who presided at his trial; The right to move for a New Trial is a matter of State regulation and in this State the right is purely statutory. (People v. Lopez 1 C.A.3d 78, 82, 81 C.R. 386; see also P.C. 1181-1182).

Nevertheless, appellant equates this statutory right with appellate review, and correctly argues that once established, it "must be kept free of unreasoned distinctions that can only impede open and equal access to the courts." (ibid, p. 81)

Petitioner asserts that the trial courts sue sponte, denial of petitioners request for a full trial transcript, without holding a hearing on motion, made it impossible for petitioner to file, and argue a meaningful motion for New Trial. Which in turn violated petitioners right to effective counsel in aid of his defense, relevant evidence in support of motion, access to the courts, due process of law, and equal protection, under the 1st, 6th, and 14th Amendments of the U.S. Constitution.

In addition also violated State Cal.Const. art. I, sec. 15, and 28(d), due process, and right to truth in evidence provisions. "..Relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings..." (Cal.Const. art.I,sec. 28(d))

Since the poor as well as the rich, are entitled to effective representation by counsel at every state of a criminal prosecution |citation|, a situation could conceivably arise where the courts refusal to furnish an indigent defendant with a full reporters transcript would not only deny him equal protection under

~ 106 ~

the law, if under similar circumstances a full transcripts were available to

an affluent defendant, but would also deprive him of effective representation by

counsel at a critical stage of his trial. (People v. Lopez, supra 1 C.A.3d at pg 83,

81 C.R. 386) See also, Britt v. North Carolina, supra 92 S.Ct. 431, 404 U.S. at 227-230)

Petitioner contends such a situation discribed by the Lopez court has ariased

in this case. Almost all of petitioners claims contained in this petition, were

congnizable on a new trial motion. Yet, without the transcripts none of petitioners

claims would have merit. Had petitioner been afforded the trial transcripts,

in light of the total facts in this case, there is a reasonable probability of

a more favorable outcome, on a new trial motion.

Petitioner also contends, he did make a sufficient showing of the need for

a full set of trial transcripts, because petitioner was going to argue and in fact

did argue ineffective counsel, during oral new trial motion. Inaddition petitioner

specificaly asked for the trial transcripts, in order to challenge trial courts

ruling on 1101(b) evidence, and verdict contrary to law, grounds.

At the very least, if the court had any concerns as to sufficient need being

inadiquately expressed in petitioners written motion for the record, trial court

should have, but failed to grant that opportunity to the petitioner, in violations

of the 1st Amend. access to courts, 6th Amend. right to counsel at hearing, and

14th Amend. Due process of law, under the U.S. Conatitution.

PETITIONER HAD A RIGHT TO BE HEARD ON MOTION FOR RECORD

The first error by the trial court was that inspite of petitioners written

request for a hearing on motion, if a more particular showing of need was necessary,

trial court afforded petitioner no opportunity to be heard on motion for trail

trancripts. Sua Sponte, without any opposition by the prosecution, and without

explanation.

Petitioner recieved a minute order denying request for full transcripts, but

granted in part sidebar conferences only. The Munite order States;

"THE COURT HAS READ AND CONSIDERED DEFENDANTS "MOTION FOR TRIAL TRANSCRIPTS. WAIVER OF FEE," Dated 07/21/03 and filed by the court on July 25th, 2001.

"THE DEFENSE MOTION FOR TRIAL TRANSCRIPTS IS GRANTED AS TO SIDEBAR CONFERENCES ONLY, IN ALL OTHER RESPECT'S, THE MOTION IS DENIED."

(See; Minute order CT. 0720, Dated 07/30/02)

Petitioner contends this was error.

Petitioner in pro-per was diligent in showing there were issues that he needed support from the trial record, in order to effectively argue at the new trial motion. Petitioner also stated that becuase he was arguing ineffective counsel, "if the court feels that a more specific showing would be required, do to the sensitive nature of evidence that relates to witnesses testimony, the defendant would request that the court conduct a in camera hearing, otherwise the need for the transcripts will be clearly displated at the hearing and motion for new trial." (Ct.0579)

What petitioner was saying here, was, if the court wants to know in more detail exactly what petitioner is claiming trial counsel was ineffective for doing, or not doing, that prejudiced the defendant, please hold an in camera hearing so there is no disclosing privileged facts, and exposing to counsel prematurely, what petitioner was going to show. Trial court never granted that in-camera hearing.

Petitioner asked for the hearing on motion in his opening page.

"PLEASE TAKE NOTICE THAT ON A DATE YET TO BE DETERMEND BY THE COURT, THE DEFENDANT WILL MOVE THAT THE COURT PROVIDE THE DEFENDANT WITH THE TRIAL TRANSCRIPT AND WAIVE THE FEE."..."THIS MOTION WILL BE BASED ON THE ATTACHED MEMORANDUM OF POINTS AND AUTHORITIES, THE ATTACHED DECLARATION AND EVIDENCE TAKEN AT THE HEARING ON THIS MOTION, AND ARGUMENT AT THAT HEARING." (CT.0575, AT PG.1)

It is the fact that petitioner was not afforded an opportunity to be heard

that is cause for the first prong of petitioners constitutional contentions.

One might consider it prejudicial per-se.

One of the essential elements of procedural due process is an opportunity for hearing. L.D. Reeder Contractor of Ariz.  v. Higgins Industries, Inc., (1959) 165 F.2d 768; Randone v. Appellate department (1971) 5 Cal.3d 536, 96 C.R. 709, 488 P.2d 13; People v. Swink, (1984) 150 C.A.3d 1076, 198 C.R. 290.

It is a cardinal principle of due process that no one may be bound or concluded by a judgment, either in respect to his or her person or property, unless that person has had his or her day in court. (Spector v. Superior Court of San Mateo County, (1961) 55 Cal.2d 839, 13 C.R. 189, 361 P.2d 909; People v. Lawrence (1956) 140 C.A.2d 133, 295 P.2d 4)

The right to a hearing is one of the rudiments of fair play assured by the Fourteenth Amendment. (Endler v. Schutzbank (1968) 68 Cal.2d 162, 65 C.R. 297, 436 P.2d 297; Baker v. Wadsworth (1970) 6 C.A.3d 253, 85 C.R. 880)

Normally, the opportunity for a hearing must precede, not follow, the deprivation of a fundamental interest, (Brooks v. Samll Claims Court, (1973) 8 Cal.3d 661, 105 C.R. 785, 504 P.2d 1249), and there can be no compromise on the footing of convenience or expediency when that minimal requirement has been neglected or ignored. (Endler v. Schutzbank, (1968) 68 Cal.2d 162, 65 C.R. 297, 436 P.2d 297).

Due process of law requires an orderly proceeding, adapted to the nature of the case, in which the person has an opportunity to be heard, and to defend, enforce and protect his or her rights. (Humphreys v. City and County of San Francisco (1928) 92 C. 69, 268 P. 388)

Absent a countervailing state interest of overriding significance, the opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard, and must be at a meaningful time and in a meaningful manner. The hearing must be such as ordinarily, or at least reasonably, is

given in similar cases. (In re Lambert, 134 Cal. 626, 66 P. 851 (1901); Collins

v. Superior Court in and for Los Angles County, (1957) 150 C.A.2d 354, 310 P.2d

103).

Petitioner also contends the right to a hearing includes the right to appear

by counsel, and an arbitrary refusal of such right constitutes a deprivation of

due process. ( Powell v. State of Ala. 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed 158 (1932);

Mendoza v. Small Claims Court  of Los Angeles Judicial Dist (1942) 49 Cal.2d 716,

160 P.2d 565).

RIGHT TO OFFER EVIDENCE

Petitioner also contends his right was violated, under the Due process clause,

to a full hearing, which includes the right of a party to offer evidence in

support of his or her cause. (Spector v. Superior Court of San Mateo County

(1961) 55 Cal.2d 839, 13 C.R. 189, 361 P.2d 909; In re Lambert 134 Cal. 626,

66 P. 851 supra), This includes the right to call witnesses. (Sahloldei v.

Providence Healthcare Inc (2003) 5 C.R.3d 598)


PARTICULARIZED NEEDS WERE SHOWN


Petitioner also contends under the second prong of his constitutional claim,

there was sufficient showing of particularized need for a full set of trial

transcripts contained in the written motion. Not the least of which was to

challenge  trial courts ruling of law, on key evidentiary device, prior crime

evidence under Evid. Code, 1101(b), which in this case was permitted by the

trial court as inference of defendants guilt of all crimes charged. (See; CALJIC

2.50 as given, CT.0510-0511).

Petitioner stated in his written motion;

"where the defendant is requesting a motion for new trial on statutory grounds

P.C. 1181(6),(7) (verdict or finding was contrary to law or evidence) the trial

transcripts will be necessary in order to show what evidence was presented and what the grounds of admissibility was when introduced." (CT.0580, at p. 6)

Petitioner continued; "...in regards to the defendants challenge of the statutory grounds 1181(5), an accurate record will be absolutely necessary to challenge the courts rulings on questions of law, such as...

- admission of 1101(b) evidence.

Since petitioner received the full transcripts, after review and direct appeal was denied, it has been the ruling of the trial court along with its failure to give any instruction as to the prosecutions allowcation of its burden of proof, which in this case was beyond a reasonable doubt, (See; RT.1626-1629; Exhibit "AA") which has been the subject of petitioners claims challenging the conviction, under inadequate legal theories, all of which pretain to 1101(b) Evid.

It is impossible to argue effectively the full impact the courts ruling had on the outcome of the verdict, without a complete trial record. Especially were prosecution produced no evidence of an incident involving Charles Mirabile, which was proffered under E.C. 1101(b), during prosecutions offer of proof. During the course of trial prosecution produced no evidence that property found at the scene of charged offenses, was taken from his automobile, parked down the street from Mr. Rahilly's residence, yet, the trial court did not strike this proffered evidence from jury consideration, pursuant to E.C. 403(c)(2).

It was not until prosecution argued facts not in evidence regarding the incident involving Mr. Mirabile (who did not testify) that the chain of inferences listed under CALJIC 2.50 was complete. In addition defense counsel did not object.

Petitioner also asked for the transcripts in regards to the trial courts ruling excluding eyewitness identification expert, and Police procedure experts testimony. (See; fact number 43).

Other evidentiary concerns were;

- exclusion of expert opinion testimony

1        – exclusion of police policy and procedures

2        – denial of request for original police reports

3        – completion of officers e-mails

4        – denial of continuance

5        – in court identification

6        – ect....

7        Petitioner is not going to go into details as to every one of these evidentiary

8    concerns, to do so would involve a relitigation of everything contained in this

9    petition , but, one thing was very clear, ypetitioner was going to argue ineffective

10   counsel, and without any trial record in support, this claim was futile.

11       Petitioner was pro-per for several months, and had a lot of knowledge about

12   his defense. I don't think anyone would dispute that. But, when defense counsel

13   was appointed and only given seven days to prepair for trial, and in those seven

14   days petitioner and defense counsel had some major brake downs in our communication,

15   ineffective counsel was going to be the main theme of petitioners motion for new

16   trial.

17       Although petitioner was not very articulate as to the details of exactly to

18   what extent he would raise issues regarding ineffective counsel, petitioner was

19   adament about raising it. In his pleading, petitioner did state; in regards to I.A.C

20       That the transcripts were necessary "to show the court that valuable impeachable

21   and exculpatory evidence was not utilized by the defense counsel during trial, that

22   defendant needs the record of witnesses statements to present to the magistrate

23   just how ineffective counsel was. That had this evidence been used the outcome of

24   the verdict could and should have been different." (CT. 0579, at p. 5)

25       Petitioner was more specific about issue in regards to I.A.C.;

26       "...that during trial and closing arguments counsel incriminated the defendant

27   was well as misstated the evidence..." (CT. 0582, at pg. 8).

28       Petitioner had concerns about reveiling to much on the motion, hence why

he requested an in-camera hearing about the specifics. Petitioner stated;

"...if the court feels that a more specific showing would be required, do to the sensitive nature of evidence that relates to witnesses testimony, the defendant would request that the court conduct a in camera hearing..." (CT. 0579-81)

Petitioner contends he had no way of knowing what is sufficient showing of particularized needs because, "because there are no machanical tests for deciding when the denial of a full reporter's transcript for argument on a motion for new trial is so arbitrary as to violate due process or to constitute a denial of effective representation, each case must be considered on its own peculiar facts and circumstances." (People v. Lopez (1969) 1 C.A.3d 78,83, 81 C.R. 386).

Petitioner contends trial court should have afforded the petitioner an opportunity to be more specific, and it was error not to do so here.

Furthermore, it is impossible to prevail on a claim of ineffective counsel without the trial record. The need for the trial transcripts would be virtually mandatory.

Petitioner askes, how do you argue effectively ineffective counsel, without any reference to the trial record? Petitioner contends, you can't.

Which makes petitioners oral arguments made during the course of petitioners new trial motion frivolous. Petitioner argued that defense counsel failed to call key defense witnesses, such as Katherine Tompkins (witness to the Hammerling incident who saw suspect but made no identification of the defendant), Diana Goedhuys husband (who was working in the back yard of his house that day, and could see the street below),Trevor Grosso (who had his house burglarized next to McCarthy's residence, same day, same time, same street, yet the defendant was not the suspect, his daughter and boyfriend were), Mr. Manning (who saw suspect at Castle Hills and Windsor, yet did not identify him as defendant), Robert Tyson (who saw suspect in his back yard, yet did not identify the defendant), ect....These were material witnesses not called by the defense, yet without the record, there can be no prejudical showing. (See; New Trial oral arguments, RT.3094-3095)

But, when it came to the trial issues, petitioner was defenseless without the record, because....

The defendant has the burden of showing both deficient performance and resulting prejudice. Reviewing courts defer to counsels reasonable tactical decisions and there is strong presumption that counseles conduct falls within range of reasonable professional assistance. (People v. Lucas (1995) 12 C.4th 415, 436, 48 C.R.2d 525)

Defendant bringing ineffective assistance of counsel claim must affirmatively prove actual prejudice not just possibility of prejudice. (Cooper v. Calderon 255 F.3d 1104)

A Strickland analysis (See; Strickland v. Washington (1984) 466 U.S. 668, 104 S.Ct. 2052) of a claim of ineffective assistance of counsel focuses not only on outcome determination , but also on whether the result of the proceeding was fundamentally unfair or unreliable and if counsel does not deprive the defendant of any substantive procedural right to which the law entitles him, result is not ineffective.

It would be impossible to conduct a Strickland analysis without the trail record. An error by counsel, even if professionally unreasonable, does not warrant setting aside judgment in a criminal proceeding if the error had no effect on the judgment. (ibid, at pg. 2066)

In order to determine whether counsels errors prejudiced the outcome of the trial it is essential to compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently. (Murtishaw v. Woodford, (2001) 255 F.3d 926)

Petitioner also expressed his concerns about his ability to recall the record of the testimony produced during the course of trial, which would include any rulings made at evidentiary hearings, such as the hearing on admissibility of E.C. 1101(b) evidence, exclusion of defense experts testimony, (402 hearings) and rulings

in regards to key jury instructions such as CALJIC's 2.50, 2.03, 2.15, 2.06, 2.52, ext...all of which are primary targets for new trial motions.

Any contention that, because petitioner was present durign the course of trial and therefore, he was not intitled to full transcripts would be repugnant.

As for requiring a prisoner to rely on his memory, the Supreme Court rejected that as an alternative to the transcript in <u>Gardner v. California</u>, (1969) 393 U.S. 367, 89 S.Ct. 580, 21 L.Ed.2d 601 (393 U.S. at 369-370), <u>Williams v. Oklahoma City</u>, 395 U.S. 458, 459, 89 S.Ct. 1818, 23 L.Ed.2d 440).

The need for the trial record was not for the trial court, or the prosecutions benifit, it was so, a pro-per petitioner could investigate meritorious new trial issues in support of his New Trial motion, with reference to accurate facts, not mere speculation as to what transpired during the course of trial.

There were 25 witnesses who testified, over a two week period, and when it was all said and done, the record is 3,410 pages long.

The trial courts Sua Sponte denial of the full transcripts, without an evidentiary hearing, with arguments in support denied petitioners right to effective assistance of counsel by interfering with counsels ability to make independent decisions about how to conduct his defense, and by dening petitioners right for a full hearing on the motion.

Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense. |citations| (<u>Strickland v. Washington</u> (1984) supra 104 S.Ct. at pg. 2063)

One additional note, advisory counsel was of no assistance in aiding this petitioner in his efforts to obtain a full trial record in support of ineffective counsel claims. He was after all the attorney of record. Also, pro se complaints are held to less stringent standards than formal pleadings drafted by lawyers. (<u>Haines v. Kerner</u>, 404 U.S. 519, 30 L.Ed.2d 652,654, (1972)

<u>PRAYER FOR RELIEF</u>

Petitioner prayer is that the ruling denying new trial motion, and judgment revers

GROUND ELEVEN

PETITIONER CLAIMS DEFENSE COUNSEL DERELICTED HIS DUTIES AS AN ADVOCATE TO THE

DEFENDANT BY INTRODUCING INTO EVIDENCE FACT DEFENDANT HAD A WARRANT FOR HIS ARREST;

HISTORY OF RUNNING FROM POLICE; FAILED TO REQUEST DEFENSE INSTRUCTION TO CALJIC 2.52;

THAN ARGUED AGAINST HIS CLIENT. HENSE, VIOLATED DEFENDANTS RIGHT TO EFFECTIVE ASSIS-

TANCE OF COUNSEL UNDER THE 6TH AMENDMENT OF THE U.S. CONSTITUTION.

### FACTS

1.) Defense counsel introduced into evidence as a fact that petitioner had a

warrant for his arrest, during cross examination of Officer Herzig. (See RT. 2294,

ln.17-19).

2.) This warrant was for a misdemeanor trespassing.

3.) Jury was never told that warrant was for a misdemeanor, nor what type of

crime, unrelated to the charged offense, or that the warrant was not for burglaries.

4.) Defense counsel introduced fact police had a flyer in the squad room with

defendants picture on it. (RT.2294,ln.21-27)

5.) Defense counsel introduced fact police officers were trying to catch the

defendant, because he would run from them. (RT.2294, ln. 21-27)

6.) Prosecution followed by introducing into evidence, flyer's are a way police

do business, flyers come out for people with warrant's that need to be arrested.

(RT.2296,ln.24-28,1)

7.) Defense counsel argued defendant is guilty of resisting arrest; "...I've

alread told you he's not an angel, and we're telling you to find him guilty of

resisting the arrest, because he certainly did..." (RT. 2841, ln. 8-10).

8.) Jury was instructed with CALJIC 2.52 inference of flight is a consciousness

of guilt of committing charged offenses.

9.) Defendant did not testify.    ~116~

10.) At no time did defense counsel argue to jury that the reason he introduced the evidence that defendant had a warrant, and a history of running from the police was to negate the inference of guilt from flight. In other words, fact defendant fled was not because of guilt of charged offenses. Yet, defense counsel never argued this to the jury.

11.) Instead defense counsel argued;

"...YOU KNOW, LADIES AND GENTLEMEN, WE'RE NOT SAYING THAT MR. SHUFELT--WE'RE NOT ARGUING HERE. I'M NOT GOING TO ARGUE TO YOU THAT MR. SHUFELT IS AN ANGEL.

THE POLICE WERE LOOKING FOR MR. SHUFELT. IN FACT, THEY HAD A FLYER THERE FOR HIM. THEY WERE LOOKING FOR HIM, AND THEY KNEW HE WOULD RUN.

HE'S A RUNNER. THAT'S WHAT THE EVIDENCE SHOWED HERE, THAT HE WAS A RUNNER. WHEN YOU GO BACK TO THE JURY ROOM, AT LEAST ON ONE OF THESE COUNTS, WE'RE GOING TO MAKE IT EASY FOR YOU, ON THE RESISTING COUNT, THE VERY LAST COUNT, HE'S GUILTY OF THAT. HE RESISTED. GO AHEAD AND FIND HIM GUILTY OF THAT. I'M TELLING YOU TO. JUST GO AHEAD AND FIND HIM GUILTY OF THAT LAST COUNT THAT'S ALLEGED, THE RESISTING ARREST COUNT, THE OBSTRUCTING COUNT. (RT.2831, LN. 12-28)

12.) PETITIONERS ONLY REMEDY IS BY PETITION FOR HABEAS CORPUS.

## DEFENSE COUNSEL INTRODUCED EVIDENCE DEFENDANT HAD WARRANT

During cross-examination of officer Herzig defense counsel introduced into evidence that defendant had a warrant for his arrest, and a history of running from police. In addition brought into evidence police had a flyer with defendants name on it. Never did defense counsel argue that defendant fled from police because of prior warrant, not because of charged crimes, and therefore CALJIC 2.52 was not applicable.

Petitioner contends defense counsel was also ineffective for failing to request defense instructions to nagate the consciousness of guilt instruction of flight, or require that prosecution must prove flight was because of the charged offenses, and not for some other reason such as the warrant, and to reject CALJIC 2.52 inferences if jury thought there was reasonable doubt flight was because of charged offenses.

The prejudice to the defendant was that the jury heard bad char    evidence, introduced by defense counsel, who then argued the defendants bad character to the jury  during closing arguments, and never argued that this evidence was introduced as a defense to the flight instruction, which makes absolutely no sence.

On Cross-examination defense counsel asked officer Herzig;

Q. OFFICER HERZIG. THE FACT OF THE MATTER IS, IS THAT THERE WAS A MISDEMEANOR WARRANT OUT FOR MR. SHUFELT, WASN'T THERE?

A. ACTUALLY WHAT THERE WAS, WE HAD A --

THE COURT: YES OR NO.

THE WITNESS: I DONT KNOW IF IT WAS A MISDEMEANOR WARRANT, THERE WAS A WARRANT.

(R.T.2294,ln.13-19)

Petitioner contends this warrant was for tresspassing, and was a misdemeanor. Yet, since the jury was never told this they could reasonably infer it was a felony or a misdemeanor warrant. What is more of a concern is wouldn't a juror be curious what the warrant was for?

1    Defense counsel introduces evidence that there was a flyer of the defendant

2   which police had handed to officers prior to defendants arrest, which is only printed

3   when there is a warrant for his arrest.

4       Q. AND POLICE OFFICERS HAD A FLYER IN THE SQUAD ROOM WITH MR. SHUFELTS PICTURE

5   ON IT, CORRECT?

6       A. THERE WAS A FLYER ON OUR LINEUP TABLE BEFORE THIS INCIDENT.

7       Q. AND PLICE OFFICERS WERE TRYING TO CATCH MR. SHUFELT BECAUSE, HE WOULD RUN

8   FROM THEM, CORRECT?

9       A. CORRECT.

10      (RT.2294,LN.21-27)

11   Because defense counsel brought into evidence that defendant had a warrant for

12   his arrest, which had nothing to do with the charged offenses, the prosecution uses

13   this evidence and exploited this fact to the jury. On redirect the prosecution asked

14      Q. NOW, FLYERS ARE PART OF THE WAY POLICE OFFICERS DO BUSINESS, ISN'T IT?

15      A. CORRECT.

16      Q. NOW. FLYERS COME OUT FOR WARRANTS, PEOPLE TO BE ARRESTED, THAT TYPE OF

17   THING?

18      A. CORRECT.        (RT.2296,ln.24-28,1)

19   FIRST off the defendant never testified, and even if he did this misdemeanor

20   warrant business would not be admissible to impeach the defendant.

21   Second, because the jury heard evidence that the defendant committed prior

22   crimes, other than for which he was charged, a reasonable juror could infer that the

23   warrant was for the prior uncharged crimes. In addition that the warrant was for some

24   prior felony.

25   The bottom line is defense counsel introduced extremely prejudicial information

26   without any tactical reason what so ever. Which normally would have been inadmissible

27   bad charactor evidence, barred by Evid. Code, 1101(a).

28

1  inspite of the trial court predisposition that the evidence was not realy evidence

2  or sufficient to support the jury"s inference that the defendant had a warrant,

3  is how defense counsel argued the fact that the defendant had a prior history with

4  the police department, to the jury during closing argument. All one can conclude is

5  that defense counsel never even considered the evidence he chose to introduce as a

6  defense.

7      Defense cousel during closing arguments argues against his clients best interest

8  and uses the very evidence that he introduced against his cleints character;

9      In closing argument defense counsel states;

10      "...DO WE REALLY KNOW WHAT'S GOING ON HERE, AND HOW MANY PEOPLE ARE OPERATING

11  IN THIS SITUATION? ...THE PROSECUTION IS ASSUMING THAT MR. SHUFELT IS DOING EVERYTHING.

12      YOU KNOW, LADIES AND GENTLEMEN; WE"RE NOT SAYING THAT MR. SHUFELT—WE"RE NOT

13  ARGUING HERE. I'M NOT GOING TO ARGUE TO YOU THAT MR. SHUFELT IS AN ANGEL.

14      THE POLICE WERE LOOKING FOR MR. SHUFELT. IN FACT, THEY HAD A FLYER THERE FOR HIM.

15  THEY WERE LOOKING FOR HIM, AND THEY KNEW HE WOULD RUN.

16      HE'S A RUNNER. THAT'S WHAT THE EVIDENCE SHOWED HERE, THAT HE WAS A RUNNER.

17      WHEN YOU GO BACK TO THE JURY ROOM, AT LEAST ON ONE OF THESE COUNTS, WE'RE GOING

18  TO MAKE IT EASY FOR YOU. ON THE RESISTING COUNT, THE VERY LAST COUNT, HE'S GUILTY OF

19  THAT. HE RESISTED. GO AHEAD AND FIND HIM GUILTY OF THAT. I'M TELLING YOU TO. JUST GO

20  AHEAD AND FIND HIM GUILTY OF THAT LAST COUNT THAT'S ALLEGED,  THE RESISTING ARREST

21  COUNT, THE OBSTRUCTING COUNT.   (RT.2831,LN.12-28)

22      As the defendant I kept waiting for Mr. Guthrie to argue that the evidence

23  negated the consciousness of guilt instruction CALJIC 2.52, Which was why I thought

24  he introduced it in the first place. I certainly didn't think that the reason he would

25  prejudice me to jury, telling them that I had a wanrant out for my arrest and that

26  I had a history of running from the police was so that defense counsel could argue that

27  THE EVIDNECE SHOW THAT THE DEFENDANT IS NOT AN ANGLE, AND THAT HE GUILTY OF RESISTING

28  ARESST, AND GO AHEAD I'M TELLING YOU FIND HIM GUILTY OF THAT.

1   Nor did I think that the tactical reason that defendse counsel introduced the prejudicial

2   evidence of prior history with the police and the fact he was wanted hense, the reason

3   for the warrant, as the "I'M NOT AN ANGLE DEFENSE". What kind of a advocate defense

4   attorney would tell the jury that the defendant had a warrant for his arrest, then

5   argue that, I'm not going to tell you he's some kind of angel. Then, to top it off

6   withdraw this evidence as a defense to the consciousness of guilt instruction CALJIC

7   2.52. Indeed not only did Mr. Guthrie withhold punches, by not objecting to all the

8   times prosecutor committed misconduct, or object to the use of prior crime evidence

9   as it came before the jury, ect.. but, defense counsel threw punches at the defendant,

10  more than once.

11      Defense counsel argues again;

12      "...I'VE ALREADY TOLD YOU HE'S <u>NOT AN ANGEL, AND WE'RE TELLING YOU TO FIND HIM</u>

13  <u>GUILTY OF RESISTING THE ARREST, BECAUSE HE CERTAINLY DID...</u>"

14      (RT.2841,LN.8-10)

15      What trial counsel didn"t argue was that the fact he had a history of running

16  from the police and that he had a prior arrest warrant of a misdemeanor trespassing

17  conviction was a meritorious defense withdrawn by defense counsel.

18      Instead defense cousel argues against his client telling the jury that he is

19  guilty of ressisting arrest?

20      Which also had major implications as to the identification testimony as to

21  who the suspect was that officer Herzig saw pushing a bycicle up the hill.. In other

22  words defense counsel conceded his clients identity as to that alligation, which was

23  extremely prejudicial and inconsistant with advocacy and undivided loyalty to the

24  defendant.

25      If defense counsel wanted to use the inference that the police fabricated evidence

26  because they did not like Mr. Shufelt, all defense counsel had to point out is the

27  fact the defendant,after being taken down to the police station, excaped, which embarissed

    this           more than
28  officer Nugent would have been sufficient, to support that inference. Nothing on the

                    ~121~

    record can support the actions by defense counsel to introduce damaging prejudicial

1  evidence that the defendant had a warrant for his arrest and a prior history of

2  running from the police. Further more the jury was never told what the warrant was

3  for which had to be a exacerbating factor on top of the prejudice already inflicted

4  upon the defendant by defense counsel.

5      Defense counsels performance caused a miscarriage of justice in light of the

6  totality of the cricumstances.

7      Resulting conviction must be reversed.

8      Defense counsel not only prejudiced the defendant, he failed to raise the

9  evidence as a defense to the flight instruction as given. (See; CALJIC 2.52 as

10 given.).

11     Counsels' eliciting fact that three years previously defendant had been convicted

12 of possessing heroin constituted ineffective representation. |People v. Perez , 148

13 C.R. 90, 83 C.A.3d 718 (1978)|

1  GROUND TWELVE

2  PETITIONER CLAIMS PROSECUTION COMMITTED MISCONDUCT BY FAILING TO PRODUCE EVIDENCE

3  USED DURING IT'S OFFER OF PROOF, THEN ARGUED FACTS NOT IN EVIDENCE REGARDING INCIDENT

4  INVOLVING A CHARLES MIRABLE, PROFFORED UNDER E.C. 1101(B). IN ADDITION DEFENSE COUNSEL

5  WAS INEFFECTIVE FOR FAILING TO "STRIKE" THE CHARLES MIRABLE UNCHARGED OFFENSES FOR

6  ANY PURPOSE, AND OBJECT TO PROSECUTION ARGUING FACTS NOT IN EVIDENCE. PROSECUTION

7  VIOLATED PETITIONERS RIGHT TO CONFRONATION OF THE WITNESS, AND DUE PROCESS OF LAW.

8  DEFENSE COUNSEL RENDER I.A.C., THUS, VIOLATED THE 6TH & 14TH AMEND. U.S. CONST.

9

10  SUPPORTING FACTS

11      1.) Prosecution sought to introduce prior crime evidence involving a victim

12  Charles Mirable, who allegedly had property taken from his unlocked vehicle parked

13  out-side his residence. This property was allegedly found mixed with property from

14  the charged offenses found at various locations. (See: 402 hearing on 1101(b) evidence

15  RT. 1742-1750, Exhibit "BB").

16      2.) Prosecution also stated he needed to eliminate Charles Mirable as a suspect

17  in the eye's of the jury. (RT.1742-1750)

18      3.) Prosecution had no witnesses to the Charles Mirable incident.

19      4.) Prosecution produced no evidence during the course of trial that a Mr.

20  Mirable was a victim of having property taken from his unlocked car parked in front

21  of his residence down the street from victim of charged offense Mr. Rahilly. (counts

22  4 & 8). (See; RT.1760-2372 Course of prosecutions case-in-chief).

23      5.) Trial court instructed jury with permitted inference listed under CALJIC

24  2.50 such as, Identity of the person who committed all crimes charged; A characteristic

25  method, plan or scheme used in the commission of offenses charged; that the defendant

26  had knowledge of things found in his possession; if defendant committed prior uncharged

27  offenses defendant committed all charged offenses. All this could be inferred from

28  the Charles Mirable incident. (See Trial courts ruling, RT.1742-1750, CALJIC 2.50)

6.) Inspite of fact that during prosecutions offer of proof that he needed Charles Mirable to testify, and that this incident was being used as proffered prior crimes allegedly committed by the defendant, during course of trial or even after prosecution informed jury that they could not locate Mr. Mirable, defense counsel never motioned to strike the Charles Mirable incident from jury consideration for any purpose.

7.) It was not until during prosecutions closing arguments that jury, for the first time heard the prosecution argue facts not in evidence that Mr. Mirable was a victim of having his property taken from his automobile parked out front of his house, down the street from Mr. Rahilly. Thus completing the main theme prosecution used to argue defendants guilt. (See: RT. 2787,ln.17-20; 2798-2799, ln. 21-28,1-23)

8.) At no time did defense counsel object to the prosecutions arguing facts not in evidence involving Charles Mirable.

9.) Charles Mirable never testified.

10.) Appellate counsel raised no issues that challenged the conviction.

11.) Petitioners only remedy is by habeas corpus.

PROSECUTION PRODUCED NO EVIDENCE MR. MARIBLE HAD HIS CAR BURGLARIZED

1        PROSECUTOR ARGUES FACTS NOT IN EVIDENCE
2            WITHOUT OBJECTION FROM DEFENSE COUNSEL

3   CHARLES MIRABILE INCIDENT

4       Petitioner contends Trial counsel was ineffective for failing to object to

5   prosecutor misconduct for arguing facts not in evidence. Prosecution argued that

6   a Charles Mirabile had his car broken into down the street from Mr. Rahilly's

7   residence. Prosecution produced no evidence during the trial of these facts, nor

8   did Charles Mirabile testify.

9       This evidence was proffered under Evidence Code 1101(b), as prior crime (CALJIC 2.5

10  committed by the defendant, and used as inference of guilt on all crimes charged.

11  Yet, the prosecution failed to produce any evidence that a crime took place, or that

12  Mr. Mirabile was a victim of any crime. That is until closing arguments.

13      Defense counsel is ineffective for failing to object.

14

15      The prosecution argues; a chain of inferences

16  "...HE DOES THE BURGLARY OF THE GEDHUYS RESIDENCE. THEN HE GOES TO THE RAHILLY

17  RESIDENCE. HE'S THERE, THEN, OF COURSE, HE STEALS FROM MR. MIRABILES CAR THATS

18  OUTSIDE WHO IS A NEIGHBOR OF MR. RAHILLY..." (SEE; RT. 2787,LN.17-19)

19      Prosecution produced no evidence of this fact during trial.

20      Again prosecution tells jury there are facts not in evidence.

21      Prosecution argues in reference to Mirabiles ID found at McCarthy's;

22  "...MIRABILES ID CARD IS ALSO FOUND AT THE MCCARTHY RESIDENCE. HOW THE HECK DID

23  HE GET THAT? BECAUSE MIRABILE, THE NEXT DOOR NEIGHBOR OF MR. RAHILLY, HE JUST WENT

24  DOWN THE LINE. FIRST, HE RIPS OFF THE RESIDENCE OF RAHILLY'S. THEN HE GOES AND HITS

25  MIRABILES CAR..."   (See: RT. 2798-2799,ln.27-28,1-4)

26      Prosecution produced no facts in evidence that Mr. Mirabiles car was burglarized,

27  and that the defendant committed this crime, yet, because defense counsel failed to

28  object, the jury was free to use the prosecutor's testimony.

In essence, the prosecution effectively circumvented the rules of evidence,
by expressing his own personal testimony that Mr. Mirabile was a vitim of car
burglary. Thisnexus between the uncharged offenses, and. the charged offenses, was
the prosecutions main theory that Mr. Mirabile was a victim of a crime, and that since
his property was found mixed with property of the charged offenses, than defendant
must have committed all crimes charged. Remember, during the 402 hearing the prosecu-
tion had to eliminate Mr. Mirabile as a suspect. Well he certainly did a good job
but in a way that violated the defendants <u>right to confrontation of the witness</u> under
the <u>Sixth Amendment U.S. Constitution</u>, without any objection by defense counsel.

The prosecution continues;

"...AT THE MCCARTHY RESIDENCE, AS YOU'LL REMEMBER, ONE OF <u>MIRABILES CARDS</u>, ID
CARDS, WAS FOUND-- EXCUSE ME -- AT THE MCCARTHY RESIDENCE, ONE OF HIS ID CARDS.

WHERE'S ANOTHER ONE OF HIS ID CARDS FOUND? IN THE RED SAAB.

SO, <u>IT CONNECTS HIM FURTHER TO THE RED SAAB</u>..." (SEE; RT.2800-2801, LN.23-28,1)

Again the prosecution is relying heavily on Mr. Mirabile being a victim, and not
a suspect, and is relying heavily on prosecutor's own testimony not subjected to
examination by the defendant to convince the jury he was a victim. Of course there
is no need to worry about any objection from defense counsel, who is completely silent
at a very critical stage of the procedings.

The prosecution continues;

"...<u>MIRABILE</u>, HE'S GOT HIS AAA CARD OUT THERE HAMMERLINGS CELL PHONES ARE OUT
FRONT. CIRCUMSTANTIAL EVIDENCE. <u>IT WASN'T TWO SEPARATE PEOPLE. IT WAS THE SAME GUY</u>
<u>DOING ALL OF THIS</u>..." (RT. 2810 LN.2-6)

Then again;

"...BACKPACKS BELONGING TO RAHILLY ARE THERE. THE CHECKBOOK AND CAMERA BELONGING
TO MS. GOEDHUYS ARE IN THE BACKPACKS. <u>MIRABILE</u> HAS ANOTHER ID CARD THATS THERE,

<u>HE'S ALREADY CONNECTED TO MIRABLE FROM THE RED SAAB.</u>

1   SO, THATS HOW IT FITS TOGETHER WITH RESPECT TO THE RAHILLY RESIDENCE. IT'S

2  CIRCUMSTANTIAL EVIDENCE OF THE PROPERTY DUMPS THAT TIE HIM TO THAT.

3     THE ONLY REASONABLE INTERPRETATION IS THE SAME GUY IS DOING ALL OF THESE.

4  (SEE; RT. 2810,LN.2-20)

5

6                              PREJUDICE

7

8     The Charles Mirabile incident was not merely cumulative in regards to the

9  prosecutions theory used to pursuade the jury, it was the prosecutions main theme.

10    In order the complete the chain of inferences used by the prosecution during

11 closing arguments, the prosecutor had to argue facts not in evidence to complete the

12 theory used to convict the defendant. Its not only the fact defense counsel failed to

13 object to prosecution argueing facts not in evidence, it's the fact defense counsel

14 never motioned to strike the Charles Mirabile incident as Evid. Code 1101(b) evidence,

15 that thoroughly prejudiced the defendant, because, the Charles Mirabile incident was

16 permitted by the trial court in conjunction with CALJIC 2.50's permitted inferences

17 as a theory the jury could use to infer the identity of the person who committed all

18 crimes charged, with the ultimate inference, "IF DEFENDANT COMMITTED THE OTHER OFFENSES

19 DEFENDANT COMMITTED ALL CRIMES CHARGED.."

20    Not only should have defense counsel objected to the prosecution argueing facts

21 not in evidence, he should have motioned the trial court to "strike" the Charles

22 Mirabile incident from being used as prior crimes committed by the defendant under

23 Evid. Code 1101(b), and permitted inferences listed under CALJIC 2.50- as given.

24    The Charles Mirabile incident was conditional under Evid. Code 403, and as soon

25 as the prosecution rested their case-in-chief, defense counsel should have made this

26 motion under Evid. Code 403c to exclude the jury from considering its use both as

27 circumstantial evidence, and as 1101(b) evidence.

28

-124-

1  Prosecutor may not argue his own belief of guilt based upon
2  evidence not produced in court. (People v. Love, 336 P.2d 33, 16 C.R.
3  777, 56 C.2d 720).
4  A calculated campaign to hostility against a party refering to
5  material not offered or admitted in evidence or suggesting existence
6  of facts unsupportable by evidence or alluding to personal knowledge
7  during his summation to jury is misconduct. (People v. McDowell, 104
8  C.R. 181, 27 C.A.3d 864 (1972).)
9  While prosecutors are not required to describe sinners as saints
10  they are required to establish the state of sin by admissible evidence,
11  unaided by aspirations that rest on inadmissible evidence, hunch or
12  spite. (U.S. v. Schindler, 614 F.2d 227)
13  A prosecutor should not misstate the law in closing arguments,
14  and also must refrain from introducing into his argument evidence not
15  in the record. (U.S. v. Artus, (1979) 591 F.2d 526)
16  Statements of facts by prosecuting attorney in his argument to
17  jury, when same are not in evidence, constitutes misconduct. (People
18  v. Kirkes, 249 P.2d 1, 39 C.2d 719; People v. Van Hooten, 170 C.R. 189,
19  113 C.A.3d 280 (1952).)
20  Argument of matters outside the record is clearly improper.
21  (People v. Beyea, (1974) 113 C.R. 565, 37 C.A.3d 717)
22  The prosecutor may comment fairly on evidence properly admitted,
23  but it is clearly misconduct for a prosecutor to refer to facts not in
24  evidence, because such statements tend to make the prosecutor his or
25  her own witness, offering unsworn testimony not subject to cross-exam-
26  ination. such testimony, although worthless as a matter of law, can be
27  "dynamite" to the jury because of the special regard the jury has for
28  the prosecutor. Thus, effectively circumventing the rules of evidence.

1  Statement of supposed facts not in evidence are <u>highly prejudicial</u>

2  form of misconduct, and a frequent basis for reversal. (See; <u>People v.</u>

3  <u>Hill</u>, (1998) 17 Cal.4th 800, at p. 827-828, 72 C.R.2d 656, 952 P.2d 673;

4  see also, <u>People v. Gains</u>, 54 C.A.4th 821, 63 C.R.2d 188 (1997).)

5      For the prosecutor to state facts not proved or not sought to be

6  proved, or to assume the existence of facts arguendo, is in effect

7  equivalent to placing before the jury unsworn evidence, and this is

8  sufficient ground for reversal. (<u>People v. Mitchell</u>, 62 Cal. 411, 1882

9  WL 2030 (1882); <u>People v. Reilly</u>, 208 Cal. 385, 281 P. 606 (1929);

10 <u>People v. Love</u>, (1961) 56 Cal.2d 720, 16 C.R. 777, 366 P.2d 33).

11     Prejudicial misconduct arises when the prosecutor uses deceptive

12 or reprehensible methods to persuade the finder of fact.

13     The prosecutor should not, attempt to evolve any theory or intro-

14 duce into the case any feature that is not fairly and reasonably justified

15 by the evidence. (<u>People v. Kamaunu</u>, 110 Cal. 609, 42 P. 1090 (1895);

16 <u>People v. Beasley</u>, 163 C.A.2d 22, 328 P.2d 834 (1958); <u>People v. Mathews</u>

17 163 (1958) 163 C.A.2d 795, 329 P.2d 983 (1958).)

18     Yet, that is exactly what the prosecution did!

19     "..MIRABLES ID CARD IS ALSO FOUND AT THE MCCARTHY RESIDENCE. HOW

20 THE HECK DID HE GET THAT? BECAUSE MIRABLE, THE NEXT FOOR NEIGHBOR OF

21 RAHILLY, HE JUST WENT DOWN THE LINE. FIRST, HE RIPS OFF THE RESIDENCE

22 AT RAHILLY'S, <u>THEN HE GOES AND HITS MR. MIRABLES CAR...</u>"

23     (RT. 2798-2799,LN.27-28, 1-6)

                    <u>LEGALLY INADEQUATE THEORY</u>

24

25 <u>PREJUDICE TO THE DEFENDANT</u>

26     <u>Because</u> the evidence involving Charles Mirable that he was a

27 victim of a tampering of his vehical, parked out front of his house,

28 was obtained through prosecutorial misconduct, in violation of defendants

right to confontation of the witness, under the 6th Amend. And

due process of law under the 14th, (See; U.S. 6th, 14th Amend. Const.)

All permitted inferences listed by CALJIC 2.50 become unconstitutional

inadequate legaly theories. such as; characteristic method, plan or

scheme used in the commission of charged offenses; identity of the

person who committed the crimes charged; defendants knowledge of the

nature of things found in hes possession; means that might be necessary

for the commission of charged offenses; and permitted inference that

goes to the ulitmate issue;

" A CLEAR CONNECTION BETWEEN THE OTHER OFFENSE AND THE ONE OF

WHICH THE DEFENDANT IS ACCUSED SO THAT IS MAY BE INFERRED THAT IF

DEFENDANT COMMITTED THE OTHER OFFENSE DEFENDANT ALSO COMMITTED THE

CRIMES CHARGED IN THIS CASE..."

(See; CALJIC 2.50 as given; See also charge to jury (RT.2764-2765,

ln.21-28,1-13)

Because there is no-way to know whether the jury used prior

crime evidence allegedly committed by the defendant involving Charles

Mirable, to convict the defendant of charged offenses, the resulting

conviciton **must** be reversed. (See; **People v. Green,** 27 Cal.3d 1, 164

C.R. 1 (1980) [when prosecution presents its case to jury on alterna-

tive theories, some of which are legally correct and others legally

incorrect, and reviewing court cannot determine form record on which

theory ensuing general verdict of guilt rested, conviction cannot

stand] Which also stated where theories depend on inadmissible evidence

theories would have been erroneous,

Since jurors are not generally equipped to determine whether a

particular theory of conviciton submitted to them is contrary to law,

a conviction based on general verdict must be overturned if one of

the theories that was submitted to the jury was legally erroneous.
(See; **Keating v. Hood,** 191 F.3d 1053 (1999) at p. 1062, 1063)

   "The Supreme court has determined that a verdict must be set
aside in cases such as this where the verdict is legally insupportable
on one ground, yet supportable on another, and it is impossible to
tell on which ground the jury relied." **United States v. Fullbright,**
105 F.3d 443, 451, cert. denied, 520 U.S. 1236, 117 S.Ct. 1836, 137
L.Ed2d 1041 (1997) (The jury instructions permitted the jury to choose
a basis for conviciton that was legally impermissible....Because we
have no way to ascertain the factual basis on which the jury convicted
Fullbright, his conviction under Count II Cannot stand.");

   **United States v. Barona,** (1995) 56 F.3d 1087, 1098 (Where the
jury is presented with a legally inadequate theory, as opposed to a
factually inadequate theory, Yates requires that the conviction be
vacated"). The Keating court continued;

   "We have applied the same reasoning in habeas cases, holding that,
even when the evidence supporting the legally correct theory was "very
strong" and the state did not argue the legally erroneous theory to
the jury, the conviction **must be reversed** When it is not possible to
determine whether the jury relied upon the erroneous theory to convict
the defendant. See **Suniga v. Bunnell,** 998 F.2d 664, 667, 669-670 (9th
Cir. 1993). The keating court noted;

   "We have noted that instructing the jury on a legally erroneous
theory in a case in which it is also instructed on a legally correct
theory is particularly damaging when the jurors are not required to
agree unanimously on the theory of conviction; in such cases, the
possibility that even one juror might have relied upon the legally
erroneous theory requires invalidation of the conviction. See id. at

1  p.669 (__Keating v. Hood__, supra, 191 f.3d at p. 1063).

2      The resulting conviciton must be reversed because there is no

3  way of knowing whether the jury relied on the short path theory of

4  prior crime evidence allegedly committed by the defendant involving

5  a Charles Mirable, which was obtained in violation of defendants right

6  to confrontation of the witness under the sixth amendment, by reprehence-

7  able prosecutorial misconduct or by one of the other theories presented

8  to the jury. Thus, creating a consitutionaly  defective legal theory

9  via CALJIC 2.50 permitted inferences as listed. Which included the

10 ulitame inference, "...if defendant committed uncharged crimes, defendant

11 committed all crimes charged."

12

13 PROSECUTION VIOLATED DEFENDANTS RIGHT TO CONFRONT THE WITNESS

14     The sixth amendment of the United States constitution sates:

15     "In all criminal prosecutions, the accused shall enjoy the right

16 ...to be confronted with the witnesses against him;..."

17     __Evid.Code §711__, states;

18     "At the trial of an action, a witness can by heard only in the

19 presence and subject to the examination of all the parties to the action,

20 if they chose to attend and examine."

21     Right of defendant to be confronted with witnesses is right to have

22 witnesses testify in presence of defendant and subject to cross-examina-

23 tion. __People v. Murphy__, (1963) 31 C.R. 306, 59 Cal,2d 818, 382 P.2d

24 346)

25     Right of cross-examination is fundamental to insure full play of

26 Sixth amendment right to confront witnesses, and wide latitude should

27 ordinarily be afforded where there exists serious of credibility of

28 witness.(__U.S. v. Stanfield__, 521 F.2d 1122.)

1  GROUND Thirteen

2  PETITIONER CLAIMS, PROSECUTOR COMMITTED MISCONDUCT BY ARGUING JACK

3  BEISERS TESTIMONY, PROFFERED AS 1101(B) EVIDENCE, "PROVED DEFENDANT WAS

4  A THEEF, THATS WHY HE IS GUILTY OF FOUR RESIDENTIAL BURGLARIES". THUS

5  EVIDENCE WAS USED AS CRIMINAL PROPENSITY, INVIOLATION OF DEFENDANTS

6  RIGHT TO IMPARTIAL JURY, AND PROOF BEYOND A REASONABLE DOUBT, UNDER

7  6TH AND 14TH AMEND. U.S. CONST. DEFENSE COUNSEL WAS INEFFECTIVE FOR

8  FAILING TO OBJECT, IN VIOLATION OF THE 6TH AMEND. U.S. CONST.

9                              FACTS

10 1.    * Testimony of a Jack Bieser was introduced in prosecutions case

11 in-chief. Jack Bieser testified he saw defendant rummaging through the

12 trunk of his wifes car out-side his appartment, at 6:00 am, August 12th

13 which was introduced as prior crimes committed by the defendant under

14 Evid.Code §1101(b). (See; RT.1777-1832).

15 2,   *Jury was intructed with CALJIC 2.50 which included limiting

16 instruction that evidence could not be used to prove criminal disposion.

17 (See; RT. 2764,ln.24-28)

18 3,   * During closing arguments prosecution argued that the testimony

19 of Jack Bieser proved that defendant was a thief who steals stuff out

20 of people's cars. Thats what he did all bay long, thats why he goes

21 down on four counts of residential burglary. (RT. 2812, ln.11-27)

22 4,   * Trial counsell did not object to this misconduct by the prosecutor

23 and request for admonishment.

24 5,   * Trial court at no time intervened to curb this act of misconduct

25 or admonish the jury to disregard prosecutors comments.

26 6,   *Appellate counsel raised no issues challenging petitioners

27 conviction in opening brief.

28 7,   * Petitioners only remedy is by writ of Habeas corpus.

-134-

COURTS RULING

Trial court permits evidence of Jack Biesers testimony under Evid. Code, §1101(b), as prior uncharged crimes committed by defendant, with permitted inferences listed under CALJIC 2.50 as follows;

(1) evidence of a characteristic method, plan or Scheme, similar to the method, plan or Scheme, to the crimes in this case.

(2) Which would further show the identity of the person who committed the criems charged.

(3) A clear connection between the other offenses and the one in which the defendant is accused, so that it may be inferred that if the defendant committed the prior offenses, the defendant also committed the crimes charged in this case.

(4) The identity of the person who committed the crimes charged.

(5) That the defendant had knowledge of the nature of things found in his possession.   (See; R.T.1747,ln.9-28)

(Note; erroneous admission of uncharged misconduct will be addressed in petitioners other claims, through-out writ)

WITNESS JACK BIESERS TESTIMONY

During the prosecutions case-in-chief Jack Bieser testified as follows;

Jack Bieser testified that at 6:00am he walked out of his apartment, saw the trunk of his wifes car opened, looked over there and saw someone rummaging through the trunk. Then he went ahead and attacked him. (R.T.1780,ln.16-22)

He felt violated so he attacked him. (R.T.1780,ln.27-28)

Jack Bieser at first did not know who it was. He knocked him down and then saw he had some merchandize with him. Then recognized him as the defendant. (R.T.1781,ln.1-19)

He said the defendant was wearing green shorts no shirt or shoes, Mr. Bieser discribed the defendant as a neanderthal, very skinny, shorts, sweaty, short hair kind of sticking out, eyes wide open, he didn't look well, (R.T.1778, ln.25-28).

Mr. Bieser testified; "I JUST DON'T KNOW WHAT TO DO WITH HIM. HE'S SLIPPERY, SWEATY. I JUST GET ON--I WAS HITTING HIM, AND I COULDN'T HIT HIM THAT HARD, I JUST COULDN'T DO IT. I WAS TRYING TO THINK DO YOU ARREST HIM, DO YOU DETAIN HIM, AND THEN HE FINALLY SLIPPED AWAY AND RAN OFF. I CHASED AFTER HIM." (RT.1782, LN.13-21).

Then he lost him. (RT.1782,ln.21-22)

SECOND INCIDENT

About an hour and a half later Mr. Bieser see's a person that walks like the defendant.

Q. YOU SEE HIM, THEN ITS NOW WHAT, ABOUT SEVEN O'CLOCK ROUGHLY?

A. YEAH, 7:30, EIGHT O'CLOCK. (RT.1784,LN.12-14)

Wearing different clothes, "HE'S WEARING KHAKI PANTS, LIKE A PENDLETON, BEIGE, RED IN IT, AND A BASEBALL CAP." (RT.1784,LN.17-18)

Q. ANY PROBLEM RECOGNIZING HIM THAT SECOND TIME?

A. NO, I COULD TELL BY THE WAY HE WALKED. (RT.1784,LN.21-22)

Mr. Bieser yells and runs at him, "..COME HERE YOU SON OF A BITCH" (RT.1784,LN.24-28). This person starts running then disapears.(RT.1785 ln.14-15) Jack Bieser never see's him again. (RT.1785,ln.25-27)

After coming around a corner Mr. Bieser See's a red saab take off. (RT.1786,ln.6-8) Hears tires screech, but does not hear any car door's (Contrary to prosecutions statements in 402 hearing), does not hear an engine start, his belief is that the car is already runing. (RT.1786, ln.10-17)

~\136~

Jack Bieser never saw the defendant get in a red saab. (RT.1802, ln.17-19) or drive a red saab. (RT.1803,ln.1-3) Nor could he recognize the person as the defendant.

Q. DID YOU HAVE ANY TROUBLE RECOGNIZING HIM THAT SECOND TIME? WAS HE CLOSE ENOUGH SO YOU COULD SEE HIM?

A. I COULDN'T RECOGNIZE HIM BECAUSE HE HAD HIS HAT PULLED OVER HIS HEAD....I RECOGNIZED HIM BY THE WAY HE WALKED. (SEE; RT.1808,LN.1-4)

Jack Bieser also testified that he was told the saab he saw belonged to a guy named 'Lance'. (RT.1788,ln.4-5) Later he is told that it belong's to 'Will Smith'. (RT.1789,ln.19-22)

TRIAL COURT GIVES LIMITING INSTRUCTION

Petitioner contends, although the trial court instructed the jury that evidence of uncharged crimes committed by the defendant, may not be considered by you to prove that defendant is a bad character or that he has a disposition to commit crimes, (see; RT.2764,ln.24-28) the prosecution committed misconduct by arguing to the jury that the testimony of Jack Bieser proves the defendant is a thief, and therefore he's guilty of four count's of residential burglaries.

PROSECUTOR MISCONDUCT DURING CLOSING ARGUMENT

During closing arguments, the prosecution argues that testimony of witness Jack Bieser show's Mr. Shufeltsis a thief. And that is why he goes down on four residential burglaries. That his intent was to steal stuff out of peoples cars all day long.

Petitioner contends inspite of the word intent, the prosecution is misleading the jury to think, that criminal propensity can be used as inference that defendant intended and in fact did commit charged offenses.

—127—

1  | <u>PROSECUTION ARGUES</u>

2

3  | "...KIND OF THE FINAL WITNESS WE HAVE IS MR. BIESER'S TESTIMONY.

4  | HE'S A COLORFUL FELLOW WHO GOT IN A FIGHT WITH MR. SHUFELT EARLY IN THE

5  | MORNING. <u>HE WAS RIGHTEOULY TICKED OFF.</u> MR. SHUFELT HAD BEEN RIPPING OFF

6  | HIS WIFE'S CAR. <u>THAT'S PRETTY UNDERSTANDABLE.</u>

7  | <u>WHAT DO WE REALLY LEARN FROM THAT? WHAT DOES THAT SHOW?</u>

8  | <u>WE KNOW MR. SHUFELT'S A THIEF.</u>

9  | <u>IT PROVES HIS INTENT TO STEAL.</u>

10 | I MEAN, <u>SHULELT'S A THIEF.</u>

11 | <u>HE STEALS STUFF OUT OF PEOPLE'S CARS.</u>

12 | <u>THAT'S WHAT HE DID ALL DAY LONG.</u>

13 | IT HAPPENED TO BE A RESIDENCE.

14 | <u>THAT'S WHY HE GOES DOWN ON FOUR RESIDENTIAL BURGLARIES.</u>

15 | SOMETIMES IT DIDN'T HAPPEN TO BE A RESIDENCE AS IN BIESER'S CASE,

16 | BUT WE KNOW WHAT HIS <u>INTENT WAS THROUGHOUT THE DAY.</u>

17 | <u>CAR THEFT. SELF EXPLANATORY.</u>      (SEE; CLOSING ARGUMENT, RT.2812

18 | LN.11-27)

Note: No objections, our admonishment by the trial court.

19 | POINTS AND AUTHORITIES

20

21 | To argue that Jack Bierser's testimony proves the defendant is a

22 | thief, is synonymous with saying, the proffered evidence of prior

23 | uncharged crimes, proves the defendant has the propensity to commit,

24 | and infact did commit all crimes charged. "THATS WHY HE GOES DOWN ON

25 | FOUR RESIDENTIAL BURGLARIES".

26 | Petitioner contends, not only was the Jack Bieser incident insuff-

27 | icient in characteristics, thus, inadmissible under Evid. Code, §§1101(b)

28 | ( See; petitioners claim of inadmissibility) the prosecution is arguing

-138-

1  exactly what you can't use 1101(b) evidence for, as criminal propensity,

2  which, as the prosecution argue's, prove's the defendant committed the

3  charged offenses. Thus, prosecutorial misconduct, reprehensible in

4  nature, as evidence of intent to commit charged offenses.

5      Prosecutions emphasis; that proffered evidence of uncharged offenses

6  could be used as inference that defendant is a thief, and thats why

7  he goes down on four count's of residential burglaries, <u>violated defendant:</u>

8  <u>right to an impartial jury under the 6th amendment, and due process of</u>

9  <u>law under the 14th amendment of the U.S. Const</u>, and is substantive,on

10  its face, which must require reversal of all charged offenses.

11      Government knew evidence of criminal propensity was inadmissible

12  as evidence of guilt, yet argued intensly, that defendants criminal

13  dispositation, was sufficient to find defendant guilty of charged offenses.

14      By disguising criminal propensity as "intent to commit crimes",

15  jury could assume the limiting portion of CALJIC 2.50 does not aplly.

16  And that "intent" must be applicable as evidence that defendant intended

17  and in fact did commit charged offenses. Which is a clear mistatement

18  of law. Designed to confuse the jury, that CALJIC 2.50 is applicable,

19  and any limiting portion as dispositiondoes notapllyy as inference of

20  intent does.

21  <u>I.A.C. DEFENSE COUNSEL</u>

22      <u>O</u>rdinarily the defendant must make a proper objection, by assignment of misconduct

23  and requiest for an admonition, or it is waived; and if an admonition was given it

24  may sometimes be regarded as a cure of the error. It is the fact that defense counsel

25  made no attempted to curb this gross misconduct by the prosecution that rendered his

26  performance deficient under both prong's of the Strickland test. (See; <u>Strickland v.</u>

27  <u>Washington</u> (1984) 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052)

28

1    Petitioner contends, when prosecution argued to jury that proffered

2    evidence of Jack Bieser's testimony proves defendant is a "thief", and

3    "he steals stuff out of people's cars", "thats what he did all day

4    long", and then the ultimate pitch, "that's why he goes down on four

5    residential burglaries", is basically saying, defendant has bad

6    charater and therefore was not only likely to have committed, but did

7    commit charged crimes. Which is exactly how, 1101(b) evidence can't

8    be used used.

9    Evid. Code, §1101(a) states;

10    (a) "EXCEPT AS PROVIDED IN THIS SECTION AND IN SECTIONS 1102,

11    1103, 1108, & 1109, EVIDENCE OF A PERSON'S CHARACTER OR TRAIT OF HIS

12    OR HER CHARACTER(WHETHER IN THE FORM OF AN OPINION, EVIDENCE OF REPUTATION

13    OR EVIDNECE OF SPECIFIC INSTANCES OF HIS OR HER CONDUCT) IS INADMISSIBLE

14    WHEN OFFERED TO PROVE HIS OR HER CONDUCT ON A SPECIFIC OCCASION."

15    Evid. Code, §1101(b) states;

16    (b) "NOTHING IN THIS SECTION PROHIBITS THE ADMISSION OF EVIDENCE

17    THAT A PERSON COMMITTED A CRIME, CIVIL WRONG, OR ACT WHEN RELEVANT TO

18    PROVE SOME FACT......OTHER THAN HIS OR HER DISPOSITION TO COMMIT SUCH

19    AN ACT."

20    The way the prosecution argued defendants criminal disposition

21    as "IT PROVES HIS INTENT TO STEAL", "I MEAN MR. SHUFELT IS A THIEF"

22    "HE STEALS STUFF OUT OF PEOPLE'S CARS", "THATS WHAT HE DID ALL DAY

23    LONG", is clearly misleading to the jury, a mistatement of law, because

24    the prosecution is using the term intent, were normally evidence of

25    prior uncharged offeses is used to negate the cliam, were the defendant

26    admits the act, but, claims innocent intent, Not, as evidence used to

27    prove, he did it once, there for he is guilty of four counts of resi-

28    dential burglaries.

PROSECUTOR MISCONDUCT

Defendant must be tried for what he did not for who he is; thus, guilt or innocence of the accused must be established by evidence relevant to particular offences being tried, not by showing that the defendant has engaged in other acts of wrongdoing. (Crotts v. Smith, 73 F.3d 861 (1996).

Evidence of defendant's prior crimes or wrongful acts may not be introduced to show that defendant has bad character and is therefore more likely to have committed crime with which he is charged. (Fed rules Evid. rule 404(b), U.S. v. Brown, (1989) 880 F.2d 1012.)

Use of prior conviction to raise inference that defendant may have been disposed to commit offense of type with which he is charged is forbidden. (U.S. v. Powell 587 F.2d 443.)

Evidence that defendant committed crimes other than those for which defendant is being tried is barred if it is offered to prove defendants criminal disposition. (People v. Hayes (1990) 276 C.R. 874, 52 Cal.3d 577, 802 P.2d 376.)

Evidence of prior offenses is not admissible simply as character evidence that is, to show propensity to commit crimes in general or a particular class of crimes. (People v. Felix, (1993) 18 C.R.2d 113, 14 C.A.4th 997).

Evidence that defendant committed some other offense, offered to help establish that he committed offense charged in information, is inadmissible if its only relevancy is to establish that defendant has character trait or propensity for committing criminal offenses in general, there by leading to inference that he acted in accordance with this character triat or propensity on occasion in question and committed charged offenses. (People v. Rodriguez (1977) 137 C.R.594, 68 C.A.3d 874

## PREJUDICE IS OVERWHELMING

1    What is even more shocking to petitioner is the fact there was no objection

2  by defense counsel.

3    If counsel had objected, at least the trial court would have reminded the jury

4  that this evidence was limited, and prosecutions argument was inapropriate, and must

5  be striken.

6    But, since there was no objection, jury was free to except prosecutions argument

7  as sufficient. In other words, the Jack Bieser incident was sufficient to find the

8  defendant guilty of all crimes charged.

9    Prior crime evidence has a highly prejudicial nature, and limited instructions

10  do very little to change this fact. But, prosecution went way to far, and without

11  objection.

12    I'm not an expert by any means, but, this has got to be one of the most foul

13  closeing arguments by a prosecutor one could ever have presented to a jury without

14  an objection.

15    Prejudice is over-whelming and obviously inherent in criminal propensity

16  evidence, especially when used by the prosecution during closing argument, as

17  infence of guilt.

18    Courts that follow the common law tradition almost unanimously

19  have come to disallow resort by the prosecution to any kind of

20  evidence of a defendants evill character to establish a probability

21  of his guilt. (Michelson v. United States (1948) 69 S.Ct. 213, 335

22  U.S. 469, 475-476)

23    The State may not show defendant's prior trouble with the law,

24  specific criminal acts, or ill name among his neighbors, even though

25  such facts might logically be persuasive that he is by propensity

26  a probable perpetrator of the crime. (Ibid, at 475)

27

28

-142-

Ground Fourteen

1  DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF

2  COUNSEL IN VIOLATION OF DEFENDANTS RIGHTS UNDER THE 6th

3  AMENDMENT OF THE U.S. CONSTITUTION, FOR FAILING TO OBJECT

4  TO PROSECUTIONS MISSTATEMENTS OF FACTS IN EVIDENCE, AS

5  CONSCIOUSNESS OF DEFENDANTS GUILT, DURING CLOSING ARGUMENTS

6  WHICH VIOLATED PETITIONERS RIGHT TO A FAIR TRIAL AND DUE PROCESS

7  OF LAW UNDER THE 6th AND 14th AMENDMENTS OF THE U.S. CONST.

8

9  SUPPORTING FACTS

10

11    During prosecutions closing arguments, the prosecution

12  argued that the defendant told officer Herzig that "he lived

13  in the house at the end of the cul de sac, on Calle Vista."

14  (See: RT. 2795, exhibit "HH", closing arguments)

15    Next, the prosecution, in direct reference to CALJIC

16  2.03, argued that this false statement, made by the

17  defendant, was strong evidence of consciousness

18  of the defenants guilt. (See: RT. 2795 - ln 10-28, 1-5)

19    At no time during the course of trial did the

20  prosecution introduce any evidence that the defendant

21  told officer Herzig, or anyone else, that "he lived

22  in a house at the end of the cul de sac."

23    Defense counsel did not object to the prosecutions

24  use of facts not in evidence as evidence of the

25  defendants consciousness of the defendants guilt.

26    Thus, jury was free to rely on the prosecutions false

27  claim, as evidence that the defendant committed the

charged offenses.

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)
OSP 98 10924

PROSECUTION ARGUES FACTS NOT IN EVIDENCE AS CONSCIOUSNESS OF GUILT
WITHOUT OBJECTION FROM DEFENSE COUNSEL

Petitioner contends prosecution argued facts not in evidence that suspect said he "lived down at the end of the Cul de Sac", and that this statement was false in addition this false statement was made by the defendant and therefore CALJIC 2.03 was applicable as consciousness of guilt defendant committed charged offenses.

Defense counsel failed to object to this prosecutorial misconduct for argueing facts not in evidence, therefore jury was free to accept prosecutors argument as pursausive inference of defendants guilt of charged offenses, thus, greatly reducing prosecutions burden of proof in violation of due process of law under the 6th and 14th amendments, of the U.S. Constitution.

In addition defense counsel was ineffective for failing to object to this prosecution misconduct, in violation of defendants right to effective assistance of counsel under the 6th Amendment of the U.S. Constitution.

During closing arguments the prosecution argued;

"...WHAT DOES SHUFELT DO? HERZIG ASKED HIM, "HEY, WHERE DO YOU LIVE"?

AND SHUFELT REPLIES, "DOWN AT THE END OF THE CUL DE SAC."

Petitioner contends, nowhere in the record of conviction does this fact exist.

The prosecution continues;

"...WELL, THAT'S THE WHOPPER OF THE DAY. HE DOESN'T LIVE AT THE END OF THE CUL DE SAC, THE PLACE HE JUST BURGLARIZES AT THE END OF THE CUL DE SAC.

WHY THE HECK WOULD HE SAY THAT?

WELL, THERE'S A JURY INSTRUCTION ON IT. IT'S CALLED THE CONSCIOUSNESS OF GUILT FALSEHOOD INSTRUCTION.

I'LL READ IT TO YOU. IT'S EXACTLY WHAT YOU THINK IT SAYS.

1    IF YOU FIND THAT BEFORE THIS TRIAL A <u>DEFENDANT MADE A WILLFULLY FALSE OR</u>

2  <u>DELIBERATING, MISLEADING STATEMENT CONCERNING THE CRIMES FOR WHICH HE'S NOW BEING</u>

3  <u>TRIED, YOU MAY CONSIDER THAT STATEMENT AS A CIRCUMSTANCE TENDING TO PROVE A CONSCIOUS-</u>

4  <u>NESS OF GUILT.</u>

5    HOWEVER, THAT CONDUCT IS NOT SUFFICIENT, BY ITSELF, TO PROVE GUILT. AND THE

6  WEIGHT AND SIGNIFICANCE IS FOR YOU TO DECIDE.

7    EXACTLY WHAT YOU THOUGHT. <u>INNOCENT FOLKS DON'T MAKE STATEMENTS LIKE THAT.</u>

8    (SEE; RT. 2795, ln.10-28,1-5)

9    Petitioner does not need to argue that even if this fact was part of the record

10  it does not prove a consciousness of guilt of charged offenses, this statement by

11  the prosecution is false. , and was never part of Officer Hirzigs testimony.

12    This comment by the prosecutor during closing arguments is simply a byproduct

13  of the prosecutors imagination, in a direct violation of the defendants right to due

14  process of law under the 14th Amendment, and clearly should have been objected to by

15  defense counsel. Without defense counsels objection, jury was free to accept prosecutor's

16  pursuasive argument of consciousness of guilt by argueing facts not in evidence.

17    Officer Herzigs testimony;

18    Q. OKAY, AND I THINK YOU SAID THAT YOU ASKED HIM FOR SOME ID?

19    A. THATS CORRECT.

20    Q. WHAT WAS HIS RESPONCE?

21    A. <u>HE TOLD ME HE LEFT HIS ID AT HIS HOUSE.</u> I TOLD HIM I WOULD FOLLOW HIM BACK

22  DOEN TO HIS HOME TO GET HIS ID.

23    Q. AND WAS THERE ANYMORE CONVERSATION?

24    A. NO.

25    (SEE; RT. 2286,LN.15-28)

26    Petitioner contends the record is clear, the suspect never said he lived at the

27  end of the Cal de Sac. Its the officer who made that conclusion if any conclusion was

28  made.

1    There is no evidence at all that the suspect made a false statement, and there

2  is certainly no evidence that the defendant made a false statement.

3    Because defense counsel failed to object, the jury was free to use the prosecutors

4  false testimony during closing arguments as inference of defendants guilt. (CALJIC 2.03.

5    There can be no tactical reason for defense counsels failure to object.

6    Prosecution was clearly relying on facts not in evidence in conjunction with

7  the consciousness of guilt instruction which greatly reduced prosecutions burden of

8  proof, and because defense counsel failed to object, jury was free to believe prosecutors

9  false testimony as inference of defendants guilt of all crimes charged, as well as

10  uncharged offenses.

11    Prejudice has been shown, and whether or not this claims is substantive on its

12  face to require reversal, has nothing to due with the cumulative effect it had in

13  consideration of all the other claims where prosecutor committed misconduct, without

14  any objection by defense counsel.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GROUND Fifteen

PETITIONER CLAIMS, TRIAL COUNSEL, AND PROSECUTING ATTORNEY VIOLATED A COURT ORDER,
THAT NO ATTORNEY, POLICE OFFICER, OR EXPERT MAY USE THE PHRASE "IDENTFICATION"
IN REFERENCE TO COMMENTS MADE BY WITNESSES DURING IDENTIFICATION PROCEDURES.
TRIAL COURT FAILED TO COMPEL OBEDIENCE TO ITS ORDER, THUS,VIOLATED THE DEFENDANTS
RIGHT TO JURY TRIAL, DUE PROCESS OF LAW, AND ASSISTANCE OF COUNSEL TO AID IN DEFENSE,
UNDER U.S. CONST. 5TH,6TH, AND 14TH AMENDMENTS.


                              FACTS


1.)* The trial court ordered, that no police officer, or attorney, nor expert, may
use the phrase "identification" when reference to comments made by witnesses during
attempted identification procedures. Because it's an improper conclusion. (See: R.T.
1730-1731,ln. 9-28,1-8).

2.)* Repeatedly, both the prosecution and defense counsel, used the phrase "ident-
ification" when referring to the photolineup, and subsequent in-court prior judgements,
implicating the defendant. (See Points and Authorities).

3.)* At no time did either trial counsel for the defendant, nor the trial court,
object, or admonish the jury to disregard the statements by counsel in violation of
the court order, during line of questioning.

4.)* The trial court waited untell all witness identification testimony had been
completed before worning the prosecution not to use the phrase as ordered. (See; R.T.
1999).

5.)* Appellate counsel raise no issues challenging the conviction in appellants
opening drief No. D040805.

6.)* Petitioners only remedy is by writ of Habeas Corpus.

7.) Both defense expert's on eyewitness identification, and police procedures, were
precluded from giving their testimony that defendant was not identified, during lineup's.

POINTS AND AUTHORITIES

CHAPTER I

THE COURT ORDER

The trial court ordered that no attorney or police officer may use the phrase "identification" because, the term identification is a conclusion. This conclusion would be for the trier of fact to determine, not the attorney's or anyone else for that matter. (See; R.T. 1730-1731)

THE COURT: NOW, AS FAR AS THE PHRASE "IDENTIFICATION", I'M ORDERING THAT NO POLICE OFFICER, NOR ATTORNEY, USE THE PHRASE "IDENTIFICATION" EXCEPT IN ARGUMENT IN RELATIONSHIP TO THE LAW.

IDENTIFICATION IS A CONCLUSION. AND IF IT WAS OBJECTED TO, WE WOULDN'T USE THE WORD "IDENTIFICATION".

IN OTHER WORDS, DR MC SPEIDEN, IN TERMS OF HOW HE PHRASES THINGS.

THE WITNESS SAID WHAT EVER THE WITNESS SAID. AND THAT IS DOCUMENTED. SO, THAT WOULD BE WHAT THE WITNESS SAID.

IT WILL BE UP TO THE JURY TO DECIDE IN CONJUNCTION WITH 2.1 AND 2.2 IF THERE WAS AN IDENTIFICATION SUCH THAT THE PERSON -- SUCH THAT IT CARRIED WEIGHT WITH THE JURORS.

(SEE; R.T. 1730,LN.9-23)

Petitioner contends, the amount of times this order was violated by both, trial counsel and prosecuting attorny's is staggering. Equally hard to believe, is the fact that the trial court, refused to inforce the very order that it imposed.

Petitioner contends, both trial counsel, and the trial court were delinquent, for failing to uphold a court order, which was implemented to prevent the attorney's from invading the province of the jury. (i.e., improper conclusion)

CHAPTER II

THE PROSECUTION

1

2

3  Petitioner contends, the prosecution repeatedly, violated the trial court's

4  order, not to use the term "identification", because it is a impermissable conclusion.

5      Petitioner contends, the prosecutor should be held in contempt of court, for

6  violating a trial court order.

7      Petitioner contends, nothing short of a reversal, dismissal for the outrageous,

8  governmental conduct, will suffice. Not only because of prosecutor misconduct, but,

9  because of the trial courts complete absence, and failure to uphold it's own

10  court order, and protect the defendants right's to a fair jury trial under the

11  6th amendment of the United States Constitution.

12  **DIANE GORDHUY ON DIRECT**

13      The prosecution, after reading the admonishment written on the photo lineup,

14  refers to the results of the lineup procedure as a "identification".

15

16      MR. HELLSTROM:

17      Q. OKAY. DID YOU READ THAT PRIOR TO IDENTIFYING OR MAKING ANY IDENTIFICATIONS

18  IN THIS MATTER?

19      A. YES, I DID.

20  (SEE; R.T.1933,LN.10-12)

21      Q. DID YOU FELL UNDER ANY PRESSURE TO IDENTIFY ANY PARTICULAR PERSON?

22      A. NO, I DID NOT.    (SEE R.T.1933,LN.23-25)

23      This is a direct violation of the trial court's order, that no attorney shall

24  use the phrase "identification", because, it is a conclusion, that is for the jury

    to decied.

25      The prosecution continues:

26      Q. OKAY. WHAT WERE YOU LOOKING AT IN ORDER TO MAKE YOUR IDENTIFICATION?

27      A. JUST THE FACE. I'M PRETTY GOOD AT FACES AND, YOU KNOW, I HAD SPENT, I DON'T

28  KNOW, MAYBE TWO MINUTES TALKING WITH THIS PERSON. SO, I JUST WANTED TO MAKE SURE

~ 149 ~

I WAS RIGHT.

(SEE; R.T.1934,LN.15-20)

Now, the jury has heard, "direct evidence", that the statement "more incline to say him, looked more like him", after three minutes of careful study, notwith-standing, the inherent suggestive bias in the lineup, was a conclusive, "identification" of the defendant. A direct violation of a court order.

The prosecution continues:

Q. OKAY. WHEN YOU GO HOME TONIGHT, AFTER YOU'VE TESTIFIED TODAY, CAN YOU BE COMFORTABLE WITH THE IDENTIFICATION YOU MADE TODAY?

A. YES, I WILL BE.

(SEE; R.T.1934,LN.21-24)

Equally egregous, was the conclussive statement by the prosecution, in the form of a question, where the witnesses was explaining the difficulty in selecting anyone from the lineup because, the suspect was wearing a hat, and nobody in the lineup was wearing a hat.

Q. WHEN YOU SQUISHED THAT HAT THAT YOU DESCRIBED ON TOP OF PICTURE NUMBER FIVE HERE, DID YOU COME UP WITH HIM?

A. YES, SIR, I DO.

(R.T.1940,LN.5-8)

Q. AS YOU SIT HERE TODAY, ANY DOUBT IN YOUR MIND THAT'S THE SAME MAN?

A. NO.

Q. WE'LL GO BACK TO THE IDENTIFICATION PART OF THIS, BUT LET'S FINISH WITH YOUR CONTACT WITH HIM AT THIS STAGE. (R.T. 1840,LN.1-6)

1

2  <u>PHILLIP HAMMERLING ON DIRECT</u>

3      Petitioner contends, the prosecutor violated the court order repeatedly, during

4  direct questioning, of the prosecution's "key" witness Phillip Hammering.

5      Phillip Hammering's comment made during the photolineup pocedure, was "4 or 5,

6  more the facial features of five", only after careful study, and by the witnesses

7  own testimony, "I was very uncertain when I was speaking with B.J. it was very hard

8  to make a choice...."(R.T.1998,ln.11-13)

9      Phillip Hammerling did not identifiy the defendant in-court.

10     Dr. Mac Spieden's testimony was this was not a identification. (See; Petitioners

11  claim exclusion of expert testimony).

12     It is extremely hard to imagine that the Prosecutor forgot, all expert testimony,

13  and defense arguments, that this type of statement was not a absolute identification,

14  in addition, the fact the prosecutor never asked the witnesses in-court, if the

15  defendant was in fact the suspect, and then through inadvertencey forgot the trial

16  court's order. "NOT TO USE THE PHASE "IDENTIFICATION".......That to call a comment

17  a "identification" would be a improper conclusion.

18     An invasion of the province of the jury.

19     Clear prosecutorial misconduct, and contempt of court.

20

21  MR. HELLSTROM:

22  Q. WAS THAT THE PHOTO LINEUP THAT YOU WERE SHOWN?

23  A. IT LOOKS LIKE IT, YES.

24  Q. WERE THE STATEMENTS THERE THAT YOU MADE UNDER THE COMMENTS SECTION THERE,

25  TO THE BEST OF YOUR MEMORY, WERE THOSE ACCURATE AS TO WHAT YOU SAID REGARDING

26  IDENTIFICATION?

27  A. YES, IT WAS.

28  Q. AND, NOW, HAVING HAD A CHANCE TO READ THAT TO REFRESH YOUR MEMORY WITH RESPECT

1 | TO WHAT YOU SAID, CAN YOU TELL THE LADIES AND GENTLEMEN WHAT YOU SAID WITH RESPECT

2 | TO IDENTIFICATION?

3 |     A. I IDENTIFIED THE BOTTOM TWO LEFT PHOTOS, NUMBER FOUR AND NUMBER FIVE. I

SAID IT WAS -- I REMEMBER -- WEEL, I IDENTIFIED THEM ON PAPERWORK. IT WAS MORE THE

4 | MORE THE FACIAL FEATURES. A LITTLE BIT OF FIVE, BUT IT WAS HARD TO SAY BECAUSE OF

5 | THE ANGLES, AND THEY WERE SLIGHTLY DIFFERENT. AND I KNOW ON FIVE HIS EYES WERE

6 | KIND OF CLOSE.

7 |     Q. OKAY. SO YOU SAID IT WAS FOUR OR FIVE, MORE LIKE THE FACIAL FEATURES OF FIVE?

8 |     A. A LITTLE BIT. I WAS VERY UNCERTAIN WHEN I WAS SPEAKING WITH B.J. IT WAS VERY

9 | HARD TO MAKE A CHOICE BETWEEN NUMBER FOUR AND NUMBER FIVE.

10 |     Q. THAT'S FAIR ENOUGH. WHEN YOU WERE SHOWN THAT PHOTO LINEUP, DID YOU FEEL ANY

11 | PRESSURE TO PICK SOMEBODY OUT?

12 |     A. ONLY FOR MYSELF.

13 |     Q. OKAY. DESCRIBE THAT FOR US.

14 |     A. NO, I JUST -- I WANTED TO REALLY -- I TRIED TO IDENTIFY WHAT I THOUGHT WAS

15 | THE MOST LIKELY PHOTOGRAPH.

16 |     Q. DID YOU WANT TO IDENTIFY THE RIGHT GUY AND EXCLUDE THE WRONG GUY?

17 |     A. PRECISELY. (improper conclusion)

18 |     Q. OKAY. OKAY.

19 |     MR. HELLSTROM: THANK YOU, SIR. NO FURTHER QUESTIONS.

20 |     THE COURT: CROSS EXAMINATION, MR. GUTHRIE?

21 |     Counsel declined any questioning.

22 |     (See: R.T.1997-1999,ln.18-28,1-28,1-6)

23 |

24 |     Petitioner contends, because of the invasion of the province of the jury, by

25 | the prosecution, without objection by trial counsel for the defendant, the jury

26 | was lead to believe that the witness Phillipe Hammerling "identified" the defendant

27 | during the photolineup procedure. When he said "4 or 5" after having a hard time.

28 |

TRIAL COURT WARNS PROSECUTION NOT TO USE PHRASE "IDENTIFICATION".


The trial court warn's the prosecution not to use the phrase "identification" during a side-bar, after all eyewitness testimony was concluded. In-spite of the trial courts warning, the failure to uphold the court's order was reprehensible. Thus, prosecutor misconduct, a pattern of conduct so egregious that it infected the trial, as to make the conviction a denial of due process. (See; 14th Amend. U.S. Const.) (prosecution misconduct under State Cal. Const. Art.1 Sec. 15 & 24)

### Warning by trial court

During a brief sidebar, the trial court warned the prosecution not to use the word "identification", and to remove the word from his vocabulary. Petitioner contends this warning came to late.

THE COURT: WHILE WE'RE HERE, LET'S TALK ABOUT THE PHRASE "IDENTIFICATION." THE WITNESS USED THE PHRASE "IDENTIFICATION", OR "IDENTIFY", BUT, NOW MR. HELLSTROM, YOU'RE USING THE WORD "IDENTFIICATION."

MR. HELLSTROM: OH.

THE COURT: "ELIMINATE IT FROM YOUR VOCABULARY."

MR. HELLSTROM: "YES, MA'AM. I'M SORRY ABOUT THAT."

THE COURT: "OKAY."

MR. GELLSTROM:"I DID IT UNCONSCIOUSLY."

THE COURT: "I KNOW. IT SEEMED TO ME LIKE THERE WAS A TACTICAL DECISION MADE BY THE DEFENSE NOT TO OBJECT. SO, I DIDN'T INTERVENE, BUT, AT THIS POINT I AM."

MR. HELLSTROM: OKAY.    (no tactical reason can exsplain trial courts dely)

THE COURT: OKAY.

(SEE; R.T.1999-2000,ln.11-28, 1-6)

Petitioner contends, the failure by the prosecution to follow the trial order, not to use the phrase "identification" as a conclusive term, was not only contempt, but, prosecutorial misconduct. The kind of misconduct that undermined the judicial process.

- \63-

DEFENSE COUNSEL WITHDRAWS A MERITORIOUS DEFENSE

AND CALLS COMMENTS MADE DURING LINEUP PROCEDURE "IDENTIFICATIONS"

IN DIRECT VIOLATION OF A TRIAL COURT ORDER


Defense expert Dr. Mac Speiden testified that research has proven that lineups can cause a witness to pick the one who looks the most like the person, rather than actualy the person who was the suspect. These type or judgments are called relative identifications which are not identifications at all.

The danger of relative judgment, is that when there's always somebody in the lineup who looks most like the culprit, the danger is your witnesses are going to choose the person who looks like the culprit, rather than the culprit himself.

(See; RT.1670-1672, testimony of Dr. Mac Speiden)

Dr. Mac Speiden testified that there are ques people will give when making an relative judgment, such as saying either two or three but, its propbably two, or saying it "looks the most like" comments. Dr. Mac Spieden testified that to say looks like, is not an identification at all, in fact its to say that's not the guy at all. (See; RT.1672-1673)

In addition when asked if the statements made by Diane Goedhuy and Phillip Hammerling were "identifications" he said no, there very relative.

Q. SO, IN YOUR OPINION, IF SOMEONE WERE TO GIVE A RELATIVE JUDGMENT AS OPPOSED TO AN ABSOLUTE JUDGMENT, THE RELATIVE JUDGMENT WOULD NOT BE AN IDENTIFICATION?

A. NO, TT'S NOT AN IDENTIFICATION.

...IF I WERE TO SAY NUMBER THREE LOOKS LIKE THE MAN THAT ROBBED ME, IN ESSENCE I'M SAYING IT'S NOT THE MAN. IT'S VERY DIFFERENT FROM SAYING, "THAT'S HIM, THAT'S THE ONE..."  (RT.1673,LN.4-8)

When asked about the comments made by the witness Diane Goedhuy during the lineup procedure the Dr. stated that her comments where very relative, especially

1  after he was told it took her almost three minutes to make her comments.

2     Q. COULD YOU TURN TO O-1, THE GOEDHUYS PHOTOGRAPHIC LINEUP? (COURT EXHIBIT O-1)

3  A. YES.

4     Q. AND IT INDICATES THERE UNDER COMMENTS MAKE BY MS. GUEDHUY, "NUMBER FIVE,

5  MORE INCLINED TO SAY IT LOOKS MORE LIKE HIM."

6     A. YES.

7     Q. IS THAT BASED ON YOUR DEFINITION OF AN ABSOLUTE ID? IS THAT AN ABSOLUTE ID?

8     A. NO, VERY RELATIVE.

9     Q. AND WHEN YOU SAY A RELATIVE IDENTIFICATION IS THAT AN IDENTIFICATION AT ALL?

10     A. NO. IT'S MORE INCLINED TO SAY HIM, LOOKS MORE LIKE HIM. "LOOKS MORE LIKE

11  HIS" IN ESSENCE IS SAYING IT'S NOT HIM. IT LOOKS MORE LIKE HIM BUT IT'S NOT.

12     (RT.1710,LN.2-13)

13     In regards to the Phillip Hammerling comments made during the lineup procedure,

14  the Dr. came to the same conclusion.

15     Q. AND LET ME TURN YOUR ATTENTION TO O-3 (COURTS EXHIBIT) AND THE SAME AREA OF

16  THE PHOTOGRAPHIC LINEUP. THIS IS THE LINEUP VIEWED BY MR. HAMMERLING.

17     WHERE IT SAYS COMMENTS, "FOUR OR FIVE, MORE THE FACIAL FEATURES OF FIVE."

18     IS THAT AN ABSOLUTE IDENTIFICATION?

19     A. NO, THAT'S CERTAINLY RELATIVE. "FOUR OR FIVE, GOT MORE THE FEATURES OF FIVE",

20  BUT IT'S NOT SAYING IT'S FIVE."

21     Petitioner contends, although the trial court abused it's discretion by disallowing

22  the expert's testimony about relative identifications, and his opinion that the state-

23  ments  where not "identifications" of the accused, (See claim exclusion of expert

24  testimony) it was the main reason that the trial court made the court order not to

25  use the phrase "identification".

26     Because, if the defendant is not going to be allowed to present evidence that

27  he was not identified during the lineup procedure, than the prosecution wouldn't

28

                              -155-

be able to say that the defendant in fact was "identified" during the lineup procedures. The trial courts reasoning was that the phrase "identification" is a conclusion which is something for the jury and only the jury to decide.

The trial court in entering the court order noted the defense experts testimony initiating it's order. In other words the defendant can not use expert testimony that the judgements were not identifications, nor may the prosecution say that they are identifications.

But, what happened is both defense counsel and the prosecutor used the phrase as a  conclusion calling the judgments by Diane Godhuy and Phillip Hammerling identifications of the defendant, which was in a direct violation of the order.

Petitioner has raised this claim under abuse of distcretion by the trial courts complete failure to compel obedience to it's own order, at least not until the prosecution had finished with eyewitness identification testimony. (See; failure to compel obedience claim)

Now, petitioner brings the same claim under ineffective assistance of counsel under the 6th Amendment for his failure to protect the defendants only defense he had to the in-court identification, which was the trial courts order.

Petitioner contends the combination of exclusion of defense experts testimony and the fact the trial courts order was repeatedly violated by both trial counsel and the prosecutor, rendered the resulting conviction a shame, and a complete miscarriage of justice in violation of the 5th, 6th, and 14th Amendments of the U.S Constitution, Due process, right to jury determination, assistance of counsel, and impartial Judicial supervision.

Each time either the prosecutor or defense counsel used the phrase as a conclusion was contempt of court, and the fact defense counsel used the phrase repeatedly and never once objected to the prosecution using the phrase was inexcusable derelection of his duty to defend, and in essence was a withdarwal of a meritoreous defense.

PREJUDICE

The defendant sought to introcduce expert testimony evidence that there is a distinction between a absolute identification, and a relative identification.

In addition, the experts opinion that the statements made during the lineup procedure were not identifications, in fact they were very relative. (See; exclusion of expert testimony claim).

ULTIMATE ISSUE; PROVINCE OF JURY

The reason why the trial court disallowed this expert's testimony was because, this was a fact for the jury to decide.

THE COURT: "....HE CANNOT TESTIFY AS TO THE ULTIMATE FACT AS TO WHETHER THIS PHOTOGRAPHIC LINEUP IS SUGGESTIVE IN HIS OPINION." (See: R.T. 1735,ln.2-4)

An again;

"...SO, UNDER 352, I THINK THAT ONCE YOU HAVE HIM EXPRESS AN OPINION ABOUT THAT PARTICULAR LINEUP IN ANY WAY, THEN WE'RE GOING TO GET INTO THE AREA THAT I DON'T BELIVE HE SHOULD BE IN, WHICH IS THE ULTIMATE OPINION AS TO WHETHER THE LINEUP IS SUGGESTIVE." (R.T.1736,ln.14-19)

Because the court said "it's the jury's decision."

THE COURT: "...THE JURY HAS TO DECIDE IF THOSE VARIOUS FACTORS THAT HE IS DIS-CUSSING IMPACTS THE WEIGHT THAT THE JURY'S GOING TO GIVE, IF ANY, TO THE LINEUP, AND THE RESULTS OF THE LINEUP." (R.T.1736,ln.21-24)

Here it is clearly stated, that the jury is supposed to decide if those state-ments made during the lineup were "identifications", Hence, why the court gave the order.

This same type of logic applied to defense police procedure expert. In reference to expert Donald Reierson's testimony that the lineup was suggestive the court said;

THE COURT: "....HE'S NOT GOING -- HE'S JUST LIKE MAC SPEIDEN. HE CAN'T TESTIFY TO THE ULTIMATE ISSUE. (R.T.1738,ln.25-27)

-\151-

Again, the trial court emphasizes; Ultimate fact.

THE COURT: "...I MEAN, WHERE I'M COMING FROM AT THE MOMENT IS I THINK REIERSON CAN TESTIFY AS TO, POLICE PROCEDURES. BUT, AS FAR AS, AGAIN, THE ULTIMATE ISSUE, THAT'S UP TO THE JURY." (R.T. 1739,ln.12-15)

Note; just how concerned the trial court is that defense witnesses not invade the province of the jury, but, when it come to the prosecution it's fair game.

In regards to the use of hypothetical questions that use facts in evidence, the trial court states;

"...IF IT IS COMING OUT THAT HE'S ONLY USING THE FACTS OF THIS CASE, IT'S GOING TO BE APPARENT TO ME, AND THEN I'M GOING TO START SUSTAINING OBJECTIONS, BECAUSE IT'S DOING WHAT I'VE INDICATED THAT YOU CANT DO,

WHICH IS TO EXPRESS AN OPINION ON THE ULTIMATE ISSUE OF THIS CASE..."

(R.T.2407,ln.20-25)

In responce to the question of the expert Dr. Macspeiden;

"IF THE WITNESS WERE TO SAY THIS, WOULD THAT CONSTITUTE IDENTIFICATION OR NOT."

THE COURT: "..THAT'S GOING TO THE ULTIMATE CONCLUSION. THATS SOMETHING I EXCLUDED.

MR. HELLSTROM: "THATS WHAT I THOUGHT."

MR GUTHRIE: "I JUST WANT TO CLARIFY IT SO I DON'T DO IT AND BREAK AN ORDER."


When counsel for the defendant sought to introduce expert evidence that there are two types of identifications, as noted by the American Phycological Association, so that the "jury would be able to understand what makes an identification absolute, or how to judge when comments are relative non-identifications", (See; R.T.2475-2477)

The court stated;

"...UNDER 352, I'M AT THE POINT OF TRYING TO MAKE THAT DISTINCTION WHERE IT'S GOING TO BE TO CONFUSING WITH THE JURY. IT'S NOT GOING TO BE THE ASSISTANCE THAT IT IS SUPPOSED TO BE TO A JURY. (R.T.2478,LN.3-5)

MR. GUTHRIE: "OKAY, I DON'T -- I'LL THINK ABOUT IT, BUT BASED ON THE COURTS RULING.

1 | I'M GOING TO STAY AWAY FORM IT.

2 |     THE COURT: "OKAY, LET'S DO THAT."

3 |

4 |     Never did the eyewitness identification expert Dr. Mac Speiden give his opinion

5 | that Witnesses Diane Goedhuy or Phillipe Hammerling comments made during the photo-

6 | lineup were relative non-identifications be cause of the trial court's order.

7 |     In other words, the defense expert's were not allowed to use the phrase "ident-

8 | ification" because of the court order, but, the prosecution was allowed to make the

9 | conculision as stated by the phrase. In a direct violation of the trial court's

10 | order.

11 |     The trial court specificaly stated in making it's order;

12 |     THE COURT: "...THE WITNESS SAID WHAT EVER THE WITNESS SAID. AND THAT IS

13 | DOCUMENTED. SO, THAT WOULD BE WHAT THE WITNESS SAID."

14 |     "....IT WILL BE UP TO THE JURY TO DECIDE IN CONJUNCTION WITH 2.1 AND 2.2 IF

15 | THERE WAS AN IDENTIFICATION........"

16 |     (R.T.1730,ln.19-22)

17 |     Thus, the reason of the court order.

18 |     Which was acted upon when it came to defense expert opinion, yet, was violated

19 | repeatedly when used by the prosecution, and defense counsel, where use of the phrase

20 | "identification" was a conclusion.

21 |     It was the trial courts duty to compel complyance of the court order, even where

22 | defense counsel was ineffective for failing to object. A clear abuse of discretion,

23 | and obstruction of justice.

24 |     The trial judge is bound to see that the administration of justice is not obstructed

25 | by anyones conduct, and take what ever steps are necessary to that end. (People v.

26 | Santo, 43 CAl.2d 319) This includes preservation of order in the courtroom against

27 | conduct calculated to obstruct justice. (People v. Merkouris, 46 Cal.2d 540, 297 P.2d

28 | 999 (1956)

such as this, the defendant was not identified, during the photolineup procedure. And, the subsequent in-court identifications, were a direct result of the tainted lineup, and suggestive conduct, of the San Diego Police department.

Petitioner contends, his counsel was eneffective, for failing to object to the use of the phrase "identification" by the prosecution, as an impermissible conclusion.

The trial court stated;

"IDENTIFICATION IS A CONCLUSION. AND IF IT WAS OBJECTED TO WE WOULDN'T USE THE WORD "IDENTIFICATION". (R.T.1730,LN.9-23)

In addition, counsel used the same phrase repetedly in his own line of questioning as a conclusive statement.

Even if counsel had a legitimate tactical reason, his performance is still inadequate if evidence supporting potentially meritorious defense remains unexplored. (See; In re Cordero, 149 C.R. 342 (1988)).

Counsels conduct undermined proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. (Strickland v. Washington, 104 S.Ct. 2052 (1984)).

PREJUDICE

Counsels conduct falls well short or reasonable professional assistance of counsel. Because, counsel failed to;

(a) present the meritoreous defense, that the defendant was never actually identified during the pre-trial lineup procedure.

(b) Failed to object to the uses of the conclusive phrase "identification" by the prosecutor.

-160-

GROUND Sixteen

1  PETITIONER CLAIMS, TRIAL COURT MADE NO FINDING THAT HIS RECORD OF UTAH CONVICTION
   CONTAINED CONDUCT THAT THE DEFENDANT PERSONALLY USED A DANGEROUS OR DEADLY WEAPON,
2  OR PERSONALLY INFLICTED G.B.I. ON SOMEONE OTHER THAN AN ACCOMPLICE, THEREFORE, PRIOR
   CONVICTION WAS NEVER BROUGHT WITHIN THE MEANING OF PARAGRAPH (8) OR (23) OF SECTION
3  1192.7(c), BEFORE DEEMED A "SERIOUS" FELONY. THUS, APPELLATE COUNSEL WAS INEFFECTIVE FOR
   FAILING TO RAISE THIS CLAIM ON DIRECT APPEAL, TRIAL COUNSEL WAS INEFFECTIVE FOR
4  FAILING TO ARGUE THAT THESE ELEMENTS ARE NOT PART OF UTHA PLEA AGREEMENT. PETITIONER
   WAS DENIED RIGHT TO COUNSEL, AND DUE PROCESS OF LAW UNDER THE 6TH & 14TH AMENDMENTS
5  OF THE U.S. CONSTITUTION

6  SUPPORTING FACTS

7  1.   On December 5, 2001, prosecution filed an amended complaint alleging inter alia,

8  that petitioners record of Utah prior conviction to Vehicular Manslaughter was a

9  ipso facto, qualifying "serious" felony within the meaning of penal code §1192.7(c).

10  (See; Information Case No. SCD163510, CT. 0001-0005, exhibit "M")

11  2.   However, the accusatory pleading does not state which of the paragraphs listed

12  under subdivision (c) of section §1192.7 was being used to bring the prior Utah

13  conviction within the meaning of California's list of serious felonies, i.e. that

14  before prior can qualify prosecutor must prove either personal use of dangerous weapon

15  or personal infliction under paragraphs (8) or (23) of section 1192.7(c).

16  3.   In March 17, 1995, petitioner entered into a guilty plea with the state of Utah

17  to Vehiclular Manslaughter, simple negligence, in violation of U.C.C. §76-5-207(1)(a)

18  a third degree felony. (See; Statement, and Change of Utah plea, exhibit's "P" & "Q")

19  4.   The   listed elements to which defendant pled guilty to are (1) on or about

20  August 19, 1994, the defendant was in actual physical control of an operable motor

21  vehicle; (2) at the time the defendnat had a blood alcohol content of .08% or greater

22  by weight; (3) That the defendant operated the vehicle in a negligent manner; (4) that

23  in doing so the defendant caused the death of Frank N. Hudleson; (5) All acts

24  occurred in Salt Lake County, State of Utah. (See; Change of plea, Statement of

25  Defendant, Exhibit "P" & "Q")

26     At no time were the conduct elements listed under paragraph (8) or (23) of section

27  §1192.7(c) ever adjudicated or found true by the trier of fact. (See; exhibit's "B,C,

28  & D", hearings on "strike" allegation and California courts ruling.)

6.   The prosecutor for the state of California agreed that the element of cause was

"proximate cause" to the Utah offense. (See; RT. 2262-2263, ln. 23-28,1, exhibit "B")

7.   The prosecution argued;

"SO, THE WAY I VIEW IT, WE'VE GOT FOUR ELEMENTS THAT I DON'T THINK ARE SUBJECT
TO DISPUTE IN TERMS OF WHAT THE UTAH -- WHAT MR. SHUFELT PLEAD TO. THAT IS,
HE DROVE A CAR, HE WAS OVER .08 AT THE TIME. HE DROVE IT NEGLIGENTLY, AND
PROXIMATELY CAUSED THE DEATH OF ANOTHER HUMAN BEING,.."

8.   Again the prosecution acquiesed to cause as "proximate" cause;

"...SO, I SEE THE FOUR ELEMENTS AS HAVING BEEN MET: HE DROVE, HE WAS OVER .08,
HE COMMITTED A LAWFUL ACT IN AN UNLAWFUL FASHION. IN OTHER WORDS, HE DROVE
NEGLIGENTLY, AND IT PROXIMATELY CAUSED THE DEATH OF ANOTHER HUMAN BEING..."
(See; RT, 2263-2264, exhibit "B")

9.   At no time during any of the proceedings regarding adjudication of petitioners

strike allegation did the prosecution argue that the cause of death, in the record

of petitioners Utah conviction and plea agreement, was either the result of personal

use of a dangerous or deadly weapon, or personally inflicted on someone other than

an accomplice. (See; Hearing on "strike" allegation exhibit's "B, C, & D")

10.  The sole basis of the prosecutions theory regarding use of petitioners prior

conviction as a "strike" was that the Utah record of conviction had all the elements

of California's manslaughter statute, P.C. §192(c)(3), and that P.C. 192(c)(3) was

automatically a qualifying 'serious" felony. (See; Two hearings regarding whether

Utah's vehicle manslaughter, same as the elements of California's manslaughter

statues, Exhibit's "B,C,D.", RT. 2261-2267, 2872-2897, and courts ruling at RT. 3086-

3088.)

11.  The prosecution repeatedly represented to the court that California's vehicle

manslaughter statutes such as P.C. §192(c)(3) was automatically, or per se, a listed

serious felony under P.C. 1192,8(a). The prosecution stated;

"THE COURT: IT'S YOUR POSITION THAT THE 192(C)(3) IS A STRIKE OFFENSE.
MR. HELLSTROM: YES, IT IS. 1192.8. (SEE; RT.2267, ln.1-3, exhibit "B")

12.  The prosecution again argued throughout the proceedings that California's

vehicular manslaughter was listed as a "serious" felony;

"...COUNSEL RAISED ISSUES AS TO WHETHER OR NOT A 192(C)(3) IS A STRIKE,
...WELL, THE 1192.8 STATUTE EXPRESSLY LISTS 192(C)(3) AS A STRIKE FELONY.
SO, THAT REALLY IS A NON-ISSUE IN MY MIND. UNLESS THE COURT HAS ADDITIONAL
QUESTIONS FOR ME ON THAT ISSUE?..." (See; RT. 2883, ln. 27-6, exhibit "C"

13. The prosecution never represented to the court that there are conduct elements

in addition to a question of law, which must be adjudicated before California

vehicular manslaughter statutes can be brought within the meaning of paragraph (8)

or (23) of California's list of serious felonies, penal code §1192.7(c).

14. More importantly, trial counsel never objected to the prosecutions misstatement

of law, or argued the fact those additional conduct elements of personal use of a

dangerous or deadly weapon, or personal infliction of G.B.I. on someone other than

an accomplice, are not included in the Utah plea agreement.

15. As a result of the prosecutions misstatement of law, without objection, that

California's vehicular manslaughter statute 192(c)(3) was automatically, "expressly

listed" as a strike felony, the conduct enhancements listed under paragraph (8) or

(23) were never adjudicated or found true. (See; Trial courts ruling RT. 3087-3088,

exhibit "D")

16. The trial court stated in its ruling;

"...JUST SO THE RECORD IS CLEAR, THE CODE SECTION THAT I AM LOOKING AT AS
FAR AS THE UTAH CONVICTION BEING EQUIVALENT TO A CALIFORNIA SECTION, IS ONLY
PENAL CODE SECTION 192, SUBDIVISION THREE...THE ONLY ONE I THINK THAT IS
APPLICABLE IS PENAL CODE SECTION 192(C)(3)...IN SOING SO, IT IS MY OPINION,
AND MY RULING, THAT THOSE ELEMENTS ARE, THAT ADMITTED CONDUCT IS THE SAME AS
THE ELEMENT IN PENAL CODE SECTION 192 PAREN C, PAREN 3. OKAY. SO, THE
MOTION TO STRIKE THE STRIKE AS BEING INVALID IS DENIED..." (RT. 3087-3088)

17. There is no finding by the trial court of the conduct that the petitioner

personally used a dangerous or deadly weapon, or personally inflicted the injury

on someone other than an accomplice, in the commission of his Utah offense.

18. Thus, petitioners record of Utah conviction by plea agreement was never brought

within the meaning of paragraph (8) or (23) of subsection §1192.7(c).

19. Appellate counsel was ineffective for failing to raise the fact there was

no finding of the additional conduct in order to qualify petitioners prior as

1   a "serious" felony within the meaning of the penal code, and thus, petitioners

2   sentencing as having suffered a "serious" felony prior was unauthorized, in violation

3   of defendants right to jury, (question of fact), and due process of law under the

4   6th, and 14th Amendment of the U.S. constituion.

5   20.  Petitioner, raised the claim for the first time in his petition for habeas corpus

6   that there was no finding by the trial court of conduct listed under paragraph (8)

7   or (23) of section §1192.7(c). on January 26, 2004 as a substantive violation, in

8   excess of the trial courts jurisdiction to use petitioners prior conviction as a

9   "strike", and imposition of greatly increased alterative sentencing, as ground one,

10  21.  The Superior Court of California, County of San Diego, denied petitioners

11  ground one summarily, and without opinion, on its order dated March 17, 2005, but,

12  ordered informal response to grounds 6 through 27 which challenged the trail and

13  current convictions, (See; order dated 03/17/05, exhibit "S")

14  22.  Petitioner immidately motioned for reconsideration and request for an explain-

15  ation, as to the courts statement of reasons why it denied summarily ground one.

16  (See; motion for reconsideration filed 04/4/05)

17  23.  The Habeas court relying on the opinion of the court of appeals, without taking

18  into consideration the contention raised in the opening brief which, affirmed the use

19  of petitioners Utah conviction as a "strike", denied petitioners claim without

20  reaching the merits. (See; Opinion HC18018, dated 5/02/05, at pg. 2) (exhibit "U")

21  24.  Herein, lies the problem, appellate counsel never raised a failure to find the

22  enhancement conduct listed under paragraph (8) or (23) of section 1192.7(c) on

23  direct appeal. See; opening brief, exhibit's "E, F, G," and opinion of the court of

24  appeals exhibit "H")

25  25. So, the Superior court acting as a habeas court should have reached the merits

26  of petitioners first claim, because failure to make a finding, before imposing

27  alternative and enhanced sentencing was an act in excess of the trial courts

28  jurisdiction and never raised on direct appeal.

## POINTS AND AUTHORITIES

Before a prior conviction of California's Vehicular manslaughter statute penal code §192(c)(3), or its foriegn equivolent, can be deemed a qualifying "serious" felony, there must be an additional finding that the defendant either, personally used a dangerous or deadly weapon, or personally inflicted G.B.I. on someone other than an accomplice, in order to bring the prior conviction within the meaning of paragraph (8) or (23) of section 1192.7(c)'s list of "serious" felonies. (See; penal code §1192.8(a))

Petitioners claim is that there was no finding of these additional conduct elements, which are not part of his Utah plea agreement, before his prior conviction was used as a "serious" felony prior, thus, petitioners Utah conviction was deemed a "serious" felony in violation of due process of law under the 14th Amendment of the U.S. constitution.

It is also petitioners contention that his appellate cousnel was ineffective for failing to allege that there was no finding of the conduct listed under para-graph (8) or (23) of section §1192.7(c) before prior Utah conviction was used as a "serious" felony prior, on direct appeal, in violation of petitioners right to assistance of appellate counsel under the 14th Amendment of the u.S. Constitution.

It is further alleged that trial counsel was ineffective for failing to object to the use of petitioners prior Utah conviction, without any adjudication of these additional conduct elements listed under paragraph (8) or (23) of subsection (c) of section 1192,7, as a "serious" felony prior, in violation of petitioners right to counsel under the 6th Amendment of the U.S. constitution.

At no time during the hearings regarding use of petitioners prior Utah plea agreement as a "strike", were the conduct elements of personal use of a dangerous or deadly weapon, or personal infliction of G.B.I on someone other than an accomplice adjudicated or found true. There not even listed on the accusatory pleading. (See; exhibit's B, C, D, and information "M")

- 105-

## PROXIMATE CAUSE/PERSONAL INFLICTION; NOT EQUIVALENT

When "personally" is included in an enhancement statute, <u>direct</u> rather than <u>derivative</u> culpability is a <u>precondition to increasing a sentence</u>, and defendant <u>must</u> directly cause an injury, <u>not</u> just proximately cause it. (<u>People v. Guzman</u>, (2000) 91 C.R.2d 885,|Guzman court noted that the act which directly causes the injury <u>must</u> be volitional.(at p.764)| ibid.77 C.A.4th 761)

Volitional meaning: (1) An act of willing, choosing, or deciding. (2).A conscious choice: DECISION, (3) Power or capability of choosing: Will. (Webster's II, New College Dictionary).

Proximate cause is not equivalent of personally causing injury. (<u>People v. Rodriguez</u> (1999) 69 Cal.App.4th 341, 81 C.R.2d 567|The requirement that a defendant personally inflict great bodily injury is <u>not satisfied</u> by evidence that the injury was <u>proximately caused</u> by the defendant.|

"In instructing jury on second strike requirement that defendant must have personally inflicted great bodily injury, trial court impermissibly equated "personally inflict" with "proximate cause" by telling jury that "personally inflict" means to directly perform an act that causes injury, and then expressly defining "cause' as proximate cause."(69 Cal.App.4th at 346-349)

## PROXIMATE CAUSE SUFFICIENT FOR P.C. 192(C)(3)

Petetioner contends all that is necessary to convict someone of P.C. 192(C)(3) (alleged equivalent California felony, Utah conviction) is proximate cause. (See: <u>People v. Hoe</u>, (1958) 164 C.A.2d 502,508, 330 P.2d 907|Whether the misconduct proven constitutes gross negligence or ordinary negligence it must appear that it was the <u>prosimate cause</u> of death| (See: also <u>People v. Lewis</u> (1957) 152 C.A.2d 824,828,829)

In addition it is not necessary that proximate cause be the sole proximate cause. (<u>People v. Hoe</u>, supra, at p. 509).

Furthermore, P.C. Sec.192(C)(3),(4) States;

" This section shall not be construed as making any homicide in the driving of

~16(6~

a vehicle <u>punishable</u> which is not a <u>proximate</u> result of the commission of an unlawful
act, not amounting to felony, or of the commission of a lawful act which might
produce death, in an unlawful manner."

PROSECUTION TELLS TRIAL COURT P.C. 192(C)(3) IS A SERIOUS FELONY PER SE

In spite of numerous opportunities to inform the trial court, that there are
additional elements that must be proven beyond a reasonable doubt, besides thoughs
listed under P.C. 192(c)(3), such as "personal infliction", of G.B.I., on someone
other than an accoplice, as is mandated under PC. 1192.8, the prosecution simply
tells the trial court that P.C. 192(C)(3) is a serious felony <u>per se</u>.

It was the prosecutions own misrepresentation of law, that was the primary
reason none of those elements listed under P.C. 1192.8 were never adjudicated or
found true by the trier of fact. (see: Trial courts ruling, RT.3087-3088). (exhibit D)

It is imputed on the prosecution to know the law, and to represent fairly, <u>ALL</u>
<u>NECESSARY ELEMENTS</u>, that the prosecution <u>must</u> prove, before a trial court can impose
increased sentences beyond the statutory maximum.

The trial court asked the prosecution several times, if 192(C)(3) was a strike;

THE COURT: IT'S YOUR POSITION THAT THE 192(C)(3) IS A STRIKE OFFENSE?

MR. HELLSTROM: <u>YES, IT IS. 1192.8</u>

(SEE: RT.2267, ln.1-3) (exhibit B)

The prosecution again tells the court that P.C.192(C)(3) is a serious felony
on it's face; The prosecution argued;

"...COUNSEL RAISED ISSUES AS TO WHETHER OR NOT A 192(C)(3) IS A STRIKE, EVEN
IF THAT WERE TRUE, WHICH HYPOTHETICALLY, LET'S SEE IF THAT'S TRUE.

WELL, THE <u>1192.8 STATUTE EXPRESSLY LISTS 192(C)(3) AS A STRIKE FELONY.</u>

SO, THAT REALLY IS A <u>NON-ISSUE</u> IN MY MIND.

UNLESS THE COURT HAS ADDITIONAL QUESTIONS FOR ME ON THAT ISSUE --

— \67—

(See: RT.2883-2884, ln.27-28,1-6) The trial court never asked any questions on point.
(exhibit "C")

TRIAL COURT MADE NO FINDING

Petitioner contends because the trial court made no finding that petitioners record of Utah conviction, included conduct that the defendant personally used a dangerous or deadly weapon, or personally inflicted G.B.I on someone other than an accomplice, pursuant to paragraphs (8) or (23) of section 1192.7(c), his strike allegation must be dismissed.

The trial court only ruled that Utah's vehicular manslaughter law was the same as California's manslaughter statute, penal code §192(c)(3), thus, petitioners prior Utah conviciton was never brought within the meaning of paragraph (8) or (23) of section 1192.7(c).

The trail courts ruling and findings are as follows;

"THE COURT: "...OKAY, FIRST OF LAW, I NEED TO RULE ON THE STRIKE PRIOR. JUST SO THE RECORD IS CLEAR, THE CODE SECTION THAT I AM LOOKING AT AS FAR AS THE UTAH CONVICTION BEING EQUIVALENT TO A CALIFORNIA SECTION, IS ONLY PENAL CODE SECTION 192, SUBDIVISION THREE...THE ONLY ONE I THINK IS APPLICABLE IS PENAL CODE SECTION 192(C)(3). OKAY. NOW, I WENT THROUGH AND LOOKED AT THE CONDUCT, AND THE ELEMENTS IN CLAIFORNIA...IN DOING SO, IT IS MY OPINION, AND MY RULING, THAT THOSE ELEMENTS ARE -- THAT ADMITTED CONDUCT IS THE SAME AS THE ELEMENT IN PENAL CODE SECTION 192 PAREN C, PAREN 3. OKAY, SO THE MOTION TO STRIKE THE STRIKE AS BEING INVALID IS DENIED." (SEE; RT.3087-3088, exhibit "D")

Petitioner claims, the strike allegation must be dissmissed because the trial court made no finding that petitioners record of Utah conviction contained conduct that the defendant personally used a dangerous or deadly weapon, or personally inflicted G.B.I on someone other than an accomplice, before subjecting petitioner to his sentence as having suffered a "serious" felony prior.

For example;

Where prosecution made "serious felony" allegation for purposes of "three strike" law, but, allegation was not dealt with, thus, trial court made no finding of personal infliction of great bodily injury on someone other than accomplice, allegation was in essence dismissed. **People v. Leslie** (1996) 54 C.R.2d 545, 547, 47 C.A.4th 200)

1    The California trial courts finding that petitioners record of Utah conviction

2   satisfied all the elements listed under California's vehicle manslaughter statute,

3   penal code §192(c)(3), did not make petitioners record of Utah conviciton a qualifying

4   "serious" felony, because there was no pleading, adjudication or subsequent finding

5   that the Utah record contained conduct that the defendant either personally used a

6   dangerous or deadly weapon, or personally inflicted G.B.I. on someone other than an

7   accomplice, in order to bring the prior within the meaning of list of "serious"

8   felonies. (See; penal codes §§ 1192.7(c)(8), 1192.7(c)(23))

9    Finding that defendant personally used a dangerous or deadly weapon, or personally

10  inflicted G.B.I., not just proximately cause the injury, is required in order to

11  classify prior offense as "serious". (See; People v. Taylor (App. 4 Dist 2004) 12 C.

12  R. 3d 693, 118 C.A.4th 11; People v. Leslie (App.2 Dist 1996) 54 C.R.2d 545, 47 C.A.

13  th 198; People v. Rogriguez (1 Dist 1999) 81 C.R.2d 567, 69 C.A.4th 341)

14   The Rodriguez court held that proximately causing an injury is clearly different

15  from personally inflicting an injury. "We think its obvious that an individual can

16  and often does proximately cause injury without personally inflicting that injury."

17  (69 Cal.App.4th at 349)

18   In Shufelt's case, the prosecution for the people ofthe state of California,

19  never argued that the result of death in petitioner's Utah plea agreemtn was caused

20  by defendant's personal use of a weapon, or personally inflicted. In fact the

21  prosecution agreed that petitioners Utah plea was to "proximate cause" (See; RT. 2261-

22  2264, exhibit "B").

23   Instead, the prosecution's position was that vehicular manslaughter was expressly

24  listed as a "serious" felony. (See; RT.2267, ln.1-3, RT. 2883-2884, ln.27-6, exhibits

25  "B" & "C")

26   This is an incorrect interpretation of California law. Moreover, defense counsel

27  should have imposed an objection to this misstatement of law.

28

1    However, a sentence void because it is based on an erroneous interpretation of
2 law may be corrected at any time, even if the sentence results in a sentence greater
3 than that originally imposed. (<u>People v. Jack</u> (1989) 213 C.A.3d 913, 261 C.R. 860
4 review denied (Dec. 14, 1989))

5    Without any adjudication or subsequent finding by the trial court that petitioners
6 record of Utah conviction contained conduct listed under paragraph (8) or (23) of
7 subdivision (c) of section 1192.7, petitioners sentence as having suffered a prior
8 "serious" felony was illegal, and imposed in excess of the trial courts jurisdiction.

9    A claim that a sentence is unauthorized may be raised for the first time on
10 appeal. Such a sentence is subject to judicial correction whenever the error comes to
11 the attention of the reviewing court. (<u>People v. Dotson</u> (1997) 16 Cal.4th 547, 66
12 C.R.2d 423, 941 P.2d 56.)

13    Failure of Appellate cousnel to raise critical sentencing error was ineffective
14 assistance of appellate counsel. (See; <u>People v. Mitchell</u> (1999) 81 C.R.2d 339, 346,
15 68 C.A.4th 1489)

16    Whereashere, appellate counsel did not challenge on direct appeal the failure
17 to adjudicate or make any finding of critical elements of conduct listed under para-
18 graph (8) or (23) of section §1192.7(c), which is a structual defect in prosecutions
19 strike allegation, petitioners only remedy now is by his petition for habeas corpus.

20    Where the excessive punishment is properly brought to the attention of the
21 appellate court, it will duly reduce or modify the judgment by striking out its
22 unwarranted part. (<u>People v. walker</u> (1947) 82 C.A.2d 196, 185 P.2d 842.)

23    Thus for example, a defendant who stipulates to a prior conviction and receives
24 a sentence enhancment for it, is not precluded from asserting on appeal that the
25 increased punishment was unwarranted because the prior conviction does not fall within
26 the class of convictions for which the statute authorizes increased punishment. (<u>People</u>
27 <u>v. Crowson</u> (1983) 33. Cal.3d 623, 632-633, 190 C.R. 165, 660 P.2d 389; implied over-
28 ruling on other grounds <u>In re Jones</u> (1994) 27 C.A.4th 1032, 33 C.R.2d 469)

Thus, the accusatory pleading did not provide petitioner with adequate notice of all the elements of the "strike" allegation which must be found true before his prior record of conviction could be used as a "serious" felony prior for purposes of alternative sentencing and 5 year inhancment, which violated petitioners right to notice of the nature of the cuase of the accusation under the 6th & 14th Amendments of the U.S. Constitution. (See, Apprendi v. New Jersey (2000) 120 S.Ct. 2348, 2371 )

The purpose of the charging document in criminal prosecutions is to provide the defendnat with notice of the offense charged, to apprise the defendant of the elements of the offense with which he is charged, so that he may prepare a defense. (people v. Adams (1974) 43 C.A.3d 697, 11 C.R. 905.) United States v Woodruff 68 F. 536, 538 (1895)

Where the accusatory pleading fails to state a fact that the statute makes an essential element of an offens,e the defect is one of substance and not merely of form, and the pleading may be challegned on appeal without having been previously attacked below by demurrer or otherwise, (People v. Mckean (1925) 76 C.A. 114, 243 p. 898, see also, James v. Borg 24 F.3d 20, certiorari denied 115 S.C.T. 333, 513 U.S. 935, 130 L.Ed.2d 291)

Use of petitioner's Utah conviction as a qualifying "serious" felony prior, must be reversed because his record of conviction was never brought withint the meaning of California's list of "serious" felonies under paragraph (8) or (23) of section §1192.7(c).

It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitutes a denial of due process. (Cole v. Arkansas, 333 U.S. 196, 201, 68 S.Ct. 514, 517; Presnell v. Georgia, 439 U.S. 14, 99 S.Ct. 235)

A person cannot incur the loss of liberty for an offense without notice and a meaningful opportunity to defend. (Jackson v. Virginia (1979) 443 U.S. 307, 315, 99 S.Ct. 2781)

GROUND Seventeen

PETITIONER CLAIMS APPELLATE Court erroneously relied upon wrong State UTAH CASE ON POINT, IN DIRECT APPEAL. AS A RESULT, APPELLATE COURT MISAPPLIED UTAH'S CRIMINAL NEGLIGENCE STANDARD, WHERE PETITIONER MERELY PLED TO SIMPLE NEGLIGENCE WHICH IS CONCOMITANT WITH DRIVING WHILE INTOXICATED, (SEE: STATE V. RISK (1974) 520 P.2D 215,216). UTAH CRIMINAL CODE 76-5-207(1)(A)(B), DOES NOT MATCH CAL., P.C. 192(C)(3), NOR DOES IT QUALIFY AS "SERIOUS" UNDER P.C.667(a)(b-i), HENCE, SENTENCE IS UNAUTHORIZED, IN VIOLATION OF DUE PROCESS, AND EQUAL PROTECTION OF LAWS UNDER U.S. CONSTITUTION'S 14TH AMENDMENT.

SUPPORTING FACTS

1.) Appellate court held that Utah's criminal code 76-5-207, subsection (1), contains all of the elements of California penal code 192(c)(3), citing State v. Ruben (Utah 1983) 663 P.2d 445,448-449. (See: Appellate opinion D040805, dated Nov. 13th, 2003, Exhibit"H")

2.) Appellate court held that petitioner contention on direct appeal that Utah criminal code 76-5-207(1) does not contain all the elements of P.C. 192(c)(3) was misstaken, citing State v. Ruben supra, 663 P.2d at pg.448-449. (Exhibit "H")

3.) Appellate court held that both statutes require that the defendant committed homicide while driving under the influence of alcohol, and in addition the Utah statute requires proof that the driver drove negligently, while the California statute requires proof that the defendant committed an unlawful act which can be negligent driving, citing In re Dennis B. (1976) 18 Cal.3d 687,697.)|Driving neglig- ently, is a sufficient unlawful act|.

4.) During course of trial, defense counsel argued that under Utah's law, driving negligently can be satisfied by the mere driving while intoxicated, where defendant plead to "simple negligence standard", and that Utah's law does not require an add- itional act of negligence. (RT.2872-2874)

5.) Trial court relied on record of Utah conviction as conduct evidence, sufficient to meet all elements of P.C. 192(c)(3). Thus, never applied least adjudicated elements test. Whether or not Utah criminal code 76-5-207(1) and Cal. Penal Code 192(c)(3) contain sufficient common elements was **not** adjudicated in the trial court. (See; Trial courts ruling on strike issue. RT.3087-3088, Exhibit"D")

6.) Appellate counsel on direct appeal informed the appellate court that he can find no Utah case on point, although it was argued that Utah's law show's that mere act of drunk driving suffices to constitute the negligence required to violate the statute, there need not be any separate act of negligent driving. (See; opening Brief, No. D040805 filed March 20th, 2003, at pg 14) (Exhibit "E")

7.) The Utah Supreme court set the standard in a finding of Simple Negligent automobile homicide, in it's president decision **State v. Risk** (Utah 1974) 520 P.2d 215,216, which held; "It thus appears that the offense of automobile homicide may be made out by **simple negligence** in a person's driving while under the influence of intoxicating liquor if as a result thereof he causes the death of another person". (at p. 216).   (See: State v. Risk, Exhibit "I")

8.) All the Utah cases mentioned in petitioners direct appeal pretain to the advent of **criminal  negligence** automobile homicide standard, and none of those cases ever overruled State v. Risk, supra. Nor has any subsequent Utah Supreme court decision. (See Shepard citation on last page, Exhibit "I" pg.4)

9.) Although appellate counsel informed petitioner that he felt strongly that the appellate decision erred by relying on State v. Ruben, he never petitioned for rehearing, and never attempted to research Utahs appellate law, only Pecific Reporter. He'l never acknowledged to the appellate court that State v. Risk supra was, and is controlling, on simple negligent standard, in petition for review which was denied.

10.) Petitioner's record of Utah conviction does not reveal any information and is silent as to any facts behind the offense.(See; Record of Utah Conviction.Ct.039

11.) Appellate court did not decide the question should trial court have applied

1  least common elements test.

2      12.) Appellate counsel did not allege either issue raised on direct appeal

3  as violations of State and Federal Due process provision's, under the Cal. Const.

4  Art. 1 Sec. 7(a), 15 & 24, U.S. Const 14 Amend.)

5      13.) If the State of California misinterperted Utahs judicial interpertation

6  of it's own state statutes, clearly this would be an act in excess of California's

7  court's jurisdiction in violation of the 14th Amendment of the United States Federal

8  constitution, and must be raised as such by petitioner in efforts to properly

9  exhaust issue in state proceedings.

10      14.) Petitioners only remedy to do this is by writ of Habeas corpus.

11      15.) One other fact. Appellate court never decided if trial courts use of

12  Utah record had sufficient evidence that could be considered "conduct" to support

13  trial court's inferences, that Utah record contained sufficient evidence of conduct

14  to prove all elements of P.C. 192(c)(3).

15      16.) Petitioner attaches arguments raised by Appellate Counsel

16  on Direct Appeal so as to incorporate these arguments to

17  this claim that Utah's Criminal Code 76-5-207(1)(a), is not

18  commensurate with Californias penal Code §192(c)(3), since

19  these arguments have already been exhausted in the

20  States highest Court. (See; Opening Brief, Reply Brief, and

21  Petition for Review, Cal. Supreme Court, Exhibits E, G, & H

22

23

24

25

26

27                    -174-

28

POINTS AND AUTHORITIES

IN SUM

   Petitioner contends appellate courts reliance on State v. Ruben (1983) 663 P.
445, 448-449, as the reason for making it's ruling that Utah's law contained all
elements of P.C. 192(c)(3), was in error. The Ruben case pretains to criminal
negligence standard, not simple negligence to which defendant pleaded guilty to,
and thus, has no baring on the gravaman.

THE GRAVAMEN

   Petitioner contends whether or not intoxication and negligent driving is a
single element, or separate, has no barring on the gravamen, which is, does the
driving while intoxicated, to a degree which renders the actor incapable of safely
operating a vehicle, satisfy the element of simple negligence, which is the failure
to exercise that degree of care that reasonable and prudent person's exercise
under like or similar circumstances, under Utah's simple negligent standard, U.C.C.
76-5-207(1)(a)(b)?

   In other words does the definition of driving while intoxicated element, satisfy
the definition of simple negligence element, or render someone incapable of exercising
that degree of care that a prudent person would excercise.

   Petitioner contends, and will demonstrate, the two elements are concomitant,
even though they maybe enumorated separately, they occure or exist concurrently.

   Petitioner contends, California reviewing court would have to agree, that the
two elements are sufficiently similar, that a jury, if instructed as such, would or
could find that, if your incapable of safely operating avehicle, you could not possibly
exercise that degree or care of a normally prudent person. Especailly where there is
no case law, or jury instruction in Utah to the contrary.

   Thus, under Utah's law, if you operate a motor vehicle while having a blood
content of alcohol .08% by weight or greater, and you cause death, the actor is

- 175 -

criminally liable under Utah criminal statute 76-5-207(1)(a)(b) automobile homicide, without having to find any additional act of negligence.

It is not purdent to drive while intoxicated under Utah law. Thus, by definition, without any instruction to the contrary, a reasonable jurror could find the actor guilty of negligent driving, from mere intoxication, under the simple negligent standard.

CASE ON POINT

Contrary to appellate counsel's expressed opinion that there is no Utah case on point, in reference to Utah's simple negligent standard, petitioner contends he was misstaken.

Not only is there a Utah case on point, it has never been overruled by any subsequent Utah decision, and is controling. See State v. Risk (Utah 1974) 520 P.2d 215, which states;

"It thus appears that the offense of automobile homicide may be made out by simple negligence in a person's driving while under the influence of intoxicating liquor if as a result thereof he causes the death of another person."(Exhibit "I")

(See State v. Durrant (Utah 1977) 561 P.2d 1056,1058)

All the cases mention in petitioners direct appeal pretain to the advent of the criminal negligence standard, which has nothing to do with the standard of simple negigence as stated in State v. Risk supra.

Thus, petitioners direct appeal, which was denied because of the erroneous reliance upon State v. Ruben, which has nothing to do with simple negligence of which petitioner pled to, was nothing more than an empty shell.

In addition, trial court erred by not applying the least adjudicated elements test, where record of Utah conviction was silent as to the facts of the underlying offense, and petitioner was merely entering a plea to the elements of the Utah criminal statute, U.C.C. 76-5-207(1)(a)(b).

BRIEF HISTORY OF U.C.C. 76-5 207

Petitioner contends, although appellate counsel did brief the history of Utah's criminal statute 76-5-207, his failure to properly direct the appellate court to the fact that there is a Utah case on point was error.

Furthermore, none of the cases relied upon by the appellate court overturned the reasoning of the president Utah case State v. Risk supra, 520 P.2d 215, which controlles simple negligence standard.

As State v. Ruden supra, 663 P.445, noted;

"Prior to the Chavez decision, the simple negligence standard could be satisfied by a mere showing that the defendant had driven a vehicle while intoxicated. |citation| After Chavez, with the advent of the criminal negligence standard, the element of intoxication and negligence could no longer be considered one and the same; rather they became separate substantive elements." (Ibid, at pg 447)

In other words what Chavez decided was that simple negligence was no longer a criminal act, and that in order to be convicted of U.C.C. 76-5-207 prosecution must prove criminal negligence, which has a higher quantum of negligence which can not be considered the same element of intoxication, thus are separate substantive elements with the advent of criminal negligence , do to the higher quantum of negligence.

As the Ruben court pointed out;

"This court had recently overruled the precedent established in State v. Durrant (Utah 1977) 561 P.2d 1056, State v. Anderson (Utah 1977), 561 P.2d 1061, and State v. Wade, (Utah 1977) 572 P.2d 398, regarding the degree of negligence required for a conviction under U.C.C. 1953, 76-5-207 (automobile homicide). We held in State v. Chavez: 'we are therefore of the opinion that our previous cases holding that automobile homicide requires only proof of simple negligence under Section 76-5-207 are in error, and are overruled..." (State v. Ruben, supra, at pg.447)

At no time did the Chavez decision set a new standard for simple negligence or overturn State v. Risk supra, 520 P.2d 215.

LEGISLATIVE INTENT

Because there was only one standard of negligence under Utah criminal code 76-5-207 and that the decision in Chavez changed that standard to criminal negligence, the simple negligence standard was no longer a criminal act.

"Thus under the new code, negligence is an element of the crime of automobile homicide under Section 76-5-207(1), supra at footnote1, and that negligence must therefore at least rise to the level of criminal negligence, or defendant is guilty of no offense at all..." (State v. Chavez, supra 605 P.2d 1126,1127)

Thus, the decision in Chavez merely abrogated the standard of simple negligence as a crime, not change it.

Thus when the legislature for the state of Utah reinstated the standard of simple negligence in 1981, after the occurrence of the Chavez decision, as a distictive additional offense, in addition to the criminal negligence standard, by amendment of U.C.C. 76Θ5-207(1) and adding 76-5-207(2) (criminal negligent standard), .....

.... And since Chavez temporarly abrogated the simple negligence standard, which was subsequently reinstated by amendment to criminal code 76-5-207, and there is no case which subsequently modified, criticized, or overruled the decision in State v. Risk, supra, 520 P.2d 215, one would have to assume the Utah legislature was well aware of the judicial interpretation expressed in Risk, as to what constitutes simple negligence.

Although appellate counsel brought a similar argument on direct appeal, without citing the controling case State v. Risk, and defining the similarity between the definition's of driving while intoxicated, and Simple Negligence, which are concomitant, caused the erroneous reliance by the appellate court. Because appellate counsel claimed "...appellant can find no Utah cases directly on point..." (See; opening brief, D040805, at pg. 14) instead of citing the controlling case which is sequarely on point (State v. Risk), one can understand how the appellate court took State v. Ruben out of context, and in essence acted in excess of California's jurisdiction.

## UTAHS LAW NEEDS NO ADDITIONAL ACT OF NEGLIGENCE

Petitioner contends, if the mere act of driving while intoxicated, was not sufficient for a jury to find, that the defendant drove negligently under the simple negligence standard, then there would be a judicial published case out of the State of Utah which would preclude a conviction of U.C.C. 76-5-207(1)(a)(b), simple negligent standard, from the element of mere driving while intoxicated.

California unlike Utah has published many cases which have held that one can not use the mere fact of driving while intoxicated, as sufficient to find simple negligence or gross negligence. Hence, why California's criminal statutes are worded different than Utah's automobile homicide statutes.

You can not point out the distinction between California's statute P.C. 192(c)(3) from Utah's automobile homicide statute U.C.C. 76-5-207 without pointing out the similarity between the definition's of Utah's criminal elements "simple negligence", with "driving while intoxicated, to a degree which render's the actor incapable of safely operating a motor vehicle."

Utah's definition of negligent driving is driving in a "less than safe manner", while California requires that there be an act either unlawful not amounting to a felony, or lawful committed unlawfully, with simple negligence, which caused death. (See; P.C. 192(c)(3)). Under Utah's law once your deemed incapable of safely operating a motor vehicle, which is satisfied by the finding of a blood alcohol content of .08% by weight or greater, your automatically going to be found guilty of negligent driving. Especially without any jury instruction to the contrary. Whereas, under California law, the finding of negligent driving cannot be made out from the mere act of driving while intoxicated. (See CALJIC 8.93)

In addition California requires that additional act to be dangerous to human life under the circumstances of its commission.

Under California's law the failure to explicitly instruct jury that it had to find defendant committed legal infraction other than driving under the influence

to convict him of vehicular manslaughter, was reversible error; jury very well

may have concluded it did not have to find any Vehicle code violation to convict

defendant. (People v. Minor 28 C.A.4th 431, 33 C.R.2d 641 (1994); See also People

v. Bennett 54 Cal.3d 1034,1039, 22C.R.2d 8, (1991)|mere fact that defendant drives

motor vehicle while under influence of alcohol and violates traffic law is insufficient

in itself to constitute gross negligence|; People v. Soledad (1987) 235 C.R. 208,

190 C.A.3d 74; see also People v. Durkin (1988) 252 C.R. 735, 205 C.A.3d supp. 9,

|In order to establish vehicular manslaughter, prosecution must prove, beyond a

reasonable doubt, that accused either committed act inherently dangerous to human life

or safety amounting to misdemeanor or infraction, or negligently committed act ordi-

narily lawful which might produce death|

Petitioner contends that if Utahs law was sufficiently similar to Californias

vehicular manslaughter statue, there would be a Utah case published which would

preclude a jury from using mere driving while intoxicated, to prove simple negligence.

In Utah, once you found the actor incapable of safely operating the vehicle

and by operating the vehicle "under those cirsumstances", or "in such a fashion",

which where the words used by the Utah trial court when petitioner entered his

plea agreement, a jury would automatically find that the defendant drove negligently,

or mere admission to driving while intoxicated, is all a trial court in Utah needs

as a factual basis, before excepting a guilty plea to U.C.C. 76-5-207(1)(a)(b),

which explains why the Utah record is silent as to any fact underlying the offense.

Unlike California's manslaughter statute 192(c)(3), and requisite CALJIC 8.93,

there is no published common law under Utah's jurisdiction which would preclude a

jury or a trial court from excepting a guilty plea, from using mere driving while

intoxicated, sufficient to support negligent (simple) driving element.

Thus, Utahs vehicular manslaughter statute is broader than Californias vehicular

manslaughter statute, and is wholly insufficient to constitute as commensurate to

P.C. 192(c)(3).

                        ~180~

Strike allegation should be dismissed.

GROUND Eighteen

1  ANY FINDING THAT PETITIONERS RECORD OF UTAH PLEA AGREEMENT CONTAINED CONDUCT THAT
   PETITIONER PERSONALLY USED A DANGEROUS OR DEADLY WEAPON, OR PERSONALLY INFLICTED
2  G.B.I. ON SOMEONE OTHER THAN AN ACCOMPLICE BY A CALIFORNIA TRIAL COURT WOULD BE
   AN ACT IN EXCESS OF THIS STATES JURISDICTION, BREACH PETITIONERS PLEA AGREEMENT,
3  VIIOLATE PROHIBITION AGAINST DOUBLE JEOPARY, AND DEFENDANTS RIGHT TO JURY TRIAL
   UNDER THE 5TH, 6TH, AND 14TH AMENDMENTS, AND ART. I§10(1) OF THE U.S. CONSTITUTION
4

5  SUPPORTING FACTS

6      Before a prior conviction for Vehicular manslaughter can qualify as a "serious"

7  felony, prosecution must plead and prove the additional conduct elements of either

8  personal use of a dangerous or deadly weapon, or personal infliction of G.B.I on

9  someone other than an accomplice, in order to bring the prior conviction within the

10 meaning of paragraph (8) or (23) of section 1192.7(c), list of serious felonies.

11     Any finding that petitioners record of Utah conviction contained conduct that

12 the defendant personally used a dangerous or deadly weaon, or personally inflicted

13 G.B.I on someone other than an accomplice, is a question of fact which must be

14 submitted and found true by a jury trial under the 6th Amendment U.S. Constitution.

15     Trial court denied petitioners desire to have a jury trial on his strike

16 allegation. (See; RT. 2893-2897, RT.2910-2913)

17     The elements or personal use of a dangerous or deadly weapon, or personal

18 infliction of G.B.I on someone other than an accomplice were not included in

19 his plea agreement with the state of Utah in exchange for his waiver of his right to

20 jury trial, confrontation of the witnesses, and self incrimination.

21     Trial court made no finding that the petitioners record of Utah conviction

22 contained conduct that the defendant personally used a dangerous or deadly weapon,

23 or personally inflicted G.B.I on someone other than an accomplice, before deeming

24 his prior was a "serious" felony. (See; ground one)

25     However, any finding of these additional elements which were not pled to

26 in the Utah criminal court, would be extrensic to the terms of petitioners Utah

27 agreement with the people of that state.

28

1    Trial court in relying on petitioner's record of Utah conviction by plea agree-

2  ment did not apply contract law in deciding whether record of Utah conviction

3  qualified as a "serious" felony under California's strike law.

4    The appellate court affirming use of petitioner's Utah conviction as a "serious"

5  felony prior, did not rely on contract law in determining whether petition had

6  actually understood at the time he entered his plea that mere driving while intoxic-

7  ated and causing death was the only conduct necessary to be guilty of vehicle

8  manslaughter under Utah's plea agreement with petitioner.

9    Petitioner was induced to entering a guilty plea in the state of Utah with the

10  understanding that the only elements to the Utah offense were those listed on the

11  terms of his Utah plea, and that those elements were fixed.

12    Petitioner was also induced into entering his guilty plea with the state of

13  Utah, that cause was "proximate cause", and that he would not be subjected to any

14  other adjudication of cause, asside from what was required in order to be convicted

15  of the crime he plea guilty to in the state of Utah.

16    Any finding that petitioner personally used a dangerous or deadly weapon, or

17  personally inflicted G.B.I on someone other than an accomplice would be aggravation

18  of the crime to which petitioner pled guilty to in the state of Utah, which was to

19  Utah criminal statute §76-5-207(1)(a).

20

21

22

23

24

25

26

27

28

## POINTS AND AUTHORITIES

Once a judge accepted defendant's plea, the terms of the contract were required to be based on an objective standard in which defendant's reasonable belief control. (People v. Toscano (2004) 20 C.R.3d 923, 124 C.A.4th 340)

### PLEA AGREEMENTS ARE CONTRACTS

Under Santobello v. New York (1971) 404 U.S. 257, 261-262, 92 S.Ct. 495, 30 L.Ed 2d 427, a criminal defendant has a due process right to inforce the terms of his plea agreement.

In California, "a negotiated plea agreement is a form of contract, and it is interpreted according to general contract principles," (People v. Shelton (2006) 37 Cal.4th 759, 767, 37 C.R.3d 354, 125 P.3d 290) and "according to the same rules as other contracts, People v. Toscano supra, 124 Cal.App.4th at pg 344 (cited with approval in Shelton along with other California cases to same effect dating back to 1982).

In California, "all contracts, whether public or private, are to be interpreted by the same rules..." (Cal.Civil Code §1635; see also Tescano, supra 124 C.A.4th 344)

A court must look to the plan meaning ofthe agreements language. (Cal. Civil Code §§ 1638,1644) If the language in the contract is ambiguous, "it must be inter-preted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." (Cal.Civil code § 1649)

The inquiry considers not the subjective belief of the promiser but, rather, the "objectively reasonable" expectation of the promisee. Back of West v. Superior Court (1992) 2 Cal.4th 1254,1265, 10 C.R.2d 538, 833 P.2d 545 [Although intent of the parties determines the meaning of the contract the relevant intent is objective—that is, the objective intent as evidenced by the words of the instrument, not a party's subjective intent." (67 C.A.4th at pg. 802 n.9)]

1    If after this second inquiry the ambiguity remains, "the language of a contract

2  should be interpreted most strongly against the party who, caused the uncertainty to

3  exist." (Cal.Civil Code §1654)

4    Ambiguities are to be construed in favor of the defendant. (Toscano, supra 124

5  Cal.App.4th at 345, 20 C.R.3d 923; Buckley v. Terhune (2006) 441 F.3d 688, 696)

6    In first failing to consider the language of Shufelt's plea agreement, and

7  second to engage in an analysis of the parties objective intent in entering that

8  agreement, the superior and appellate courts clearly contravened contact law, where

9  as here the terms of the Utah agreement was expressly stated on the record, in light

10  of Santobello and Adamson, its dicision falls squarely within the ambit of §§2254(d)(1).

11    The proper interpretation of petitioners Utah plea agreement as to whether he

12  believed and understood at the time he entered his plea, that simply driving while

13  intoxicated satisfied "negligent driving", under simple negligent standard, becomes

14  clear when the inquiry is based on general contract law.

15    The inquiry is not whether Utah's law is the same as California's law, but

16  what the petitioner understood to be the law at the time petitioner entered his

17  Utah plea agreement.

18    The conclusion under this type of inquiry is that petitioner understood at the

19  time he plead guilty, that simple negligent vehicle manslaughter is satisfied by

20  conduct where the petitioner merely drove while intoxicated, and caused death, under

21  the terms of his Utah plea agreement.

22

23

24

25

26

27

28

1    Petitioner now contends that any adjudication of elements not specifically

2 listed and expressly admitted to at the time petitioner plead guilty in the state

3 of Utah, would be a form of aggravation to a final conviction after the fact, breach

4 the terms of his Utah plea agreement, violate the priciples of double jeopardy, and

5 be an act in excess of this states jurisdiction, under the 5th, 6th, and 14th

6 Amendments of the U.S. Constitution.

7    Under Santobello v. New York supra, 404 U.S. at 261-262, a criminal defendant

8 has the right to enforce the terms of his plea agreement. (See also, Brown v. Poole

9 (2003) 337 F.3d 1155, 1159)

10    The terms of petitioners Utah plea agreement used to induce his guilty plea and

11 waiver of his inallenable rights to jury trial, confrontation of witnesses, and

12 right to present a defense, as well as self incrimination, were the elements of the

13 crime charged, as understood at the time he entered his plea agreement. No more,

14 no less.

15    Since those elements by themselves don't fit neatly within the meaning of

16 paragraph (8) or (23), or any of the other paragraph's listed under section §1192.7(c),

17 petitioners Utah plea agreement cannot be used as a "serious" felony prior.

18 CALIFORNIA HAS NO JURISDICTION OF CRIME COMMITTED IN UTAH

19    The 6th Amendment of the United States Constitution, which is binding on the

20 states through the 14th Amendment, states;

21    "In all criminal prosecutions, the accused shall enjoy the right to a speedy
     and public trial, by an impartial jury of the state and district wherein

22    the crime shall have been committed, which district shall have been previously
     ascertained by law, and to be informed of the nature and cause of the

23    accusation;" (See; 6th Amend. U.S. Const.)

24    The elements of personal use of a dangerous or deadly weapon or personal inflic-

25 tion of G.B.I on someone other than an accomplice, are not elements expressly listed

26 in the discription of the Utah crime petitioner plead guilty to.

27

28

1    On March 17, 1994 Petitioner entered into a plea agreement in exchange for his

2  waiver of right to jury trial, confrontation of the witnesses and self incrimination.

3    In consideration for petitioners waiver of these inalienable rights, petitioner

4  pled guilty to violating Utah Criminal Code §76-5-207(a)(1). (See; Statement of

5  defendant, exhibit "P")

6    This Statement specifically states;

7    "I have received a copy of the information against me, I have read it, and
     I understand the nature and elements of the offense for which I am pleading
8    guilty.

9    "The elements of the crime of which I am charged are as follows; (1) On or about
     August 19, 1994, the defendant had a blood alcohol content of .08% or greater
10   by weight; (2) that the defendant operated the vehicle in a negligent manner;
     (3) That in doing so the defendant caused the death of Frank N. Hudleson; (4)
11   All acts occurred in Salt Lake County, State of Utah." (See; Statement at
     pg.2, exhibit "P")

12

13   Cause of death was agreed to be "proximate cause" which is the law under both

14  Utah and California's vehicle manslaughter statutes.

15   How exactly Frank Hudleson died is nowhere mentioned in the record.

16   Prosecution for the state of California agreed that petitioners Utah plea

17  agreement was to "proximate cause" of death. (See; RT.2262-2263,ln.23-28,1, RT. 2263-

18  2264, exhibit "B")

19   Prosecution for the state of Utah or the state of California never alleged that

20  petitioner used a dangerous or deadly weapon, or personally inflicted injury as the

21  cause of death, in the Utah accident.

22   Nor are these elements included in the terms of petitioners Utah plea agreement.

23   However, before a prior conviction for vehicle manslaughter can qualify as a

24  serious felony under California's "serious"felony law, prosecution for the state

25  of California must plead and prove the additional elements listed under paragraph

26  (8) or (23) of section 1192.7(c), before petitioners foreign conviction by plea

27  agreement could be deemed a "serious" felony. (Penal code § 1192.8(a),exhibit "R")

28

1  EX POST FACTO LAWS PROHIBITED

2         Determining whether petitioners Utah plea agreement, qualifies as a "serious"

3  felony under California's "strike" law would require an additional finding that

4  the facts surrounding petitioners Utah accident, contained in the record of his

5  Utah plea agreement, constitutes either personal use of a dangerous weapon or

6  personal infliction of G.B.I on someone other then an accomplice, before petitioners

7  prior could be used to increase petitioners sentence on his current convictions.

8         These additional elements are extrensic to the crime to which petitioenr pled

9  guilty to, which was U.C.C. 76-5-207(1)(a).

10        For a California Court to find petitioners Utah plea agreement to U.C.C.

11 §76-5-207(a)(1), vehicular manslaughter, includes conduct that proves additional

12 elements listed under California's "serious" felony law, would in issence alter

13 the definition of the crime to which petitioner plead guilty to, by aggravating it

14 to a greater offense then it was at the time petitioner pled guilty.

15        Pursuant to the prohibition against ex post facto laws, a legislature may not

16 retroactively alter the definition of a crime, (People v. Rrazer (1999) 21 Cal.4th 737,

17 88 C.R.2d 312, 982 P.2d 180; Hubbart v. Superior Court (1999) 19 Cal.4th 1138, 81

18 C.R.2d 492, 969 P.2d 584)

19        Thus, a law that aggravates a crime or makes it greater than it was when

20 committed, is an ex post facto law within the meaning of the U.S. Constitution

21 prohibition. (People v. Castellanos (1999) 21 CAL.4TH 785, 88 C.R.2d 346, 982 P.2d

22 211)

23        Simply put, this state cannot aggravate the crime to which petitioner pled

24 guilty to in the state of Utah, after the fact, by making findings of elements

25 based on the facts of that prior conviction. This would be a judicial enlargment of

26 a criminal statute.

27

28

1  DOUBLE JEOPARDY

2      In California, defendants may rely on the double jeopardy protection of the

3  fifth amendment to the United States Constitution, which is binding on state courts

4  throught the fourteenth amendment, and California's state constitution art. I,

5  section §15. (Arizona v. Manypenny (1981) 451 u.S. 232, 68 L.Ed.2d 5, 101 S.Ct. 1657;

6  Richard M. v. Superior Court (1971) 4 C.3d 370, 377, 93 C.R. 752, 756)

7      The double jeopardy clause protection extends against multiple prosecutions

8  when collateral estoppel or res judicata applies to an issue previously litigate.

9  (People v. Comingore (1977) 20 C.3d 142, 141 CLR 542; P.C. §§ 656, 793-794)

10     However, because prosecution did not mention the additional elements listed

11 under paragraph (8) or (23), of section 1192.7(c) in the accusatory pleading, or

12 allege that he had the burden of proving either personal use of a dangerous weapon

13 or personal infliction of G.B.I. on someone other than an accomplice, in the charging

14 document, petitioner was precluded from entering a plea of once in jeopardy. (See;

15 Information, CT. 0001-0005, exhibit "M")

16     No person can be subject to a second prosecution for a public offense for which

17 he or she has once been prosecuted an convicted or aquitted. (Penal code §656)

18     In order to bring petitioners prior plea agreement within the meaning of para-

19 graph (8) or (23) of section 1192.7(c), the prosecution would have to plead and prove

20 that the cause of petitioners Utah accident was the result of personal infliction, or

21 personal use of a dangerous weapon. (See; penal Code §1192,8(a), exhibit "R")

22     Because cause under the Utah plea agreement was already determined to be

23 "proximate cause," and not personally inflicted or from use of a dangerous weapon,

24 any relitigation of casue under petitioners Utah plea agreement would be barred by

25 collateral estoppel or res judicata principles, and be a violation of 5th amendment

26 prohibition against double joepardy.

27     Cause was already determined to be "proximate cause," under the Utah plea agree-

28 ment.

NEGLIGENT DRIVING ELEMENT

Petitioner plea agreement and waiver of his right to jury trial was induced by the Utah state prosecutors representations and the expressed explaination by the trial court Judge at the time petitioner entered his Utah plea agreement, that the element of negligent driving, was satisfied by his act of merely driving his vehicle while intoxicated, under Utah's simple negligent standard.

On March 17, 1995, petitioner entered into a plea agreement to count one of the Utah information, which alleged a violation of U.C.C. §76-5-207(1)(a). (See; amended information Case No. 941013828FS, exhibit "N")

The charging information states;

"...George W. Shufelt, a party to the offense, did operate a motor vehicle while having a blood alcohol content of .98 grams or greater by weight, or while under the influence of alcohol and any drug, to a degree which rendered the actor incapable of safely operating the vehicle, and caused the death of Frank N. Hubleson by operatingthe vehicle in a negligent manner. " (Information Utah, exhibit "N")

It would seem on first impression that all that is necessary to satisfy the element of driving in a negligent manner, would be the act of driving under the influence to a degree that rendered the actor incapable of safely operating the vehicle, and causing death.

There is no dispute, that under California's vehicular manslaughter statutes, mere driving while intoxicated cannot satisfy the element of driving negligently, there must be proof of an additional unlawful act which causes death. (See; People v. Soledad (1987) 19p C.A.3d 74, 82; CALJIC 3.36 6th Ed.)

Because petitioners record of Utah conviction is to a plea agreement, and plea agreements are interpreted according to ordinary contract principles, and protected by the due process clause, petitioner claims, the trial court committed prejudicial error by not considering contract law when determining whether petitioners plea agreement satisfied all the elements of a California felony.

1      A review of the Utah record reveals;

2      (1)  There is no factual basis developed in the record that shows conduct
            that the defendant drove his vehicle in a negligent manner, that could
3           satisfy Californias definition of negligent driving.

4      (2)  Defendant did not pelad guilty to violating any separate vehicle code
            infractions, nor did he admit any additional law violations or
5           infactions during his change of plea hearing, nor did he admit that he
            failed to do any act required by law during his change of plea hearing,
6           and the Information of which he pled guilty to does not indicate any
            additional violations. (See; Information, statement, change of plea
7           hearing, exhibit's "N, P & C.")

8      Moreover, petitioner was inducted into entering his plea agreement with the

9  understanding that mere driving while intoxicated and causeing death was all that

10 was required in order to be found guilty of the crime to which he pled guilty.

11     Asside from petitioners waiver of all his constitutional rights there are

12 two parts of the terms of his plea agreement with the state of Utah that are

13 significant.

14     The first is the elements to which he pled guilty to, and the second is the

15 admitted conduct to which he was criminally liable for. (See; statement of defendant,

16 pg. 2, exhibit "P")

17     The defendant admitted to the following conduct which he understood made him

18 criminally liable of the crime he pled to under U.C.C. 76-5-207(1)(a);

19     "My conduct, and the conduct of other persons for which I am criminally
       liable, that constitutes the elements of the crime charge are as follows;
20     On August 19, 1994, the defendant was involved in an automobile accident
       in Salt Lake City, Utah, that resulted in the death of the driving of an
21     Automobile struck by the defendant's vehicle. The defendants blood alcohol
       content was greater than .08% by weight."
22

23     The contract that petitioner was induced into entering states, "My conduct,

24 and the conduct of other persons for which I am criminally liable, that constitutes

25 the elements of the crime charged are as follows."

26     There is no admitted conduct in petitioners writen plea agreement that he

27 actually drove his vehicle in a negligent manner, or that would constitute any form

28 of intent to use his vehicle as a dangerous weapon, or personnaly inflicted injury.

1       In entering a plea, the purpose of an inquiry concering guilt is to protect

2  against situations in which the defendant, although realizing what he or she has

3  done, is not sufficiently skilled in the law to recognize that his or her acts do

4  not constitute the offense that is charged. Such an inquiry also provides the court

5  with a better assessment of defendant's competency, willingness to plead guilty,

6  and understanding of the charge. <u>People v. Watts</u> (1977) 67 C.A.3d 173,187, 136 C.R.

7  469).

8       During the change of plea hearing the Utah trial court stated;

9       The court: What it all boils down to is the allegation of the state that
you will be pleading guilty to what would be a third degree felony, and
10  that while intoxicated, operated a motor vehicle in such a fashion as
that, you caused the death of frank hudleson. Thats the sum and substance
11  of the allegation now that it is amended.

12  Do you understand that? The defendant: Yes, your Honor.

13       The court: You  want to plead guilty because you believe you are guilty of

14  that offense? The defendant: I'm guilty.

15       The Utah trial court next explained the elements as follows;

16       The court: Now in this particular circumstance, Mr. Shuflet, the elements
or the bases forthe states allegations are as follows, and listen carefully
17  to these, becauseby pleading guilty you are telling me the following things
are true.
18       First, that this incident occurred at 500 South State street, here in
19  Salt Lake County; Secondly, that it occurred on or about August 19th of
1994, that you were the person that committed the offense, and that you
20  at that time operated a motor vehicle while your had a blood alcohol content
of .08 grams or greater, and that you were, in fact, under the influence of
21  alcohol, and that rendered you incapable of safely operating your vehicle,
and operating the vehicle under <u>those circumstances,</u> caused the death of
22  Frank M. Hudleson, in that you operated your vehicle in a negligent manner.
That means less then safe manner.

23  Do you understand those elements?  The Defendant: Yes your Honor.

24       The court: Do you understand that by pleading guilty to those things you are

25  telling me those things aretrue? The Defendant: Yes, your Honor. (See; Change of plea

26  transcripts, at pg's. 7-8, exhibit "Q")

27

28

It is objectionably reasonable, that when the trial court explained to the defendant, that the negligent driving element, means "less then stafe manner," and that because the defendant was intoxicated "to a degree that rendered you incapable of safely operating your vehicle," that all parties understood that driving while intoxicated, was what constituted the negligent driving, or driving in a less than safe manner.

It simply is not safe to drive while intoxicated to a degree that renders you incapable of safely operating your vehicle, under the terms of petitioners Utah plea agreement.

Moreover, petitioner was induced to waiving his right to a jury trial, confront witnesses, introduce evidnce of other attendant causes, which contributed to the Utah automobile accident, with the understanding that his driving while intoxicated was negligent driving.

Since the trial court in construing petitioners record of conviction failed to interpret the terms of his plea agreement according to general contract law, resulted in a decision contrary to clerarly established u.S. Supreme Court Law as set forth in Santobello v. New York (1971) 404 U.S. 257; Rickett v. Adamson (1987) 483 U.S. 1)

The failure of California's courts to interprit the terms of petitioners Utah plea agreement under contract law, and under the expressed terms of the agreement regarding the parties intentions between petitioner and the state of Utah, as explained to him at the time he entered his plea, violated the 14th amendment of the U.S. constitution.

Here, the California court not only failed to apply the law properly, but failed to apply contract law at all, even though petitioners record of his plea agreement was a most solemn contract.

It was objectively reasonable that the promiser (Utah) and the promisee (petitioner) both belived at the time of making the agreemnt that there was no cause

~192~

1  except "proximate cause", and that negligent dirving was the same as driving while

2  intoxicated, based on the objective intent of the plea agreement.

3      None of the California courts, during trial or on direct appeal, considered the

4  record of conviction under contract law. In fact they failed to consider the terms

5  of the agreement entirely, in deciding whether Utah's law was the same as California

6  vehicle manslaughter law.

7      Accordingly, it failed to apply controlling state law and reached a decision

8  that both in its mode of analysis and its resfult was contrary to the terms of

9  petitioner's plea agreement.

10      Consistant or not consistant with Utah's state law, the petitioner was

11  induced in signing the plea agreement by the Utah court, and the prosecuting Utah

12  attorney, with the understanding that mere driving while intoxicated, and "proximately

13  causing" death, was the conduct which rendered petitioner guilty, and caused him to

14  waive his unallenable rights to jury trial.

15      This may be a problem for the state of Calfirnia when seeking to

16  subject petitioner to increased sentencing, but it should not be a problem for

17  a petitioner.

18      Under Santabello Mr. Shufelt had a due process right to enforce the provisions

19  which induced him into entering his guilty plea, even where it involves use of that

20  prior to increase his current sentence.

21      Thus, California's three strikes law which allows use of prior out of state

22  convictions obtained by plea, if it finds additional elements of conduct not expressly

23  included in the crime agreed upon, violated petitioners rights under the 5th, 6th,

24  and 14th amendments of the U.S. constitution which prohibits double jeopardy, protects

25  rights to jury trials, and due process of law principles.

26

27

28

GROUND NINETEEN

1  APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO ARGUE
   ON DIRECT APPEAL, PETITIONER HAD A RIGHT TO JURY TRIAL ON THE FACTUAL ISSUE OF
2  WHETHER CONDUCT CONTAINED IN THE RECORD OF UTAH CONVICTION PROVED THAT THE DEFENDANT
   PERSONALLY USED A DANGEROUS OR DEADLY WEAPON, OR PERSONALLY INFLICTED G.B.I. ON
3  SOMEONE OTHER THAN AN ACCOMPLICE WHICH MUST BE PLEAD AND PROVED BEFORE A PRIOR
   CONVICTION CAN QUALIFY AS "SERIOUS" WITHIN THE MEANING OF PENAL CODE §1192.7(c),
4  PARAGRAPH (8) OR (23), UNDER THE 6TH AMEND. RIGHT TO JURY TRIAL, THUS, VIOLATED
   PETITIONERS RIGHT TO EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL UNDER THE 6TH & 14TH
5  AMENDMENTS OF THE U.S. CONSTITUTION.

6

7  SUPPORTING FACTS

8      Prosecutor alleged that petitioners prior Utah conviction by plea agreement was

9  to a qualifying serious felony under penal code §1192.7(c). (See; Information, CT.

10 0001-0005, exhibit "M" at pg. 4-5)

11     The only issue argued in the trial court was whether Utah's vehicular man-

12 slaughter statute U.C.C. §76-5-207(1)(a), contained all the same elements of Californi-

13 vehicular manslaughter statute, penal code §192(c)(3). (See; Hearings on strike

14 allegations, RT.2261-2267; RT.2872-2897, exhibits "B" & "C")

15     The California Trial court, relying on conduct, ruled that the record of

16 petitioner's Utah conviction included all the elements of California's vehicle

17 manslaughter statute, penal code §192(c)(3), and thus, motion to strike the strike

18 was denied. (See; Courts ruling, RT. 3086-3088, exhibit "D")

19     The only dispute regarding the two different state statutes was whether under

20 Utah's vehicle Manslaughter law, negligent driving element could be satisfied by the

21 conduct of mere, driving while intoxicated, which defense counsel argued, is Utah's

22 law. Verses, California's vehicular Manslaughter law which requires proof of an

23 additional act of negligence, besides the act of mere driving while intoxicated.

24 (See; RT. 2872-2897, exhibit "C")

25     The trial court, without deciding whether Utah's law required an additional act

26 of negligence, relied instead on conduct contained in the record of Utah conviciton

27 in rendering its ruling, that, in fact, the record of petitioner's Utah conviction

28 contained all the elements of California penal code §192(c)(3). (See; RT.3087-3088

   exhibit "D")

1    The only issue adjudicated in the trial court was whether Utah's record of

2  conviction contained all the elements listed under penal code §192(c)(3).

3    The trial court ruled;

4    "In doing so, it is my opinion, and my ruling that those elements are —
     that admitted conduct is the same as the elements in penal code section

5    192 paran. (c), paren 3, Okay, os the motion to strike the strike as
     being invalid is denied." (See; ruling, RT.3088, exhibit "D")

6    As petitioner has already argued in ground one, the trial courts ruling as

7  expressly stated, does not make petitioners record of Utah conviciton a, qualifying

8  serious felony, because, there was no finding by the trial court that the record of

9  petitioners Utah conviciton contained conduct that proved the defendant either,

10  personally used a dangerous or deadly weapon, or personally inflicted the cause of

11  death, on someone other than an accomplice, in order to bring the prior conviction

12  within the meaing of paragraph (8) or (23) of subdivision (c) of section 1192.7.

13  (See; Ground One, of petition for habeas corpus)

14    Petitioner has also alleged that his appellate counsel was ineffective for not

15  raising fact trial court failed to make any finding, or render a special verdict,

16  of the additional conduct elements listed under (8) or (23) of section 1192.7(c)

17  on direct appeal. (See; ground One)

18    Now, petitioner argues that his appellate counsel failed to allege that before

19  a conviction of vehicular manslaughter under California law, can be deemed a qualify-

20  ing "serious" felony, there must be an additional finding of fact, distinct from

21  a mere question of law, to which petitioner was entitled to have a jury decide. i.e.,

22  whether record of Utah conviciton contained conduct that the defendant personally

23  used a dangerous or deadly weapon, or personally inflicted the injury on someone

24  other than an accomplice pursuant to penal code 969(f), and 1192.8(a).

25    Appellate counsel, in ground one of appellants opening Brief, argued the same

26  argument advanced in the trial court, which was that Utah's criminal statute, U.C.C.

27  §76-5-207(1)(a), was not the same as California's penal code §192(c)(3), In that

28

                              —195—

1   the Utah statue did not requrie an additional act of negligence, asside from mere

2   driving while intoxicated, and causing death, whereas, California's manslaughter

3   statute requires an additional act. (See; opening Brief, Grd; one at pages 13-14,

4   exhibit "E")

5        Appellate counsel, citing Utah case law, vehemently argued that under Utah state

6   law, and criminal code § 76-5-207(1)(a), did not require an additional act of

7   negligence, and that mere driving while intoxicated was sufficient to prove the

8   negligent driving element (See; opening brief, pg's 13-22, exhibit "E")

9        Appellate counsel on his second claim argued that petitioner had a right to

10  have a jury, not a judge decide whether or not his record of Utah conviction contained

11  conduct that the defendant drove negligently, because without commission of an addi-

12  tional act of negligence, appellants Utah conviciton would not be the equivalent of

13  the relevant California serious felony, under section §192(c)(3). (See; opening

14  Brief at pg. 22-26 grd. 2, exhibit "E")

15       However, Appellate counsel failed to allege in support of this claim that

16  before a violation of penal code §192(c)(3) can qualifying as a "serious" felony,

17  prosecutor must allege in the accusatory pleading, and a jury must subsequently find

18  true, beyond a reasonable doubt, that the defendant's conduct in the record of his

19  prior conviction, proves he personally used a dangerous or deadly weapon or personally

20  inflicted G.B.I. on someone other than an accomplice, which are not elements to

21  vehicular manslaughter under U.C.C. 76-5-207(1)(a) or Penal Code §192(c)(3).

22       In other words, petitioner was denied a jury trial on a factual issue, that

23  was not even decided by the trial court, as to whether his conduct satisfied the

24  elements listed under paragraph (8) or (23) of section 1192.7(c).

25       On direct appeal, the appellate court first ruled in its unpublished opinion

26  dated November 13, 2003, D040805, exhibit "H", that the contention that Utah's law

27  does not necessitate and additional act of negligence, asside from mere driving

28  while intoxicated was in error.

                              ~ 196 ~

1    The Appellate court framed the first issue as;

2    "The qeustion Shufelt raises is whether the Utah Criminal Code section
     §76-5-207, subsection (1)(a) contains all the elements of section 192,
3    subdivision (c)(3)." (See; opinion, exhibit "H" at pg.3)

4    The appellate court then compared the elements listed under Utah's criminal

5    code § 76-5-207(1)(a), with penal code § 192(c)(3) and concluded both statutes

6    were the same. The Appellate court stated;

7    "Both statutes require that the defendant committed homicide while driving
     under the influence of alcohol. The Utah statute requires proof that the
8    defendant drove negligently, while the California statute requires proof
     that the defendant committed an unlawful act. Driving negligently is a
9    sufficient unlawful act. (In re Dennis B. (1976) 18 Cal.3d 687, 697)

10   The appellate court concludes;

11   "Shufelt argues his guilty plea to Utah criminal code section 76-5-207, sub-
     section (1) does not containall the elements of section 192, subsection (c),
12   because the Utah supereme court has interpreted the Utah Code section 76-5-207
     subsection (1) to allow conviction on evidnece of intoxication alone,
13   he is mistaken."

14   Citing State v. Ruben (1983) 663 P.2d 445, 448-449, which pretained to Utah's

15   "criminal negligent" standard, wereas petitioner's Utah plea was to simple negligent

16   standard and not even a crime at the time Ruben was decided in 1983, the appellate

17   court said;

18   "Thus, in utah, as in California, a defendant is guilty of vehicular manslaughter
     if he kills another human being while driving negligently, and under the
19   influence of alcohol. (opinion at pg. 4, exhibit "H")"

20   After citing the engry of his Utah plea the Appellate court concluded;

21   "In doing so, he admitted violating a Utah Statute that included all the
     elements of a California serious felony." (ibid, at pg. 5)
22

23   However, the appellate court never decided whether there needed to be additional

24   findings of facts such as conduct contained in the record that defendant personally

25   used a dangerous or deadly weapon, or personally inflicted G.B.I. on someone other

26   then an accomplice, before vehicular manslaughter can be deemed a "serious" felony,

27   because the issue was not presented to the appellate court, or contained in the

28   opening brief.

POINTS AND AUTHORITIES

In Apprendi v. New Jersey (2000) 530 U.S. 466 (Apprendi), the United States Supreme Court announced that the federal due process clause entitles criminal defendants to a jury trial on all factual issues, other than the fact of a prior conviction, that increase the penalty for a crime beyond the statutory maximum. (Ibid. at p. 490)

There is no dispute that petitioners prior Utah conviciton was used to increase his sentence beyond the maximum prison sentence on the charged crimes and subsequent convictions. Petitioners sentence was increased by some 12, years, 4 months, beyond statutory maximum because of the strike prior allegation. (See; sentencing hearing; RT. 3185-3188, Ct. 722-723)

Appellate counsel on direct appeal argued two issues. (1) was, that Utah Criminal Code §76-5-207(1)(a) was broader than California's Criminal statute, penal code §192(c)(3), because under Utah law, the element of negligent driving is satisfied by mere driving while intoxicated, whereas, under California vehicle manslaughter statute prosecution must prove an additional act asside from mere driving while intoxicated, to constitutethe negligent driving element. (See; opening Brief, pg. 13-22, exhibit "E")

Appellate Counsel's second contention was that appellant was entitled to have a jury decide if in fact Utah's criminal code §76-5-207(1)(a) contained all the elements of penal code §192(c)(3). (See; opening Brief at pg. 23-27, exhibit "E")

The Court of Appeals resolved the first contention against petition ruling that Utah's criminal code §76-5-207(1)(a) was the same as California's penal Code §192(c)(3) as a matter of law. (See; opinion D040805, pg's 1-5, exhibit "H")

Then, relying on that ruling denied appellants second argument that he had a right to jury trial on his trike allegation, because, unlike a question of fact, whether a foreign states statute, has the same elements as a California statutes is a question of law to be decided by a court [judge]. (See; opinion at pg. 5-6, exhibit "H")

The Appellate court relying on the conclusion that Utah's vehicle manslaughter statute was legally the same as California's manslaughter statute, to deny the second contention raised on direct appeal, that appellant had a right to jury trial on the strike allegation. The appellate court ruled;

"Unlike the factual determination whether a crime was committed because of the victims race, whether a conviction of a foreign [statute] is a serious felony under California law involves primarily a legal analysis to be resolved by the court...Here the trial court did not err in determining that Shufelt's Utah conviction was a conviction of a prior serious felony and a strike prior." (opinion at pg. 6, exhibit "H")

Petitioner does not dispute that the threshold comparison of the foreign jurisdiction's law with California's law is a question for the judge.

However, Had appellate counsel correctly argued that before a prior conviction of vehicular manslaughter, or its foreign equivalent, can qualify as "serious", prosection must pled and prove the additional facts in order to bring the prior within the meaning of paragraph (8) or (23) of section 1192.7(c), petitioners claim he had a right to jury trial on those factual issues under the 6th Amendment of the U.S. Constitution, just may have been granted on direct appeal.

As it is, petitioner must now raise this claim under the correct law, as ineffective appellate counsel, by petition for habeas corpus.

GROUND TWENTY

PETITIONER CLAIMS CALIFORNIA THREE STRIKES LAW ALLOWING USE OF OUT-OF-STATE

CONVICTIONS, WHICH MAY CONTAIN ALL ELEMENTS OF A CALIFORNIA SERIOUS FELONY, IS

UNCONSTITUTIONALLY VAGUE, FAIL'S TO GIVE ADEQUATE NOTICE OF SPECIFIC PUNISHMENT

IMPOSED FOR HAVING COMMITTED A QUALIFYING SERIOUS FELONY PRIOR. PETITIONER HAD NO

REMEDY TO KNOW THAT PRIOR FELONY QUALIFIED UNTIL FINDING WAS MADE AFTER ACCUSED

AND CONVICTED OF CURRENT FELONIES. THUS, PROCESS VIOLATES FIRST ESSENTIAL OF DUE

PROCESS OF LAW, RIGHT TO SUFFICIENT NOTICE, AND EQUAL PROTECTION UNDER THE 14TH

AMENDMENT U.S. CONST. CAL. CONST. ART I, SEC. 7 & 15.


SUPPORTING FACTS

1.) On March 17, 1995, petitioner entered a guilty plea in the State of Utah,

to Automobile homicide, a third degree felony, in violation of Utah Criminal Code

76-5-207(1)(a)(b), on August 18, 1994. (See; Change of plea hearing, C.T. 0401-0413;

Information CT. 0309).

2.) The determination as to whether or not petitioners foreign conviction was

a qualifying "serious felony" under California law was not made until after petitioner

was accused and subsequently convicted of having committed current felonies. (See;

hearings of "strike" allegation, RT. 2261-2267, Exhibit "B"; RT.2872-2897, Exhibit

"C"; Trial courts ruling made at sentencing hearing, RT.3086-3088, Exhibit "D").

3.) Determination as to whether or not petitioners Utah conviction contained

all the elements of California's penal code 192(c)(3) was not clear, as evidenced by

the arguments of counsel's, and trial courts personal views on the "strike" issue.

See Trial courts preliminary ruling, RT. 2221, Exhibit "A";

THE COURT: "...MR. HELLSTROM, JUST SO THAT YOU'RE AWARE, PRELIMINARILY, I

THINK YOU MAY HAVE AN UPHILL BATTLE ON THE DEFENSE TO STRIKE THE STRIKE. SO, WE

DEFINITELY NEED YOU TO GET THAT MOTION TO US, YOUR RESPONSE, IN THE MORING ON

MONDAY." (LN.17-21)         -200-

4.) After two hearings on the strike issue, and arguments by both the prosecution and defense counsel, trial court was still not sure whether or not petitioners Utah conviction was concomitant with California's vehicle manslaughter statute, P.C. 192(c)(3). After arguments the trial court stated;

THE TRIAL COURT; "I WANT TO SPEND SOME MORE TIME ON THIS. I DON'T THINK THERE'S A CASE EXACTLY ON POINT. I DO THINK IT'S ONE OF THOSE INSTANCES IF THERE IS A FELONY CONVICTION, NO MATTER WHAT I DO, IT'S GOING (TO) CAUSE SOMEBODY TO GET A READING FROM A HIGHER COURT ON IT.

SO, I WANT TO TAKE A CLOSER LOOK AT IT. I WILL SAY THAT I DO NOT BELIEVE THAT I CAN USE THE PROBABLE CAUSE STATEMENT. I THINK THAT'S HEARSAY. I DO NOT THINK IT'S USABLE FOR PURPOSES OF DETERMINING THE CONDUCT.

SO, I THINK I AM LEFT TO THE PARAMETERS OF THE CHANGE OF PLEA STATEMENT, WHICH IS PHRASED DIFFERENTLY IN UTAH.

OTHER THAN THAT, I WANT TO SPEND A LITTLE BIT MORE TIME ON IT BECAUSE I THINK IT'S A CLOSE CALL..." (RT.2893, ln. 2-17, Exhibit "C")

5.) Prosecution never pleaded the fact that California penal code 192(c)(3) is not a qualifying "serious felony" unless prosecution proves that defendant personally inflicted G.B.I. on someone other then an accomplice, pursuant to the procedure in P.C. 1192.8(a)(b).

6.) Thus, whether or not petitioner personally inflicted G.B.I. on someone other then an accomplice, was not adjudicated, and thus, no finding was made by the trier of fact, before petitioner was sentenced as though he had suffered a prior "serious felony", thus, sentencing is unathorized. (See; Claim One)

7.) Personal infliction of G.B.I. on someone other then an accomplice are not elements that were adjudicated by the Utah court, nor part of record of Utah conviction.

8.) Prosecution argued that where petitioner was admitting to the element of "negligent driving", was actually an admission to "conduct" which has broader

1  meaning then it does as an element, thus, is concomitant to Californias's element

2  of a lawful act committed unlawfully. (See; second hearing on "Strike" issue, RT

3  2872-2897, Exhibit "C")

4      9.) Utah Supreme court has interpreted the meaning of the element of "negligent

5  driving" under Utah' law, which can be satisfied by mere driving while intoxicated

6  in the Supreme court decision State v. Risk (1974) 520 P.2d 215,216 which held;

7      "It thus appears that the offense of automobile homicide may be made out by

8  simple negligence in a person's driving while under the influence of intoxicating

9  liquor if as a result thereof he causes the death of another person."(ibid,pg.216)

10     10.) California vehicle manslaughter statute 192(c)(3) requires a finding of

11  an additional act of negligence aside of the element of driving while intoxicated.

12  (See; People v. Soledad (1987) 190 C.A.3d 74,82; CALJIC 8.93 (6th Ed.)

13     11.) California trial court did not consider Utah's published judicial determi-

14  nation of its own law under the annotated U.C.C. 76-5-207, and thus, never applied

15  the least adjudicated elements test.

16     12.) Trial court relied exclusively upon conduct evidence in making its

17  finding that Utah conviction contained all the elements of Cal. P.C. 192(c)(3).

18  (See; Trial courts ruling, RT. 3086-3088, 08/22/02, Exhibit "D").

19     13.) California does not provide petitioner any other remedy to inform

20  petitioner that his Utah conviction qualifies as a "serious felony", and will be

21  subjected to alternative sentencing, if found guilty of subsequent felony, until

22  after petitioner has suffered subsequent felony conviction.

23     14.) It is petitioners contention that P.C. 667, 667.5(c), 1170.12, & 1192.7(c)

24  are unconstitutionally vague, and do not provide sufficient notice that petitioners

25  foreign conviction quaifies as a "serious felony" prior, and thus prescribed

26  alternative sentencing was imposed in violation of Due Process of law, and equal

27  protection. This contention is cognizable by petition for writ of Habeas Corpus.

   In re Bell (1942) 19 C.2d 488,492-495.

28

15.) Some people who's prior serious felonies are from the State of California are listed by statute as "serious/violent" felonies under P.C. 667.5(c), or PC. 1192.7(c) and whether or not they have suffered a "serious/violent" felony prior is not readily subject to dispute.

16.) Unlike people who's prior felony convictions from this state, petitioners Utah conviction, is not listed specificaly by statute, under P.C. 667.5(c) or 1192.7(c). Nor are any of California vehicle manslaughter statutes, without additional findings.

17.) Penal Code 1197.8 states that a prior conviction of California vehicle manslaughter statute P.C. 192(C)(3) can be qualified as a "serious felony" if defendant personally inflicted G.B.I. on someone other then an accomplice, (not plead or alleged by the prosecution) but, these additional findings must be found true, and proved beyond a reasonable doubt (no finding was made).

18.) Whether or not petitioners Utah conviction qualifies as a California "serious felony" requires a mixed question of facts and law, to which petitioners right to jury trial attatches. (See; Apprendi v. New Jersey (2000) 120 S.Ct. 2348, 147 L.Ed.2d 435 |The constitution requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt (ibid)|. See also; People v. Mcgee 115 C.A.4th 819, 9 C.R.3d 586 (2004) |Apprendi applies to "strike" allegations from foreign conviction where trial court relies upon conduct to qualify foreign conviction as "serious/violent" prior|. (See claim Two)

19.) Mixed questions of fact and law are wholly unpredictable, and the outcome is unknown until rendered.

POINTS AND AUTHORITIES

Petitioner contends, California "Three Strikes Law" is unconstitutionally vague, and fail's to provide sufficient notice of specific punishment imposed for having suffered a prior qualifying "Serious/Violent" felony, as listed under Penal Code's P.C. 667.5(c), or 1192.7(c). Petitioners prior out-of-state conviction is not listed under P.C. 667.5(c) or 1192.7(c), and whether or not petitioners prior felony constitutes a "serious/violent" felony, is just to complicated to provide sufficient notice. Secondly...

Petitioner contends,    the determination as to whether or not petitioners out-of-state conviction qualified as a "serious/violent" felony within the meaning of California's "Three Strikes Law", did not accure until after petitioner had been accused and subsequently convicted of current offenses. Thus, this procedure of waiting until petitioner has suffered a current felony conviction before adjudicating whether or not his prior foreign conviction constituted a qualifying serious felony prior, and use as an aggrivating factor in sentencing, violated the first essential of Due Process of law, within the meaning of State Cal. Cosnt. Art. I Sec. 7 & 15, and Federal U.S. Constitution 14th Amendment, due process provisions.

Petitioner further contends, because people who's prior felony convictions are from the state of California, and listed by statute as "Serious" or "Violent" are provided notice, unlike petitioners foreign conviction which is not listed as a serious felony, and whether or not it can qualify involves a mixed question of fact and law, and must be proven beyond a reasonable doubt, violates the equal protection clause of both State and Federal constitutional equal protection, immunities and privileges provisions, under the State Cal. Cosnt. Art. I, Sec. 7(a)(b), 15, Federal U.S. Cosntitution 14th Amend.

California Penal Code 11972.7(c) lists the following felonies as serious;

(c) As used in this section, "serious felony" means any of the following:

(1) Murder or voluntary manslaughter; (2) mayhem; (3) rape; (4) sodomy by force; Oral copulation by force; (6) lewd or lascivious act on a child; (7) any felony punishable by death or life imprisonment;

(8) any felony in which the defendant **personally inflicts** great bodily in ury on any person, other than an accomplice, or any felony in which defendant personally uses a firearm;

(9) attempted murder; (10) assault with intent to commit rape or robbery; (11) assault with a deadly weapon on a peace officer; (12) assault by a life p soner on a none inmate; (13) assault with a deadly weapon by an inmate; (14) arson; (15) explosion with intent to injure; (16) explosion causing bodily injury; (17) explosion with intent to murder; (18) burglary first degree; (19) robbery or bank robbery; (20) kidnapping. (21) holding hostage person in state prison; (22) attempt to commit felony punsihable by death or imprisonment for life; (23) any felony in which the defendant personlly used a dangerous or deadly weapon; (24) selling, (PCP) health and safety code 1105(d)(2), 11055(f)(1)(A), 11100(a); (25) violation of 289(a)by force, or fear; (26) grand theft of firearm; (27) carjacking; (28) felony of 186.22; assault with intent to commit 220; (30) violation of 244; (31) violation of 245; (32) violation of 245.2, 245.3, or 245.5; (33) discharge of a firearm violation of 246; (34) penetration by foreign object in violation of 264.1; (35) continuous secual abuse of 288.5; (36) shooting from a vehicle 12034 (c) or (d); (37) intimidation ofwitnesses violation 422; (39) any attempt to commit a crime listed in this subdivision other than an assault; (40) any violation of 12022.53; (41) any conspiracy to commit an offense described in this subdivision.

Petitioner contends, there is not one felony listed under P.C. 1192.7(c) that is commensurate with petitioners Utah conviction. Nor is petitioners Utah conviction commensurate with any of the felonies under P.C. 1192.7(c).

Petitioner contends none of the two provisions P.C. 667.5(c) or 1192.7(c) provide notice that petitioners Utah conviction could qualify as a "serious" or "violent" felony under California's law, because none of the felonies listed have elements that were adjudicated in the Utah trial court, and are not part of petitioners Utah plea agreement.

Petitioner contends this is as far as a person of common intelligence should have to go in order to know that his prior conviction constitutes a "serious felony" for purposes of alternative sentencing. Yet, the inquiry as to whether or not petitioners Utah conviction qualifies as a California "serious" felony is far from

1   over. The first step involves a legal analysis as to whether or not Petitioners

2   Utah conviction under U.C.C. 76-5-207(1) contains all the elements of any California

3   felony.

4       Subdivision (d)(2) states that a foreign conviction qualifies if it has all

5   the elements of a felony listed under 667.5(c) or 1192.7(c) inclusively.

6       As petitioner has pointed out, his foreign Utah conviction does not contain

7   any of the elements of the felonies, listed under 667.5(c) or 1192.7(c), thus, the

8   law does not provide any notice that petitioners foreign Utah conviction may

9   consitute a qualifying "serious" felony prior.

10      Penal Code 667(d)(2) states;

11      "(2) A conviction in another jurisdiction for an offense that, if committed

12  in California, is punishable by imprisonment in the state prison. A prior conviction

13  of particular felony shall include a conviction in another jurisdiction for an

14  offense that includes all the elements of the particular felony as defined in

15  subdivision (c) of Section 667.5 or subdivision (c) of Section 1192.7"

16      Whether or not petitioners Utah conviction includes all the elements of

17  California's vehicular manslaughter statute, requires a complicated legal analysis

18  involving mixed questions of fact and law, and is only the first step in determination

19  as to whether or not his foreign conviction might qualify as a "serious" felony

20  prior.

21      The process of comparing  Utah Criminal Code 76-5-207(1) with California

22  Penal Code 192(c)(3) is beyond the ability of people with common intelligence.

23      It involves a finding of facts mixed with law, before any ruling can be had.

24  Not only that, but, even if the Utah conviction contained all the elements of

25  California's Penal Code 192(c)(3), this still does not make petitioners foreign

26  conviction a qualifying "serious" felony prior.

27      A trial court would have to qualify a violation of P.C. 192(c)(3) under Penal

28  Code. 1192.8, otherwise it is not a "strikable offense".

-206-

1    Penal Code <u>1192.8 (a)(b)</u> States;

2    (a) For purposes of subdivision (c) of Section 1192.7, "serious felony" also
     means any violation of Section 191.5, <u>paragraph (1) or (3) of subdivision</u>

3    <u>(c) of section 192,</u> paragraph (a) or (c) of section 192.5 of this code, or
     Section 1800.3, subdivision (b) of section 23104, or Section 23153 of the

4    Vehicle Code, <u>when any of these offenses involve the personal infliction</u>
     <u>of great bodily injury on any person other than an accomplice,</u> or the

5    personal use of a dangerous or deadly weapon, <u>within the meaning of</u>
     <u>paragraph (8) or (23) of subdivision (c) of Section 1192.7.</u>

6

7    Petitioner contends it is clear under statutory law that whether or not

8    petitioners Utah conviction has all the elements of Penal Code 192(c)(3) is

9    insufficient by it self to qualify petitioners Utah conviction as a "serious felony"

10   prior, and is only the first step a trial court must undergo, in the very complicated

11   process of procedure which <u>must</u> be followed before petitioner Utah conviction

12   could be deemed a "serious felony" prior, and provide notice.

13       The fact that the trial court did not make any finding of personal infliction

14   on someone other than an accomplice, before sentencing petitioner under the

15   "three strikes" privision, renders petitioners sentence <u>void</u>. And without any finding

16   by the trial court as to whether or not petitioner personally inflicted G.B.I.

17   on someone other than an accomplice, trial court had no jurisdiction to sentence

18   petitioner under 667(a)(b-i), or 1170.12, and remand for resentencing is mandatory.

19   (See; petitioners claim One)

20       Petitioner contends California's "three Strikes law" is so vague as applied

21   to petitioners foreign Utah conviction, that the prosecution, trial judge, and

22   defense counsel all overlooked the single most important finding required by law

23   before petitioner was deemed to suffer as if his prior was "serious", without finding

24   all the necessary elements to make it as such, under 1192.7(c)(8).

25       It behooves petitioner to point this out in addition to the fact, state appointed

26   appellate counsel, did not catch the error either.

27       Even the determination as to whether or not petitioners foreign conviction has

28

1  all the elements of Penal Code 192(c)(3) was so vague that the trial court had

2  to rely on <u>conduct</u> evidence where petitioner was merely enterning a plea to an

3  element. There is no <u>conduct</u> contain in the record of petitioners Utah conviction

4  that could prove the additional element missing from Utah's law, ...or could prove

5  that elements necessary to conviction someone under California's penal code 192(c)(3).

6      Petitioner contends the finding by the trial court that petitioners foreign

7  Utah conviction contained all the elements of P.C. 192(c)(3) was obtained in violation

8  of the procedural due process of law, mandated under both State and Federal

9  contitutional provisions. (See; <u>Cal State Const. Art.I sec. 15, U.S. Const 14th</u>

10 <u>Amend.</u>)  (See petitioners claims One through Four)

11     In light of the fact that under Utah law, negligent driving can be satisfied

12 by mere driving while intoxicated, under the simple negligent standard, (See; <u>State</u>

13 <u>v. Risk</u> (1974) 520 P.2d 215,216), but, under California law mere intoxication is

14 insufficient to qualify as the additional act either lawful but committed unlawfully,

15 or unlawful, which caused death, (See; <u>People v. Minor</u> (1994) 28 C.A.4th 431,437-438;

16 <u>People v. Bennett</u> (1991) 54 Cal.3d 1032, 1039|mere act of driving a motor vehicle under

17 the influence of alcohol does not satisfy the requirement of an unlawful act of

18 negligent operation of the vehicle.) means simply that the State of Utah and the

19 State of California's vehicular manslaughter statutes are in conflict with one another,

20 and are irreconcilable.

21     Thus, relying upon the analysis between California's penal Code 192(c)(3), with

22 Utah's Criminal Code 76-5-207(1) to provide notice that petitioners Utah conviction

23 qualifies as a serious felony would be repugnant.

24     Furthermore, were in this case, trial court relied upon <u>conduct</u> to prove an

25 element of Penal Code 192(c)(3), is a question of fact which must be decided by a

26 jury, under Apprindi. See; (<u>Apprendi, v. New Jersey</u> (2000) 120 S.Ct. 2348, 147

27 L.Ed.2d 435, 530 U.S. 466, 490 |"other than the fact of a prior conviction, any

28 fact that increases the penalty for a crime beyond the prescribed statutory

maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt.|. See also <u>Blakely v. Washington</u> (2004) S.Ct. 2531, 159 L.ed.2d 403, (because the facts supporting petitioners exceptional sentence were neither admitted by petitioner nor found by a jury, the sentence violated his Sixth Amendment right to trial by jury, petitioners sentence is invalid. (ibid at pg.415)). See also recient decision in <u>People v. McGee</u> (2004) 115 C.A.4th 819, (Apprendi applies to "strike" allegation from foreign jurisdictions were trial court relied upon conduct. (ibid  9 C.R.3d 586, 595,596,597)).

Petitioner contends because the issue as to whether or not petitioners foreing conviction qualifies as a "serious" felony, requires a mixed question of facts, and law, to which right to jury trial attaches, the predictability as to whether or not petitioners conviction qualifies as a "serious" felony under california's law cannot be known until after jury verdict has been rendered. Thus, further exacerbating petitioners right to sufficient notice prior to being accused and subsequently convicted of current felonies.


Petitioner contends what about thoughs people who's prior convictions from the state of California are listed by penal code under the "serious" or "violent" felony list, or  have already been informed prior to committing subsequent convic-tions? Isn't petitioner intitled to the same sufficient form of notice as those people similarly situated? petition contends ofcourse he is. In addition what about the prosecutions arbitrary  handling of petitioners "strike" allegation?

ALL LAWS MUST HAVE UNIFORM OPERATION


The Constitional provision that all laws of a general nature must have uniform operation, is mandatory, (Cal. Const. Art IV Sec. 16(a)), and must be followed with substantial strictness. ( <u>Ryan v. Riley</u>, (1924) 65 C.A. 181, 223 P. 1027).

The provision will not tolerate a criminal law so lacking in definition that

## NATURE OF LIBERTY INTEREST

Personal liberty is a fundamental interest, second only to life itself, protected under both the California and the United States Constitutions. The term "liberty" as used in the state and federal constitutions consists partially of the right to be free from arbitrary personal restraint. ( In re Roger S., 19 Cal.3d 921, 141 C.R. 298, 569 P.2d 1286 (1977); In re Lambert, 134 Cal. 626, 66 P. 851 (1901)).

DUTY OF THE COURTS

No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, withou due process of law; nor deny to any person within its jurisidiction the equal protection of the law. (U.S. Const. 14th Amend.)

State statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment. (Vitek v. Jones, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980))

The determination of the constitutionality of a statute is within the special province and duty of the courts. (Marbury v. Madison (1803) 5 U.S. 137, 2 L.Ed. 60 1803 WL 893)

Although the determination of whether the legislature has gone beyond constitutional limitations is always a matter of great delicacy. Once it is determined that a statute encroaches on constitutional limitations, the judicial department must not hesitate in condemning it. (Byers v. Board of Sup'rs of San Bernardino County (1968) 262 C.A.2d 148 68 C.R. 549).

Since state courts, equally and concurrently with the federal courts, bear the obligation to enforce every right secured by the Federal Constitution, when the question of the validity of a state statute is necessarily involved as being in alleged violation of any provision of the Federal Constitution, it is as much the duty of the state courts as of the federal courts to decide that question

and to hold the law void if it violates the Constitution. (<u>Yee Gee v. City and County of San Francisco</u>  (1916) 235 F. 757)

As long as the legislature confines its action within the limits of the constitution, its acts are rightful and conclusive; but when the legislature transcends the limits of that instrument, such acts are void and bind no one. In the contemplation of our system they are not laws; and since the courts are always open for redress, there is always available a practical mode for determining the rights of the citizen. (<u>Nogues v. Dougless</u> (1857) 7 Cal. 65, 1857 WL 649).

Moreover, although the courts may not interfere by writ or process to prevent the legislature from passing an act, or the governor from signing it, when the execution of the law has once been committed to a ministerial officer the courts will pass on its validity, and if they find it void, will arrest its execution by the executive. (<u>Nogues v. Dougless</u> supra, 7 Cal. 65 (concurring opinion of Murray, CJ., noting that the power which the judiciary possesses to declare a law unconstitutional comprehends the necessary authority to carry its judgments into effect)

RIGHT TO NOTICE

One of the essential elements of procedural due process is notice. (<u>Randon v. Appellate Department</u> (1971) 5 Cal.3d 536, 96 C.R. 709, 488 P.2d 15; <u>People v. Swink</u> (1984) 150 C.A.3d 1076, 198 C.R. 290).

Without notice to the person affected by governmental action, that action can be viewed as arbitrary and unfair. (<u>Edward W. v. Lamkins</u> (2002) 99 C.A.4th 516, 122 C.R.2d 1).

Petitioner contends the California procedure which waits until petitioner has suffered a current felony, before any adjudication as to whether or not his foreign conviction qualifies as a "serious" felony, prior, for purposes of increasing his sentencing beyond statutory maximum, violates the first essential of due process of law, adequate notice, because such a determination is highly unpredictable

and involves a mixed question of facts and law, well beyond a person of common intelligences understanding.

Procedural due process requires that a criminal statute give **fair Warning** of the acts or omissions which it declares to be prohibited and punishable. (Clingenpeal v. Municipal Court of Antelope  166 C.R. 573)

"No one may be required at perial of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the state commands or forbids..." ( Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct 618,619, 83 L.Ed. 888, 890)

STATUTORY VAGUENESS

Generally, any statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning or differ as to its application violates the first essential of due process of law. (In re Davies 242 C.A.2d 645, 51 C.R. 702; People v. McCaughan 49 C2d 409,414, 317 P.2d 974)

"it is well settled that as a part of procedural due process, a criminal statute must be so definite and certain that it gives fair warning, not necessarily with mathematical exactitude, but sufficient to inform a person of ordinary or average intelligence, of what acts or omissions it declares to be prohibited and punishable.|citations|" Solander v. Municipal court (1975) 45 C.A.3d 644,677, 119 C.R. 609, 611.

In a penal ordinance or statute, in order to comply with the constitutional requirement of due process of law, the crime itself which is prohibited and punishable as such must be clearly defined; it cannot be left to inference, implication, innuendo or surmise. (MacLoed v. Los Altos 182 C.A.2d 364, 6 C.R. 326)

Civil as well as criminal statutes must be sufficiently clear as to give a fair warning of the conduct prohibited, and they must provide a standard or guide against which conduct can be uniformly judged by courts and administrative agencies. (Morrison v. State Board of Education 1 C.3d 214, 82 C.R. 175, 461 P.2d 375)

In a criminal law context, vague statutory language creates the danger that police, prosecutors, judges and juries will lack sufficient standards to reach their decisions thus, opening the door to arbitrary or discriminatory enforcement of the law. (Pryor v. Minicipal Court v. Los Angeles Judicial Dist., 25 C3d 238, 158 C.R. 330).

"the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play, and the settled rules of law. A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."(Connally v. General Constr. Co. 269 U.S. 385, 391, 46 S.Ct. 126,127, 70 L.Ed 322; In re Davis (1966) 242 C.A.2d 645,650, 51 C.R. 702, 706)

IN CONCLUSION

Petitioner contends the remedy if California wants to wait until current felony conviction has been redered before determining whether or not a foreign conviction, which involves a mixed question of fact with law, or involves legal analysis well beyond people with common intelligence, might qualify as "serious" or "violent",would be to not use subsequent finding, to aggravate current felony sentence, but to aggravate any subsequent felony in the furture. This is the only way to insure fundamental fairness, consonant with fair play and proper intent behind the three strikes law, which is to deter criminals who have been fairly warned they have suffered a qualifying "serious" felony, from committing a future felony.

In the alternative, the legislature could make findings on its own, and list all felony convictions from foreign jurisdicitions which are "serious" or "violent"

for purposes of punishing or deterring future crimes.

The Claifornia legislature should not place upon petitioner the very act that the legislature was designed to perform. Thatis the fact finding process which is imputed upon the legislature before inacting its laws.

The existence of resonable althernative procedures for accomplishing valid state purposes is a significant factor in determining whether statutory provisions needlessly chill the exercise of constitutional rights. (U.S. v. Jackson (1968) 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138)

The question is not whether the chilling effect on the constitutional right is incidental rather than intentional, but whether the effect is unnecessary, and therefore excessive. (In re Ricky H., (1970) 2 Cal.3d 513, 86 C.R. 76, 468 P.2d 204)

Petitioner request remand for resentencing which is not inconsistent with the priciples of fundamental fairness.

# VERIFICATION OF PETITION

George W. Shufelt
      Petitioner,

V.

A. Hedgpeth, (Warden)
      Respondent,


    I the undersigned say; I am the petitioner in this action. I declare under penalty of perjury under the law of the State of California and 28 U.S.C. §1746(2), that the foregoing allegations and statements of fact are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

    This verification includes contents of petitioners application and all facts listed in support of claims.


Date 5/27/08        Signature George W. Shufelt
                     George W. Shufelt
                     In proper,



COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 3-95)

OSP 98 10924

PROOF OF SERVICE

Declaration of Service by Mail

I, _George W. Shufelt_ , declare that I am over the age of eighteen (18) and that I (am/am not) a party to this action. On _May 28_, _2008_ , I deposited a copy of the following document(s):

- Federal Petition for Habeas Corpus
- Exhibits A through TT
- In forma pauperis
- Proof of Mailing

in a sealed envelope with postage prepaid into the United States mail outlet via an authorized California Department of Corrections employee at _Kern Valley_ State Prison, in _Kern_ County, _Delano_ California, and addressed as follows:

United States District Court
Southern District of California
880 Front St., Room 4290
San Diego, CA 92101-8900

I declare under penalty of perjury by the laws of the State of California that the foregoing is true and correct (pursuant to 28 USCA §1746(2)).

Date: _5/28/08_          Signature _George W. Shuf_